Keith Beauchamp (012434)
Andrew T. Fox (034581)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, AZ 85004
Telephone: (602) 381-5490
kbeauchamp@cblawyers.com
afox@cblawyers.com

David R. Kaplan (*pro hac vice* forthcoming)
**SAXENA WHITE P.C.**
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
dkaplan@saxenawhite.com

[Additional Counsel Listed on Signature Page]

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Orbis Global Equity Fund Limited; Orbis Global Equity Fund (Australia Registered); Orbis Institutional Funds Limited; Orbis Global Equity LE Fund (Australia Registered); Orbis Institutional Global Equity LP; Orbis SICAV, Orbis Optimal SA Fund Limited; Orbis Institutional US Equity LP; Orbis OEIC; Orbis Optimal Global Equity LP; Allan Gray Australia Balanced Fund; and Orbis Global Balanced Fund (Australia Registered), | No. |
| | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| NortonLifelock Inc. (f/k/a Symantec Corporation); Gregory S. Clark; Nicholas R. Noviello; and Mark S. Garfield, | |
| Defendants. | |

{00578558.1 }

<u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................. 2

II.     JURISDICTION AND VENUE ........................................................... 11

III.    PARTIES ............................................................................................ 12

        A.      Plaintiffs ................................................................................. 12

        B.      Defendants ............................................................................. 13

IV.     SYMANTEC'S "UNIQUE TRANSFORMATION PERIOD" ............ 17

        A.      Symantec's Business ............................................................ 17

        B.      Symantec Acquires Blue Coat and LifeLock and Promotes These "Transformative Acquisitions" to Investors ..................... 18

        C.      Defendants Used Accounting Manipulations and Realized Millions of Dollars in Executive Compensation ........................ 22

V.      DEFENDANTS MISLED INVESTORS REGARDING SYMANTEC'S FINANCIAL RESULTS, REVENUE GROWTH, AND INTERNAL CONTROLS ........................................................................................ 27

        A.      Defendants' Revenue Recognition Practices Violated GAAP ................. 28

                1.      GAAP Revenue Recognition Principles .......................... 28

                2.      GAAP Deferred Revenue Principles ............................... 31

                3.      Defendants Improperly Recognize Revenue at Period-End to Meet the Company's Guidance and Reach Incentive Compensation Targets ...................................................... 32

        B.      Defendants' Non-GAAP Reporting was Misleading and Violated SEC Rules and Regulations ................................................... 57

                1.      SEC Guidance for Non-GAAP Measures ...................... 57

                2.      Defendants Misled Investors About the Reasons for Adjustments to Non-GAAP Measures ............................ 59

                3.      Symantec Manipulated its Non-GAAP Measures by Excluding Recurring Operating Expenses Incurred in the Ordinary Course as T&T Costs .................................... 63

                4.      Former Employees Confirmed that Non-GAAP Measures Were Widely Manipulated and Incapable of Calculation ............... 70

                5.      Defendants Knew or Recklessly Disregarded that Symantec's Reported T&T were Inflated and Misclassified ............................... 75

6.     Defendants Deceptively Switched Bonus Payments From Cash to Restricted Stock Units to Boost Non-GAAP Operating Income.................................................. 83

C.     Analysts and Investors Relied Heavily on Symantec's Reported GAAP and Non-GAAP Financial Results ..................................... 86

D.     Symantec Had Ineffective Internal Controls............................. 89

1.     Defendants' Obligation to Maintain Effective Internal Controls Over Financial Reporting and Disclosure Controls and Procedures ..................................... 89

2.     Symantec Had Inadequate Internal Controls ..................... 92

E.     As A Result Of Their Accounting Manipulations, Defendants Clark and Noviello Received Lucrative Executive Compensation Payouts......... 95

F.     Defendants Clark, Noviello, and Garfield Realized Nearly $20 Million By Selling Symantec Shares at Fraud Inflated Prices........... 102

VI.   DEFENDANTS MISLED INVESTORS REGARDING SYMANTEC'S GROWING DEFERRED REVENUES ................................................ 103

A.     Symantec's Deferred Revenue Growth and Contract Duration Increased During the Relevant Period......................................... 104

B.     Defendants Misled Investors Regarding the Reasons for Deferred Revenue Growth......................................................... 105

VII.  DEFENDANTS' MISREPRESENTATIONS ARE REVEALED .................... 109

A.     Symantec's Discloses an Internal Investigation By Its Audit Committee Following a Whistleblower Report to the SEC ..................... 109

B.     Symantec's Audit Committee Investigation Confirms Multiple Aspects of Defendants' Misconduct .......................................... 117

VIII. DEVELOPMENTS AFTER THE RELEVANT PERIOD ............................... 119

A.     Widespread Executive Terminations and Departures............................. 119

IX.   DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS AND MATERIAL OMISSIONS............................................. 123

A.     Fourth Quarter Fiscal Year 2017 And Fiscal Year 2017 ......................... 123

B.     First Quarter Fiscal Year 2018 Results ....................................... 130

C.     August 8, 2017 Item 5.02 On Form 8-K ..................................... 137

D.     August 16, 2017 Proxy Statement............................................. 137

E.     Second Quarter Fiscal Year 2018 Results................................... 139

F.  Barclays Global Technology, Media and Telecommunications Conference ............................................................. 147

G.  Third Quarter 2018 Results .......................................................... 148

H.  Fourth Quarter 2018 Results ....................................................... 156

X.  ADDITIONAL SCIENTER ALLEGATIONS ...................................... 161

A.  The Individual Defendants Knew or Were Deliberately Reckless Regarding the T&T Manipulations .............................. 161

B.  Defendants Clark and Noviello Were Motivated to Misclassify T&T Expenses to Achieve Lucrative Payouts ........................... 167

C.  Scienter for the Revenue Recognition Violations ..................... 168

D.  Scienter For Contract Duration Misstatements ......................... 170

E.  Defendants Admitted that Symantec had Ineffective Internal Controls Regarding Transition Costs During the Relevant Period. ......... 172

F.  Further Facts Supporting a Strong Inference of Scienter ........... 172

XI.  LOSS CAUSATION .............................................................................. 180

XII.  THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .............. 181

XIII.  PLAINTIFFS' RELIANCE ...................................................................... 182

XIV.  COUNTS ............................................................................................... 186

XV.  PRAYER FOR RELIEF .......................................................................... 197

XVI.  JURY DEMAND .................................................................................... 197

Plaintiffs, investment funds managed by Orbis Investment Management Limited, a privately-owned investment management firm, bring this action under the Securities and Exchange Act of 1934 ("Exchange Act"), Arizona Securities Act ("ASA"), Arizona Consumer Fraud Act ("ACFA"), and common law against NortonLifeLock Inc., f/k/a Symantec Corporation ("Symantec" or the "Company"), Gregory S. Clark ("Clark"), Nicholas R. Noviello ("Noviello"), and Mark S. Garfield ("Garfield") (collectively, "Defendants") to recover damages for losses Plaintiffs suffered on their purchases or acquisitions of Symantec common stock between May 11, 2017 to August 2, 2018, inclusive (the "Relevant Period").

Except as to allegations specifically pertaining to Plaintiffs, all allegations herein are based upon the investigation undertaken by Plaintiffs' counsel. Counsel's independent and ongoing investigation has included the review and analysis of: (i) Symantec's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports from securities and financial analysts; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Symantec securities; (vii) consultation with expert consultants; (viii) interviews, sworn testimony, and other statements provided by former Symantec employees; (ix) internal Symantec documents; (x) additional materials and data concerning the Company and industry as identified herein; (xi) accounting rules, regulations, and guidance; (xii) disclosures from companies that Symantec identified in its financial statements as its peers; and (xiii) pleadings, filings, evidentiary matter, expert analysis, and court orders in other litigation involving Symantec, including the consolidated securities class action and a related derivative action in the U.S. District Court for the Northern District of California captioned *SEB Investment Management AB v. Symantec Corporation and Gregory S. Clark,* No. 3:18-cv-02902-WHA (the "Class Action") and *Lee v. Clark, et al.*, Case No. 3:19-cv-02522-WHA (the "Derivative Action"), respectively.

# I.     **INTRODUCTION**

1.     This action arises from a straightforward fraud in which Defendants misled investors about Symantec's financial performance and accounting practices.  During the Relevant Period, Defendants Clark, Symantec's former Chief Executive Officer ("CEO"), Noviello, its former Chief Financial Officer ("CFO"), and Garfield, its former Chief Accounting Officer ("CAO") reported financial results that violated GAAP and made non-GAAP adjustments and related statements that were materially false and misleading. Defendants engaged in a host of improper and unethical accounting practices, including prematurely booking revenues, inflating non-GAAP operating income by miscategorizing hundreds of millions of dollars in ordinary business expenses as "transition" and "transformation" costs ("T&T"), and concealing that the Company's rising deferred revenues were due to longer contract terms rather than meaningful sales growth.

2.     The truth began to emerge in May 2018, when Symantec shocked investors by announcing that its Audit Committee had launched an internal investigation after receiving a whistleblower complaint that was so serious the Company felt compelled to report it to the SEC.  Then, in August 2018, Symantec announced the preliminary findings of the Audit Committee investigation, including that the Company's reported financials were "open from an accounting perspective" and "subject to adjustment."  In response to these disclosures, Symantec's stock price plummeted by over $11 per share, including a 33% single-day decline that represented the worst day of trading in Symantec stock in nearly 17 years.

3.     Ultimately, the Company admitted to engaging in accounting misconduct and having "weak and informal" internal controls over financial reporting.  Following the Audit Committee's investigation, at least thirteen high-level executives departed the Company. Defendants Clark and Noviello were fired, and Defendant Garfield felt compelled to resign because he could no longer stomach the "***ridiculous***" and "***potentially illegal***" manipulations—excoriating the Company's bonus plan in his exit interview as "***a***

***compensation plan that drives people to do something that's wrong***," although not before receiving a generous pay package.

4.     Symantec is an Arizona-based provider of cybersecurity software. Symantec emerged as a leader in cybersecurity software with the release of the Norton Antivirus brand in 1990.  Beginning in 2005, and continuing for the next decade, the Company's performance steadily declined.  Aiming to turn its fortunes around and restore its revenue growth and market share, Symantec announced in 2016 the acquisition of Blue Coat Systems, Inc. ("Blue Coat"), a privately held network security firm.

5.     After the acquisition, Blue Coat's top management took over as Symantec's senior management. Indeed, Blue Coat's CEO (Defendant Clark), CFO (Defendant Noviello), Chief Operating Officer, Chief Technology Officer, Chief Marketing Officer, Chief of Staff, and Head of Worldwide Sales all assumed identical posts at Symantec. Symantec's post-merger performance remained sluggish, however, and threatened to materially reduce the senior executives' compensation.  Defendants scrambled to close the gap between actual and projected financial results.   Defendants also turned to a host of accounting manipulations.

6.     The Relevant Period begins on May 11, 2017, the day after Symantec reported its fourth quarter 2017 results.[1] Defendants emphasized the Company's "strong" financial performance and outlook, highlighting Symantec's reported revenue and strong non-GAAP operating margin. Such margins, Defendants told investors, resulted from the Company's execution of previously announced cost-savings initiatives and synergies related to the Blue Coat acquisition and the acquisition of LifeLock, Inc. ("LifeLock"), a consumer identity-protection company.   Securities analysts credited Defendants' statements, reporting that Blue Coat "finally provides [Symantec] with a legitimate

---

[1] Symantec reports pursuant to a 52/53-week fiscal year ending on the Friday closest to March 31. For example, Symantec's fiscal year 2017 consisted of 52 weeks, ending on March 31, 2017.

network security presence, as well as stronger footing in the cloud," and praised an "influx of leadership talent."

7.     Thereafter, Symantec consistently reported strong financial performance, including impressive revenue growth and operating margins. Quarter after quarter, Symantec reported revenue growth exceeding 25% year over year, and operating margins of over 30%, which regularly beat the Company's guidance and analysts' expectations. These results caused the Company's stock to trade at fraud-inflated prices, with shares reaching an all-time high in September 2017.

8.     Significantly, in connection with the "transformative" Blue Coat acquisition, Symantec implemented a Value Creation Plan ("VCP") for fiscal 2017.  The VCP was a new executive compensation plan that enabled Defendants Clark and Noviello to receive Performance-based Restricted Stock Units ("PRUs") if the Company hit certain 2018 non-GAAP operating income targets. Throughout the Relevant Period, the Company reported stellar performance, specifically with regard to its non-GAAP measures ("NGMs") and non-GAAP operating income.  As a result, Defendants Clark and Noviello were awarded large bonuses under the VCP.  All told, Defendants Clark and Noviello reaped over *$54 million* and *$13.6 million*, respectively, in incentive compensation.

9.     Unbeknownst to Plaintiffs, the Company's purported financial turnaround was a façade.  Defendants resorted to a variety of accounting tricks and other schemes to feign success, exceed the Company's projected financial guidance, and reach their executive compensation benchmarks.

10.    <u>First</u>, Defendants improperly booked revenue to inflate the Company's quarter-end and year-end numbers in violation of GAAP. Defendants recognized revenue on sales that did not have signed contracts, contained unapproved extended terms, and/or for which customers could not or would not pay. Defendants also double-booked revenue totaling at least $63 million and improperly accelerated the recognition of deferred revenue in violation of GAAP.

11.     As just one example that is particularly emblematic of Defendants' improper accounting, Symantec incorrectly recognized $12 million worth of revenue on a deal with Oracle in the fourth quarter of 2018 (the "Oracle Transaction") that should have been recognized during the next fiscal year.  This was not an innocent mistake, or one that Defendants can credibly blame on technical accounting assessments.  Indeed, before agreeing to contract for the purchase of Symantec products, Oracle asked Symantec to ensure that the products would work on Oracle's platform.  Because the request came during the waning days of fiscal year 2018, Defendants Clark and Noviello were explicitly told *twice* by accounting personnel that any such promise would push the deal's revenue recognition into fiscal year 2019.  Accounting personnel even went so far as to warn Clark and Noviello – the Company's two most senior executives – that there "***was no room for anyone doing something stupid.***"  Nevertheless, Clark sent a text message to an Oracle executive ensuring Symantec's products' future functionality.  Worse yet, Defendant Clark lied to accounting personnel, concealing the text message and feigning ignorance of any such promise.  With Clark's secret promise, the Oracle Transaction closed and revenue was improperly recognized in fiscal year 2018.   As a result, the full $13 million counted towards the 2018 executive bonus calculations—helping Clark and Noviello reap nearly $70 million in incentive compensation payouts.

12.     <u>Second</u>, Defendants manipulated the Company's reported T&T costs and NGMs. Although Defendants publicly claimed they were only excluding expenses from its NGMs that were not incurred in "***the ordinary course***," Defendants were, in fact, misclassifying ordinary operating expenses necessary for the Company's ongoing operations as T&T costs, thereby excluding them from the calculation of non-GAAP operating income.  Former employees explained that manipulating T&T costs was an avenue by which the Company employees could meet the "intense budget pressure" and that Defendant Clark "pushed hard" on categorizing questionable expenses as "transition" costs.  In total, Symantec improperly excluded more than ***$365 million*** in T&T expenses from its reported NGMs during the Relevant Period.

13.     Defendants' stated reason for reporting (manipulated) NGMs was false and misleading. Defendants falsely told investors its NGMs helped to "***facilitate comparison***" to Symantec's "***peers***."  However, Symantec's peers did not exclude T&T costs from their NGMs—a fact made crystal clear by Symantec's own internal documents, which state with regard to reporting of NGMs that "***We don't have any clear/current benchmarking analysis against peer companies***." (Emphasis in original)

14.     There is no question that Defendants were aware of these large, pervasive, and extraordinary manipulations to non-GAAP measures.  Even before the Relevant Period, Defendant Clark received an email from a senior finance employee flagging millions of dollars in "***debatable***" T&T classifications which "***were not hitting non-GAAP***."   On May 19, 2017, at the very beginning of the Relevant Period, Defendant Garfield disclosed to Clark and Noviello a "***significant deficiency***" in the Company's non-GAAP reporting control enhancement which was "***overwhelmed by the volume and complexity of non-GAAP activity (over $300m in Q4 alone).***"  Then, in July 2017, Garfield took the extraordinary step of resigning because of the accounting artifices.  In doing so, Garfield again stressed to Defendants Clark and Noviello that the Company's T&T costs "***were frequently submitted in error***."   During his exit interview, Garfield stressed how there was too much "pressure to make Non-GAAP operating margin," including "an effort to expand the definition of Transition costs" that was "***ridiculous***."  He confirmed to the Board of Directors that Defendants Clark and Noviello were "driving the Non-GAAP numbers up" because "[a] couple of hundred million of extra Non-GAAP dollars for Fiscal '18 drives the [executive bonuses], and they can ***triple their income***." Garfield flagged that Defendant Clark could receive "***something like a 3x payout***" and rang alarm bells that the manipulation from "***GAAP to Non-GAAP is potentially illegal***."

15.     The circumstances of Garfield's resignation forced Symantec's Board of Directors to address the Company's accounting practices.  Faced with accusations that senior management was engaging in "potentially illegal" T&T classifications, Symantec's Board retained Ernst & Young ("E&Y") in September 2017 to review the Company's

NGMs.  Within months, E&Y concluded that Symantec's "guidelines, processes and controls around NGMs and T&T costs [we]re not detailed and processes not fully memorialized, and as such, there [wa]s risk around completeness and accuracy of [the Company's] non-GAAP reporting." Moreover, E&Y concluded that, for T&T costs, "sufficient controls do not exist to validate that those costs are of the appropriate nature and type for that categorization." E&Y even warned that "the costs included in Transition and transformation (T&T) have the appearance of recurring operating expenses" and flagged this issue as *"Highest risk – likely to result in SEC scrutiny or require change to historic results."*

16.  Despite these repeated, consistent, and clear warnings, neither Symantec's Board of Directors nor Defendants Clark or Noviello put an end to the improper accounting.  As a result, in fiscal 2018, alone, Defendants excluded $272 million in T&T expenses from Symantec's reported NGMs, which decreased non-GAAP operating expenses and increased non-GAAP operating income by the same amount.

17.  What's more, Defendants implemented an additional scheme to skew Symantec's NGMs and ensure Defendants reached their VCP benchmark.  Historically, Symantec funded its employee bonuses pursuant to its Executive Annual Incentive Plan ("EAIP") and Annual Incentive Plan ("AIP") with cash.  By using cash, the bonuses were considered operating expenses under both GAAP and the Company's NGMs.  However, for fiscal year 2018, Defendants made a significant switch, choosing to pay these bonuses in restricted stock units immediately convertible to cash—an expense that was *excluded* from the Company's NGMs. Internal documents reveal the shift was made specifically to "save on non-GAAP opex [operating expenses] in FY18."  Company employees realized that this "*financial engineering*" did not "*generate any economic value*" but instead was a tool to enable top executives to meet compensation benchmarks.  Defendants never told investors that the EAIP and AIP bonuses were accounted for differently in 2018 or that the shift to stock-based compensation was made to artificially reduce non-GAAP operating expenses.

18.     Third, Defendants misled investors regarding the true reason for, and nature of, Symantec's increasing deferred revenues and perceived growth. Defendants publicly proclaimed throughout the Relevant Period that the Company's deferred revenues were increasing because customers were "***increasingly adopting our cloud subscription and virtual clients' products***" which provided "***ratable revenue recognition.***"     In truth, however, the Company was merely selling longer-term multi-year contracts to its existing customers, which resulted in more deferred revenue.  Defendants' misrepresentations regarding the basis for the increased deferred revenue was highly material to investors. Symantec measured total growth by in-period revenue ***plus*** deferred revenue; therefore, an increase in deferred revenue gave investors the impression that the Company was growing and that it was selling additional and different products, when in fact, the Company was doing no such thing.

19.     Fourth, Defendants misled investors regarding Symantec's inadequate financial controls.  In every Form 10-K and 10-Q filed during the Relevant Period, Defendants Clark and Noviello certified to investors that the Company's financial statements complied with GAAP, that Defendants evaluated Symantec's internal control over financial reporting, that the controls were effective, and that the Company had disclosed all significant deficiencies in the design or operation of its controls.  Defendants were specifically aware of multiple "significant deficiencies" regarding control functions over NGMs.  Both internal reports provided to Defendants and E&Y's review found that the Company's controls over its non-GAAP reporting were flawed and could require the Company to amend its "historic results."   In fact, during Defendant Garfield's exit interview he explained that it may "be impossible" to go back and fix the improper reporting of T&T costs as the Company did not even "track" which expenses were properly categorized as transition and which were not.  Defendants failed to disclose any of these accounting issues to the market, but rather falsely certified that the Company maintained effective internal controls.

20.     Investors finally began to learn the truth on May 10, 2018, when Symantec stunned the market by announcing, after market close, that the Audit Committee of the Board of Directors had commenced an internal investigation into the Company's accounting practices.   Symantec disclosed that the investigation was prompted due to concerns raised by a whistleblower former employee, which were so serious that the Board determined that they must be reported to the SEC. Given the investigation, the Company further informed investors that its "financial results and guidance may be subject to change," and that it is "unlikely that the investigation will be completed in time for the Company to file its annual report . . . in a timely manner."   In addition, the Company revealed for the first time that lengthening contract duration, rather than meaningful customer growth, had been fueling Symantec's rising deferred revenues. On this news, Symantec stock declined on unusually heavy trading by over *33%*, falling from $29.18 per share on May 10, 2018, to $19.52 per share on May 11, 2018, erasing roughly $6 billion of market capitalization in the worst day of trading for Symantec investors in almost 17 years.

21.     On August 2, 2018, Symantec announced additional details of the internal investigation and disappointing financial results that followed the cessation of the accounting manipulations. The Company disclosed that the investigation was still "ongoing" and that, while the Company did not anticipate a material adverse impact on its historical financial statements for Q3 fiscal year 2018 and prior, "[o]ur fourth quarter fiscal year 2018 and subsequent periods remain open from an accounting perspective, subject to adjustment for material updates."     Moreover, the Company reported a slew of disappointing results, including that implied billings fell more than 20% from the previous year, which the Company claimed was caused by poor pipeline management, that the Company was reducing revenue guidance, and that Symantec expected decreased earnings per share.   Analysts were "highly disappointed" in these disclosures and highlighted a spread between the Company's GAAP and non-GAAP results. For example, Morningstar Equity Research noted that in prior quarters "management may have inflated restructuring

expenses," a line item that included transition costs, "by placing expenses that would have typically been regular operating expenses into this line item."  On this news, Symantec stock declined nearly 8%, from $20.88 per share on August 2, 2018, to $19.25 per share on August 3, 2018, erasing roughly $1 billion of market capitalization.

22.   All told, Symantec's stock lost over ***$7 billion*** in shareholder value during the Relevant Period, falling from a fraud-inflated high of $34.16 per share to close at just $19.25 at the end of the Relevant Period.  As set forth below, Plaintiffs purchased



significant amounts of Symantec shares at prices artificially inflated by Defendants' material misstatements and omissions, and suffered substantial losses as the truth emerged.

23.   Ultimately, after concluding its internal investigation, Symantec ***admitted*** to a host of serious accounting deficiencies and remedial measures, including: (i) weak and informal processes with respect to the review, approval, and tracking of transition expenses; (ii) identification of an additional transaction – *i.e.*, the Oracle Transaction – in which $12 million of $13 million recognized as revenue in the fourth quarter of fiscal year

2018 should have been deferred; (iii) behavior inconsistent with the Company's Code of Conduct and related policies; (iv) the Company would have to revise its previously disclosed financial results for both Q4 2018 and Q1 2019; (v) that Symantec had brought in an outside accounting firm and taken other steps to shore up the Company's reported non-GAAP measures, since the quarter ending September 29, 2017; (vi) the Company would be undertaking substantial structuring changes to its internal management, including appointing a separate Chief Accounting Officer and a separate Chief Compliance Officer reporting to the Audit Committee, and adopting enhanced internal controls; and (vii) the SEC had commenced an investigation into Symantec's accounting.

24.     In the wake of these disclosures, multiple securities fraud class actions were filed against Defendants on behalf of the Company's investors.  The class actions were consolidated in the Northern District of California, where Symantec was previously headquartered.  A lead plaintiff was appointed, and the Class Action was captioned *SEB Investment Management v. Symantec Corp.*, No, 18-cv-02902-WHA (N.D. Cal.).  The Class Action proceeded past the pleading stage, through discovery and class certification, and, with summary judgment fully briefed, reached a $70 million settlement (pending final approval) in exchange for a full release of the Class's claims.

25.     By this action, Plaintiffs, who timely excluded themselves from the Class Action, seek redress for their substantial damages suffered as a result of Defendants' violations of the Exchange Act, Arizona Securities Act, Arizona Consumer Fraud Act, and for common law fraud.

## II.     JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction of Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This Court has personal jurisdiction over this action because Symantec does business in this District and maintains its corporate headquarters in this District, and the individual defendants all served as senior executive officers of the Company.

28.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, venue is proper pursuant to 28 U.S.C. § 1391.

29.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.     Plaintiffs

30.     Plaintiffs are investment funds managed by Orbis Investment Management Limited, a privately-owned asset manager based in Hamilton, Bermuda. Plaintiffs purchased Symantec common stock during the Relevant Period and suffered damages as a result of Defendants' wrongful conduct, as alleged herein.  Applying a damages model based on the event study and statistical regression analysis utilized by the Lead Plaintiff in obtaining class certification in the Class Action, the Plaintiffs collectively incurred over $360 million in recoverable securities fraud damages on their purchases of Symantec common stock during the Relevant Period.

31.     Plaintiff Orbis Global Equity Fund Limited is an open-ended mutual fund company organized under the laws of Bermuda and located in Hamilton, Bermuda.

32.     Plaintiff Orbis Global Equity Fund (Australia Registered) is a unit trust established under the laws of Australia and located in Melbourne, Victoria, Australia.

33.     Plaintiff Orbis Institutional Funds Limited is a mutual fund company organized under the laws of Bermuda and located in Hamilton, Bermuda.  Orbis Global Equity (OFO) Fund and Orbis Institutional Global Equity Fund are investment funds that are part of Orbis Institutional Funds Limited.

34.     Plaintiff Orbis Global Equity LE Fund (Australia Registered) is a unit trust established under the laws of Australia located in Melbourne, Victoria, Australia.

35.     Plaintiff Orbis Institutional Global Equity LP is a limited partnership organized under Delaware law and located in Hamilton, Bermuda.

36.     Plaintiff Orbis SICAV is an investment fund company organized under the laws of Luxembourg and located in Bourmicht, Luxembourg.  Orbis SICAV Global Balanced Fund and Orbis SICAV Global Equity Fund are investment funds that are part of Orbis SICAV.

37.     Plaintiff Orbis Optimal SA Fund Limited is an open-ended mutual fund company organized under the laws of Bermuda and located in Hamilton, Bermuda.

38.     Plaintiff Orbis Institutional US Equity LP is an investment fund incorporated in the state of Delaware and located in Hamilton, Bermuda.

39.     Plaintiff Orbis OEIC is an investment fund incorporated in the United Kingdom and located in London, United Kingdom.  Orbis OEIC Global Equity Fund and Orbis OEIC Global Balanced Fund are investment funds that are part of Orbis OEIC.

40.     Plaintiff Orbis Optimal Global Equity LP is a limited partnership organized under Delaware law and located in Hamilton, Bermuda.

41.     Plaintiff Allan Gray Australia Balanced Fund is a unit trust established under the laws of Australia and located in Melbourne, Australia.

42.     Orbis Global Balanced Fund (Australia Registered) is unit trust established under the laws of Australia and located in Melbourne, Australia.

**B.     Defendants**

43.     Defendant Symantec is a corporation organized under Delaware law and headquartered at 60 E Rio Salado Parkway Suite 1000, Tempe, Arizona 85281.  Symantec sells cybersecurity products and services and had operations in more than 35 countries during the Relevant Period.   Symantec's stock trades on the NASDAQ Stock Market. Throughout the Relevant Period, Symantec disseminated SEC filings, press releases, investor presentations, and additional reports.

44.     Defendant Clark was the CEO and a director of Blue Coat from 2011 to August of 2016. He became Symantec's CEO when it acquired Blue Coat. From August 1, 2016 until his termination in May 2019, Clark served as Symantec's CEO and a member of Symantec's Board of Directors.

45.     During the Relevant Period, Clark made materially false and misleading statements and omissions about Symantec's financial performance, stated metrics, and internal controls for financial reporting, in the Company's public filings, at investor presentations, and during conference calls. Clark also was present at and participated in earnings calls when other Defendants made materially false and misleading statements or omissions on these subjects, which Clark knew to be false and misleading, yet failed to correct. Clark executed certifications relating to Symantec's false and misleading reports on the Company's May 19, 2017 Form 10-K, August 4, 2017 Form 10-Q, November 3, 2017 Form 10-Q, and February 2, 2018 Form 10-Q SEC filings.

46.     Clark directly participated in and controlled the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and financial performance. Further, Clark shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading. Because of his position of control and authority, his ability to exercise power and influence over Symantec's conduct, and his access to material inside information about Symantec during the Relevant Period, Defendant Clark was a controlling person within the meaning of Section 20(a) of the Exchange Act.

47.     Defendant Noviello served as Blue Coat's CFO before Symantec acquired Blue Coat in August 2016. Noviello joined Symantec as Chief Integration Officer in August 2016, following its acquisition of Blue Coat. He became Symantec's CFO of Symantec on December 1, 2016, and the Company's Principal Accounting Officer

1    ("PAO") on August 7, 2017. He served as the Company's CFO until his termination in
2    May 2019.

3         48.     Throughout the Relevant Period, Noviello had actual knowledge of and was
4    personally involved in the Company's integration of acquired entities, implementation of
5    cost reduction programs, and preparation of financial statements.   Under Noviello's
6    Corporate Profile on Symantec's website, Noviello held himself out as "lead[ing] the
7    company's integration and transformation office, and the company's cost reduction
8    program." As CFO, Noviello was responsible for establishing, maintaining, and evaluating
9    Symantec's disclosure controls and procedures, including its financial reporting.

10        49.     During the Relevant Period, Noviello made materially false and misleading
11   statements and omissions about Symantec's financial performance, stated metrics, and
12   internal controls for financial reporting in the Company's public filings, at investor
13   presentations, and during conference calls. Noviello also was present when the other
14   Defendants made materially false and misleading statements or omissions on these
15   subjects, which he knew to be false and misleading, yet took no steps to correct. Noviello
16   executed certifications relating to Symantec's false and misleading reports on the
17   Company's May 10, 2017 Form 8-K, May 19, 2017 Form 10-K, August 2, 2017 Form 8-
18   K, August 4, 2017 Form 10-Q, August 8, 2017 Form 8-K, November 1, 2017 Form 8-K,
19   November 3, 2017 Form 10-Q, January 31, 2018 Form 8-K, February 1, 2018 Form 10-Q
20   and May 10, 2018 Form 8-K SEC filings.

21        50.     Noviello directly participated in the management and day-to-day operations
22   of the Company and had actual knowledge of confidential proprietary information
23   concerning the Company and its business, operations, and financial performance. Noviello
24   also shared primary responsibility for ensuring that the Company's SEC filings and other
25   public statements or releases were complete, accurate, and did not omit material
26   information necessary under the circumstances to make them not misleading. At all
27   relevant times, Defendant Noviello possessed the power and authority to control, and
28   approved of, the contents of the Company's press releases and investor and media

1   presentations. Because of this position of control and authority, his ability to exercise

2   power and influence over Symantec's conduct, and his access to material inside

3   information about Symantec during the Relevant Period, Defendant Noviello, at the time

4   of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a)

5   of the Exchange Act.

6          51.    Defendant Garfield was Symantec's CAO from February 3, 2014 to August

7   7, 2017.   After resigning from the Company, Garfield continued at Symantec in an

8   "advisory capacity" through October 2017. As CAO, Garfield's responsibilities included:

9   (i) managing Symantec's financial processes, including oversight of over 270 employees;

10  (ii) participating in Audit Committee meetings, including presenting to Symantec's Board

11  of Directors and Audit Committee; (iii) interacting with investors, including the

12  formulation of external financial communication strategy, setting guidance, drafting

13  scripts, and answering questions from shareholders and sell side analysts; and (iv)

14  conducting finance diligence, including making model assumptions and post close

15  integration analysis for both the Blue Coat and LifeLock acquisitions.

16         52.    During the Relevant Period, Garfield made materially false and misleading

17  statements and omissions about Symantec's financial performance and stated metrics,

18  specifically, in the Company's May 19, 2017 Form 10-K SEC filing. Defendant Garfield

19  directly participated in the management and day-to-day operations of the Company and

20  had actual knowledge of confidential proprietary information concerning the Company and

21  its business, operations, and financial performance. Garfield also shared primary

22  responsibility for ensuring that the Company's SEC filings and other public statements or

23  releases were complete, accurate, and did not omit material information necessary under

24  the circumstances to make them not misleading. Because of this position of control and

25  authority, his ability to exercise power and influence over Symantec's conduct, and his

26  access to material inside information about Symantec during the Relevant Period,

27  Defendant Garfield, at the time of the wrongs alleged herein, was a controlling person

28  within the meaning of Section 20(a) of the Exchange Act.

## IV.     SYMANTEC'S "UNIQUE TRANSFORMATION PERIOD"

### A.     Symantec's Business

53.     During the Relevant Period, Symantec provided consumer and enterprise security software products and services. Symantec emerged as a leader in the security software industry when it released its Norton Antivirus software in 1990. The Company historically operated in two segments: Consumer Security and Enterprise Security. Symantec's Consumer Security products are directed to individuals and include a range of Norton-based products and services for personal computing and mobile environments. The Enterprise Security side of the business was directed to entire business operations or enterprises and included various threat protection and website security products, among others.[2]

54.     By 2005, Symantec's security business had substantially slowed down. In order to address this decline, Symantec determined to change its business strategy to focus on both security technology (as it had in the past), and on software storage/availability technologies. To facilitate the new strategy, Symantec paid $13.5 billion to acquire Veritas Software, a leader in the software storage and backup/recovery industries.

55.     Symantec's dual strategy of focusing on both security and software storage/availability technologies was unsuccessful. Between 2005 through 2015, Symantec underperformed its peers. The Company's Enterprise and Consumer businesses declined, and Symantec reported disappointing financial results, leading to a series of management changes.  Between July 2012 and April 2016, Symantec went through three different CEOs and divested itself of the relatively recent Veritas Software business.  On April 29, 2016, after the Company reported a series of disappointing financial quarterly results, Symantec's Board of Directors requested that the CEO be replaced again.

---

[2] Symantec sold its Enterprise Security business to Broadcom, Inc. after the end of the Relevant Period.

**B.     Symantec Acquires Blue Coat and LifeLock and Promotes These "Transformative Acquisitions" to Investors**

56.     Shortly after Symantec's divestiture of Veritas Software, Symantec announced on February 4, 2016 that it was targeting cost savings of approximately $400 million to be achieved by the end of its fiscal year 2018 (ended March 31, 2018).[3]

57.     On June 12, 2016, Symantec announced that it was acquiring Blue Coat, a leader in the web and cloud security industry, for $4.65 billion. The acquisition closed on August 1, 2016. Industry commentators have since explained the unusual and "concerning" features of the transaction and subsequent integration.

58.     First, following completion of the transaction, Blue Coat's top management team, including Blue Coat CEO, Defendant Clark; Blue Coat CFO, Defendant Noviello; Blue Coat Chief Technology Officer, Hugh Thompson; Blue Coat Chief Operating Officer ("COO"), Michael Fey; Blue Coat Chief Marketing Officer, Michael Williams; and Blue Coat Chief of Staff, Matt MacKenzie, all assumed the identical posts at Symantec.[4] Analysts noted the "rare" occasion in which a large public company like Symantec chooses to replace its entire top management team with the management of a just-acquired, smaller, private company like Blue Coat.  As one analyst observed, "Plugging in a C-suite from a recent acquisition certainly seems like a risk factor for dysfunction, as it could set up an 'us' versus 'them' war in the ranks. Such a highly politicized environment can create a toxic culture that leads to mistakes, cover ups, and outright wrongdoing."[5]

---

[3] *See, e.g.*, Carson Block, *Symantec Cold Read: Where Were The Short Sellers On Symantec?*, Forbes (May 13, 2018), *available at* https://www.forbes.com/sites/cblock/2018/05/13/symantec-cold-read-where-were-the-short-sellers-on-symantec/#6c5107141fdf.

[4] Several of these executives have since been ousted by Symantec, including Defendants Clark and Noviello, and Messrs. Fey and Williams.

[5] *See Supra* note 3.

59.     Second, Symantec acquired Blue Coat from private equity manager, Bain Capital ("Bain"), a firm with a business model and reputation for restructuring portfolio companies and engineering their financials to facilitate fast exits.  Bain purchased Blue Coat in 2015 for $2.4 billion. Bain owned Blue Coat for only one year before selling it to Symantec for $4.9 billion – a 100% return on Bain's investment. Thus, "in addition to the general concern of bringing in a new C-suite from an acquired company, the C-suite from such a PE-itized company seems a non-obvious choice for a replacement C-suite, given that Blue Coat seems to fit the PE profile of being managed for an exit."[6]

60.     Symantec promoted its acquisition of Blue Coat as advancing Symantec's profitability and growth.  For example, in Symantec's August 1, 2016 press release announcing the Blue Coat closing, new CEO Clark stated:  "With our increased scale, portfolio and resources, large enterprises can now look to Symantec as a single strategic source for integrated solutions across endpoints,[7] cloud and infrastructure to defend against sophisticated attacks and create a stronger, more cost-efficient security posture."

61.     In the same August 1, 2016 press release, Symantec's Chairman Dan Schulman reiterated: "Nearly two years ago, we announced our intention to become the leading pure play cyber security company.  Today, that intention becomes a reality, as we combine Symantec's leadership in endpoint, email, data loss prevention and datacenter security with Blue Coat's strength in cloud security with the #1 market share position at the secure web gateway."

62.     Despite such concerns, many analysts viewed the Blue Coat acquisition positively. For example, on August 1, 2016, Jefferies concluded, "We Remain Positive on the Deal Overall," stating that "We see logical product synergies as SYMC makes a push to become more of a security 'platform' across endpoints, web security, and more," while

---

[6] *Id.*

[7] "Endpoint" security is a term in the software industry that refers to protecting a business network when it is accessed by remote devices. Endpoint software is installed on network servers and remote devices.

noting that "significant execution risk remains." Jefferies also viewed the arrival of Defendant Clark and Michael Fey to Symantec positively: "Greg Clark (appointed CEO) and Michael Fey (appointed COO) bring with them a very strong track record from Blue Coat, where they and their team are largely credited with modernizing Blue Coat's products, reigniting growth, and positioning for shifts to cloud and mobile."  MKM Partners similarly observed on August 2, 2016, that "Positive Investor Sentiment Could Continue," as "Investors have been enthusiastic about the Bluecoat [sic] deal as reflected by the 18% increase in SYMC shares since the announcement as compared to 6% for NASDAQ."

63.    The Blue Coat acquisition directly impacted Symantec's equity compensation plan for management.   Defendants explained in the Company's September 5, 2017 Form 14A filed with the SEC, that Symantec "Revised goals upward [for its Annual Incentive Plan] to reflect Blue Coat . . . impact[.]" The Company increased the revenue and income targets for executive compensation. In addition, Symantec's Compensation Committee revised their performance metric for "Equity Incentives" for executives to now be tied to non-GAAP operating income instead of earnings per share. The revisions are summarized in the graphic below from Symantec's September 5, 2017 Form 14A filed with the SEC, with annotations in the blue boxes.



64.     On November 20, 2016, Symantec announced that it had entered into an agreement to acquire identity-protection software company LifeLock for $2.3 billion. Defendants represented to investors that LifeLock would transform Symantec's consumer business segment and create organic growth. For example, Defendant Clark stated in Symantec's November 20, 2016 press release: "As we all know, consumer cybercrime has reached crisis levels. … With the combination of Norton and LifeLock, we will be able to deliver comprehensive cyber defense for consumers. . . . This acquisition marks the transformation of the consumer security industry from malware protection to the broader category of Digital Safety for consumers."   Symantec's Chairman of the Board of Directors, Dan Schulman, similarly stated in the Company's November 20, 2016 press release:   "With the acquisition of LifeLock, Symantec adds a new dimension to its protection capabilities to address the expanding needs of the consumer marketplace."

65.     Analysts viewed the LifeLock acquisition positively, as further enhancing the Company's turnaround effort.  For example, on November 21, 2016, in a report entitled, "Norton Joins the Transformation Train via LifeLock," BTIG stated that the LifeLock acquisition "mark[ed] the third and (we believe) final step in the evolution of the 'new' Symantec. Now, the consumer business joins the transformation train, started by the Veritas divestiture and continued by the Blue Coat acquisition." Cowen & Company similarly wrote on November 21, 2016, "No Slowdown in Symantec M&A Train; Acquires LifeLock for $2.3b."  Symantec closed the LifeLock acquisition on February 9, 2017.

**C.     Defendants Used Accounting Manipulations and Realized Millions of Dollars in Executive Compensation**

66.     As discussed in greater detail below, after assuming leadership roles, the Blue Coat executives, including Defendants Noviello and Clark, manipulated the Company's financial statements through various accounting misconduct.  As Blue Coat revenues lagged, threatening internal revenue and operating income targets, as well as Symantec's guidance to investors, Defendants worked to close the gap between actual and projected financial results. After aggressive cost cutting measures proved inadequate, Defendants turned to accounting manipulations.

67.     *First*, Defendants engaged in improper revenue recognition practices in violation of GAAP. Defendants recognized revenue on sales that did not have signed contracts, did not go through the appropriate approval channels, contained unapproved extended terms, and/or for which customers could not or would not pay.  Defendants also double-booked revenue and improperly accelerated the recognition of deferred revenue in violation of GAAP.  For example, Defendants have admitted (*see infra*, section VII.B.) that in the fourth quarter of 2018, Symantec improperly recorded $12 million in revenue in connection with the Oracle Transaction, when such revenue should have been deferred to the next quarter.

68.     *Second*, Defendants manipulated Symantec's expenses in order to inflate the Company's non-GAAP measures, allowing Defendants Clark and Noviello to receive

millions of dollars in undeserved incentive compensation payouts.  While Defendants claimed their non-GAAP measures were necessary to facilitate comparison to its "peers," Symantec was an outlier that excluded from its non-GAAP measures hundreds of millions of dollars of expenses that its peers did not exclude.  Defendants misclassified as T&T normal, recurring expenses necessary to operate its business, in violation of SEC regulations.  Furthermore, Symantec switched employee bonus payouts from cash to restricted stock, immediately convertible to cash, which led to increased non-GAAP operating income without actually increasing revenues or reducing expenses.  As Symantec's real revenue growth lagged, so did the volume of T&T expenses excluded from the Company's non-GAAP operating income. Defendants misleadingly used T&T classifications and the shift to stock-based compensation as way to artificially meet budget targets and operating income benchmarks.

69.     Former employees explained that there was an "intense budget pressure" to meet financial targets, and manipulating T&T costs was an opportunistic avenue by which to do so.  Former manager Madiline Wolf (née Gatto) testified that her job felt "threatened" if she failed to meet certain costs savings some of which related to T&T costs.  She also stated that she was "unhappy with the ethical culture" created after the Blue Coat acquisition for many reasons, including because the accounting team's decisions about T&T costs were overruled. Similarly, Sean Delehanty, Symantec's Senior Vice President of Finance, described how Defendant Clark "pushed hard" on fitting expenses into T&T. Defendant Garfield stated that there was *"an air of fear at Symantec,"* adding that his job was threatened if he did not agree to budget cuts.

70.     Other employees have described the Company's conduct as *"brazen," "shady,"* and *"cooking the books."*  For example, a former Account Manager stated that the Blue Coat executives "breached everything from accounting to sales practices" and engaged in "brazen" misconduct, including double-booking deals.  The former Account Manager stated that Defendant Clark directed a former VP and Security Officer at Symantec to put expense dollars in capital buckets.  She added "the VP told Clark that we

couldn't do this, and Clark replied that he could do whatever he wanted."  A former Enterprise Healthcare Account Executive described other improper revenue recognition practices.  For example, Symantec had provisional purchase provisional purchase orders, which meant at times, if a deal did not come in quite yet, they would have a partner get the purchase order for them. In addition, if they had an email where a customer promised to pay them, that deal was booked and the revenue was recognized. She added, *"This was startup shit that they did all of the time.  That was how they recognized revenue which is really cooking the books."*

71.     These accounts are bolstered by internal Symantec documents showing that throughout the Relevant Period, Defendants Clark and Noviello were made aware of the Company's accounting improprieties but refused to correct the problems in order to secure lucrative incentive compensation payments.  For example, in February 2017, Defendant Clark received an email from a Senior VP in Finance flagging millions of dollars in *"debatable"* T&T classifications.  On May 19, 2017, Clark and Noviello received materials related to an Audit Committee Meeting in which Defendant Garfield disclosed a significant deficiency in the Company's non-GAAP reporting and explained that the control enhancement was *"overwhelmed by the volume and complexity of non-GAAP activity (over $300m in Q4 alone)."*

72.     The accounting improprieties led to the departure of several senior members of Symantec's accounting team, including Defendant Garfield—but not before Garfield first falsely certified the Company's 2017 Form 10-K.  On July 6, 2017, Defendants Clark and Noviello were informed in an email that senior members of the accounting function, including Garfield, were asking to be *"involuntary terminated for cause"* because *"accounting need[ed] a fundamental change in the cost structure to meet the goals set"* by management. The presentation attached to this email called for an "Accounting Re-Org" and flagged that "T&T Restructuring" costs were "frequently submitted in error (as it was

in Q4)" as well as "recent control issues driven by complex systems and an organization starved of resources."[8]

73.     On August 7, 2017 Garfield gave an exit interview to a Symantec Board member (Anita Sands) highlighting the serious problems that Symantec had with its T&T expenses and other non-GAAP measures. The contemporaneous notes from this exit interview, produced by Symantec in the Class Action, flag "**pressure to make Non-GAAP operating margin**," including "an effort to expand the definition of Transition costs" that was "**ridiculous**," and warned that this issue was what the Audit Committee "need[s] to worry about most" as it was "**potentially illegal**."  According to the exit interview notes, Garfield further stated that:

> What is happening is … they [are] driving the non-GAAP number up … A couple of hundred of million of extra Non-GAAP dollars for Fiscal 18 drives the VCP, and they can **triple their income**. Even Greg [Clark] would get something like a **3x payout. We've created a compensation plan that drives people to do something that's wrong**.

74.     Significantly, Defendants Clark and Noviello both knew about Garfield's exit interview.   Indeed, Defendant Noviello asked Garfield's replacement, Matthew Brown, for some "talking points" relating to Symantec's non-GAAP accounting.  In a September 8, 2017 email, Mr. Brown explained that, among other things, the Company's "**non-GAAP policy whitepaper [was] not firmly grounded in guidance from the SEC**," the policy was "**inconsistent**," the Company had no "**clear/current benchmarking analysis against peer companies**" in terms of non-GAAP accounting policies, there was "**a lack of understanding of the policy by key stakeholders,**" and the Company lacked "**a review process of the actual expenses hitting GAAP-only accounts**." (Emphasis in original).

---

[8] Garfield testified that his statements referred to the fact that "[p]eople … submitted things that they wanted … to not be included in the non-GAAP operating income, but it should be."

75.     In September 2017, faced with accusations raised to the Board level that Symantec management was engaging in improper T&T classifications Symantec retained E&Y to review its T&T classifications, including the Company's first benchmarking of its non-GAAP measures or "NGMs" against peers.  As summarized in the final November 16, 2017 Board materials, presented by Defendant Noviello and provided to Clark, E&Y's benchmarking analysis "showed that Symantec [wa]s an outlier in terms of the number of NGMs in comparison to [its] peers and d[id] not comply to some of the SEC guidance on usage and reconciliations to GAAP."  E&Y's report also concluded that Symantec's "guidelines, processes and controls around NGMs and T&T costs [we]re not detailed and processes not fully memorialized, and as such, there [wa]s risk around completeness and accuracy of [the Company's] non-GAAP reporting."  Moreover, E&Y concluded that for T&T costs, "sufficient controls do not exist to validate that those costs are of the appropriate nature and type for that categorization."  The Board also went through each major T&T project and were made aware that each presented a higher-than-average risk of "Non-compliance with SEC Guidance for Non-GAAP Presentation."

76.     E&Y also warned Defendants that "the costs included in Transition and transformation (T&T) have the appearance of recurring operating expenses." E&Y flagged this issue as ***"Highest risk – likely to result in SEC scrutiny or require change to historic results."***

77.     Defendants did not report E&Y's findings to investors.  Indeed, not only did the Company conceal E&Y's findings, Symantec did not change its T&T classification practices during FY 2018, instead waiting under after Q1 2019 to end its existing policy for T&T adjustments.  By waiting until after FY 2018 to end the improper practices, Defendants Clark and Noviello were able to secure nearly $70 million in undeserved payouts under the Company's compensation plan.

78.     Ultimately, Defendants' misconduct resulted in a whistleblower complaint, internal investigation, admission of wrongdoing, SEC probe, and the terminations of nearly a dozen of Symantec's top executives, including Defendants Clark and Noviello.  On

September 24, 2018, Symantec announced the results of the Audit Committee investigation, admitting (among other things) that the Company improperly recorded $12 million in revenue in the fourth quarter of 2018 and had "relatively weak and informal" controls specifically relating to the "review, approval, and tracking of transition and transformation expenses."

## V.   DEFENDANTS MISLED INVESTORS REGARDING SYMANTEC'S FINANCIAL RESULTS, REVENUE GROWTH, AND INTERNAL CONTROLS

79.   As detailed below, Defendants manipulated Symantec's reported financial results in multiple ways. First, Defendants improperly recognized revenue, including revenue that should have been deferred, in violation of GAAP. Such tactics resulted in misleading, overstated GAAP (and non-GAAP) revenues. Second, Defendants manipulated critical non-GAAP measures by (a) misleadingly claiming they were necessary to compare the Company's results to both its peers and the Company's prior quarters, (b) improperly reporting normal recurring expenses incurred in the ordinary course of business as "transition costs" in violation of SEC accounting-related rules and regulations, and (c) altering its cash bonuses to stock-based compensation without sufficient disclosures.  Defendants' improper accounting allowed them to report inflated non-GAAP operating income, which was a key metric to hitting lucrative executive compensation targets.  Furthermore, contrary to Defendants' representations to investors, Symantec's internal controls over financial reporting and disclosure controls were woefully ineffective during the Relevant Period, allowing the rampant accounting manipulations to occur.

### A.     Defendants' Revenue Recognition Practices Violated GAAP

#### 1.     GAAP Revenue Recognition Principles

80.     GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements.[9]  The SEC has the statutory authority to codify GAAP and has delegated that authority to the Financial Accounting Standards Board.  SEC Regulation S-X (17 C.F.R. Part 210) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures. During the Relevant Period, Symantec represented that its financial statements were presented in conformity with GAAP.

81.     Under GAAP, a misstatement or omission in financial statements is material if, "there is a substantial likelihood that a reasonable person would consider it important." Expanding on the concept of materiality, ASC 250-10-S99[10] provides that an "omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."  According to ASC 250-10-S99, the formulation of materiality "in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws."

82.     Symantec is required under GAAP to recognize revenue only when certain criteria are met, and in the period when those criteria are met. A company violates GAAP when it misleadingly shifts revenue from one period to another for the purpose of making one period look better.  The use of such accounting manipulations is often tied to an entity's need to achieve or report predetermined financial results.

---

[9] The conceptual framework underlying financial accounting and reporting, especially the rules that comprise the accrual-based accounting required by GAAP, are set forth, among other places, in Statements of Financial Accounting Concepts ("FASCONs") promulgated by the Financial Accounting Standards Board ("FASB").

[10] The abbreviation "ASC" refers to FASB Accounting Standards Codification.

83.     Arbitrarily moving and recording revenue from one period to another is misleading because recognizing revenue in the proper period is a GAAP requirement and is critical to the transparency and accuracy of financial statements.  Indeed, accounting literature places significant emphasis on the fact that one of the goals of financial statements based on accrual accounting, which is an accounting method that records revenues when earned and expenses when they are incurred, "is to account in the periods in which they occur for the effects on an entity of transactions and other events and circumstances."  This is done through the use of the "matching principle" – matching revenue to the period to which it relates.  Financial Accounting Standards Board Concepts Statement ("FASCON") No. 6. At all relevant times, Symantec's accounting was (purportedly) accrual accounting.  Moreover, accounting guidance requires that in order for financial information to be useful, it must be relevant and faithfully represent what it purports to represent.  FASCON No. 8.

84.     ASC 605-10-25-1 provides that revenue may be recognized when it is realized or realizable and earned.  ASC Topic 605 provides, in relevant part: "Revenue and gains are realized when products (goods or services), merchandise or other assets are exchanged for cash or claims to cash. . . . [R]evenue and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash."  Additionally, ASC Topic 605 states:

> [R]evenue is not recognized until earned. . . . [A]n entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by revenues.

85.     Of particular relevance to Symantec's business, ASC 985-605-25-2, Software Requiring Significant Production, Modification, or Customization states:

> If an arrangement to deliver software or a software system, either alone or together with other products or services, requires significant production, modification, or customization of software, the entire arrangement shall be accounted for in conformity with Subtopic 605-

35, using the relevant guidance in paragraphs 985-605-25-88 through 25-107 on applying contract accounting to certain arrangements involving software.

86.     Further, ASC 985-605-25-3, Software Not Requiring Significant Production, Modification, or Customization, establishes basic revenue recognition criteria for software licenses.  ASC 985-605-25-3 provides:

If the arrangement does not require significant production, modification, or customization of software, revenue shall be recognized when all of the following criteria are met:

     a. Persuasive evidence of an arrangement exists;

     b. Delivery has occurred;

     c. The vendor's fee is fixed or determinable; and

     d. Collectability is probable.

87.     With respect to subpart (a), ASC 605-25-16 further states:

If the vendor operates in a manner that does not rely on signed contracts to document the elements and obligations of an arrangement, the vendor should have other forms of evidence to document the transaction (for example, a purchase order from a third party or online authorization). If the vendor has a customary business practice of using written contracts, evidence of the arrangement is provided only by a contract signed by both parties.[11]

88.     Consistent with the accounting rules set forth above, Defendants included Symantec's revenue recognition policy in the Company's annual Form 10-K filed on March 31, 2017.  That policy provided, among other things, "We recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability is probable."

---

[11] ASC 958-605-25-21 reiterates with regard to customer acceptance, "After delivery, if uncertainty exists about customer acceptance of the software, license revenue shall not be recognized until acceptance occurs."  With regard to Subpart 3(d), whether collectability is probable, ASC 985-605-25-34 provides that "any extended terms in a software licensing arrangement may indicate that the fee is not fixed or determinable."

89.     KPMG, Symantec's independent auditor during the Relevant Period, issued guidance regarding Revenue from Contracts with Customers: "Under current SEC guidance, if an entity's customary business practice is to have, in addition to meeting the other criteria, a contract signed by both parties before it concludes that persuasive evidence of an arrangement exists, the entity does not recognize revenue until a written sales agreement is finalized – including being signed by both the customer and the entity . . . ." The same KPMG guidance states, "Under current SEC guidance and U.S. GAAP for software entities, consideration in a contract has to be fixed or determinable in order for the entity to recognize revenue."

90.     Accordingly, under GAAP and Symantec's revenue recognition policy, and consistent with the guidance provided by Symantec's auditor, revenues must not be recognized (i) unless and until the vendor has documentation of the transaction (such as a purchase order), or the underlying contract and agreement is executed and is in the hands of management prior to the end of an accounting period; (ii) if uncertainty exists about customer acceptance of the software; and/or (iii) if extended terms in the software licensing arrangement indicate that the fee is not fixed or determinable.

### 2.     GAAP Deferred Revenue Principles

91.     Deferred revenue, a liability, should be recorded when a company receives payment from a customer or bills a customer for products or services that are to be delivered or performed in the future. Deferred revenue is recorded if a company has not satisfied GAAP's revenue recognition criteria (e.g., delivery of products or performance of services has taken place).

92.     Accordingly, Symantec's revenue recognition policy set forth in its Forms 10-K for the Relevant Period noted that "[f]or software arrangements that include multiple elements, including … maintenance, services, and packaged products with content updates and subscriptions, we allocate and defer revenue for the undelivered items." Symantec claimed to use specific criteria to determine the value of the undelivered items that should be accounted for as deferred revenue. In instances where specific evidence "does not exist

for undelivered items, the entire arrangement fee is recognized ratably over the performance period." Recognizing deferred revenue that is not realized or realizable and earned violates GAAP, and renders the subject financial statements misleading.

### 3. Defendants Improperly Recognize Revenue at Period-End to Meet the Company's Guidance and Reach Incentive Compensation Targets

93. Throughout the Relevant Period, Symantec's revenue recognition practices violated GAAP and Symantec's own stated revenue recognition policy. Among other things, the Company's recognized revenue at period-end on sales that did not have signed contracts, did not go through the appropriate approval channels, contained unapproved extended terms, and/or for which customers could not or would not pay. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met GAAP's revenue recognition criteria.

#### a. Defendants Improperly Recorded the Oracle Transaction to Inflate Revenue for Fiscal Year 2018

94. A clear example of Symantec's accounting misconduct involves the Oracle Transaction, which closed in the fourth quarter of fiscal year 2018. According to an internal accounting memorandum prepared by Symantec's VP of Finance, Mr. Brown, Symantec negotiated a deal to supply Oracle with certain software for use in Oracle's cloud environment. However, on March 29, 2018—as FY 2018 was coming to a close—Thomas Kurian, Oracle's President of Product Development, specifically wrote to Defendant Clark that Oracle required "a short letter indicating your intention is to certify the Security Analytics offering on OCI within the next 3 months[.]" In essence, Oracle demanded that Symantec agree to provide future modifications of the software to ensure its compatibility with Oracle's systems. Under GAAP, however, if Symantec promised Oracle this future functionality, much of the Oracle transaction's revenues could not be recognized in Q4 2018 but instead had to be deferred until sometime during fiscal year 2019 when the ultimate (modified) product was delivered.

95.    At an in-person meeting held on March 29, 2018, Mr. Brown **directly** instructed both Defendants Clark and Noviello that Symantec could **_not_** promise Oracle the future functionality and still recognize revenues from the Oracle Transaction.  Later that evening, Defendant Noviello reached out to Mr. Brown at 9:20 PM to discuss the issue and determine whether there was any possible workaround.  According to Mr. Brown's notes from the call, Mr. Brown "reiterated that we can't include anything with future functionality, **_whether in contract or verbal_**" and still recognize the revenue in fiscal year 2018.  Defendant Noviello assured Mr. Brown that he would relay that message to Defendant Clark.

96.    During the call, Mr. Brown alternatively "suggested we could include the language and just defer the revenue, but revenue looks to be coming short" in fiscal 2018.  Mr. Brown stressed that the accounting issue was "pretty clear," and that Symantec's auditors would be "**_all over this_**" so **_"[t]here's no room for anyone doing something stupid_**."

97.    At this point, Defendants Clark and Noviello were in a bind.  If Symantec made the assurances Oracle required, Symantec's fiscal year 2018 revenue would come "short" – threatening Symantec's 2018 financial results, and Defendants Noviello's and Clark's executive compensation bonuses.  If Symantec refused to make the assurances, the entire Oracle Transaction could fall apart.  Ultimately, Defendant Clark ignored Mr. Brown's express warnings and sent a text message to Oracle's Kurian on March 30, 2019, informing him that Symantec "can't send a loi or a zero dollar sow … **_we will get it done but we can't contract to it_**."  With those assurances, the Oracle Transaction closed in March 2018 and Symantec recognized $13.1 million revenue in Q4 FY 2018 from that deal.

98.    On April 6, 2018, Mr. Brown held a follow up meeting with Defendants Clark and Noviello to directly discuss the accounting for the Oracle Transaction.  At the meeting, Mr. Brown specifically asked whether Symantec had made any future commitments to Oracle outside of those delineated in the contract. Despite his direct text

communications with Oracle, Defendant Clark told Mr. Brown that he knew of no such commitments.

99.     Using the revenues from the Oracle Transaction, Symantec, in its Form 8-K filed on May 10, 2018, reported $6 million in GAAP operating income for Q4 2018 and $49 million in GAAP operating income for all of fiscal year 2018.

100.     On September 24, 2018, after the Audit Committee's investigation, Symantec **admitted** that the accounting for the Oracle Transaction was misleading. According to the investigation, Symantec recognized revenue that should have been deferred in its earnings releases for the fourth quarter of fiscal year 2018 and first quarter of fiscal year 2019, and that those financial statements would be restated accordingly:

> [T]he Audit Committee reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018 (which is still an open period). After subsequent review of the transaction, the Company has concluded that *$12 million of the $13 million should be deferred.* Accordingly, the previously announced financial results for the fourth quarter of fiscal year 2018 and the first quarter of fiscal year 2019 (ended June 29, 2018) *will be revised to take into account this deferral and any other financial adjustments required as a result of this revision.*

101.     This $12 million in revenue (and related gross profit) that Defendants admitted was improperly recorded was material to Symantec's financial results.  Under SEC guidance, accounting errors that improperly affect an item by 5% provide a "preliminary assumption" that the misstatement was material.  As noted, Symantec originally reported $49 million in GAAP operating income for fiscal year 2018, which Symantec previously identified as a "Key Financial Metric."[12]  However, *24.5%* of that metric was caused by the improperly recognized $12 million from the Oracle Transaction that should have been deferred. Specifically, the $49 million figure would have been

---

[12] *See* Symantec's Form 10-K for the Fiscal Year Ended March 31, 2017 (the "2017 10-K") filed on May 18, 2017 at 36 ("Key Financial Metrics").  Symantec's Form 10-K for Fiscal Year Ended March 31, 2018 ("2018 10-K"), filed on October 26, 2018, also called GAAP operating income a "Key Financial Metric."

reported as only $37 million had Defendants not revised their final financial results to include various other adjustments that they previously had not planned on recording. This would have accordingly lowered operating income for the fiscal year by 24.5%.  Moreover, the improper revenue recognition also materially impacted Symantec's 2018 fourth quarter financials as Symantec would have had to lower its operating income by **200%** if not for the Company deciding to record other adjustments they previously had not planned on recording.  Accordingly, the $12 million misstatement was quantitatively material for both the 2018 full year and fourth quarter reported GAAP operating income.

102.    This exact point regarding the materiality of the $12 million in admitted improperly recorded revenue was made by Watchdog Research, an "independent" financial reporter that "identif[ies] red flags, issues and other anomalies in financial reporting." As set forth in a Watchdog Research report concerning Symantec titled "What happened?," this independent financial reporter stated:

> Any irregularities in accounting **are material** because they raise questions about the potential for failure or weakness in the personnel and/or systems used for a company's accounting. In [Symantec's] case, it might seem a $12 million revenue recognition issue would be immaterial. **But that would be false**. Symantec reported $49 million in operating income in 2018. If the $49 was reduced by the $12 million, that still means the $12 million had an impact of **20% on operating income – excluding any millions spent on the investigation!**[13]

103.    Second, the $12 million was material from a qualitative standpoint.  Under SEC guidance, certain conditions "may well render material a quantitatively small statement of a financial statement item." Those include "[w]hether the misstatement changes a loss into income or vice versa," and/or "[w]heather the misstatement has the effect of increasing management's compensation - for example, by satisfying requirements

---

[13] https://blog.watchdogresearch.com/posts/symantec-flashback-what-happened/

for the award of bonuses or other forms of incentive compensation."  Accordingly, ASC 250-10-S99 cautions:

> [A] registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial. While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. ***The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings.*** In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements."[14]

104.    The $12 million overstatement in Q4 2018 was qualitatively material under the foregoing standards.  First, the $12 million turned a *loss* into operating *income* for Q4 2018.  As noted above, in its 2018 10-K, Symantec reported revised figures for the quarter that reduced gross profits and operating income by a full $12 million on a dollar-for-dollar basis. The $12 million was double Symantec's originally reported $6 million in operating income for Q4 2018.    Therefore, the improper accounting for the Oracle Transaction allowed Symantec to report income rather than a loss position for its Q4 2018 operating income.

105.    Second, the highest levels of the organization were instrumental in the misleading financial reporting and in "managing" the reported earnings.  Defendant Clark, the Company's CEO, and Defendant Noviello, the CFO, were directly involved in the transaction at issue, were explicitly instructed not to offer any future functionality to Oracle either in writing or verbally, made the side deal anyway, and covered up their actions when directly questioned by accounting personnel.

---

[14] Auditing Standards No. 14 also provides a similar list of qualitative factors related to the evaluation of materiality, including "[t]he sensitivity of the circumstances surrounding the misstatement, for example, the implications of misstatements involving fraud and possible illegal acts, violations of contractual provisions, and conflicts of interest."

106.    Third, executive management were awarded bonuses because of the materially misstated financial results. The Oracle Transaction and its improper accounting allowed Symantec to hit certain fiscal year 2018 compensation targets.  In fact, right after the Oracle Transaction, COO Fey asked Clark "Think we did enough to hit more than 2.5 vcp"— a reference to Symantec's executive compensation plan.  These qualitative factors further demonstrate the materiality of the $12 million accounting overstatement to the Company and its investors.

b.    **The Accounts of Multiple Former Employees Confirm the Improper Revenue Recognition was Rampant**

107.    The improper accounting of the Oracle Transaction was not a one-off occurrence. Multiple former Symantec employees provided firsthand accounts explaining that Defendants engaged in improper revenue recognition practices throughout the Relevant Period that were inconsistent with GAAP and the Company's internal revenue recognition policy.

108.    For example, a former Account Manager who managed Symantec's Verizon Account (the Company's largest account on the East Coast) and who worked at the Company from 2013 through June 2019 recalled that after the acquisition, Blue Coat executives ran Symantec and "breached everything from accounting to sales practices" and Clark told his subordinates that "he could do whatever he wanted."[15]  With regard to improper revenue booking, she explained that the Company regularly recognized revenue for sales in which purchase orders had not yet been issued.[16]

109.    Specifically, the former Account Manager explained that requesting a letter of intent from customers were considered "side letters" and were prohibited by the

---

[15] The former Account manager, who worked in the Florida office, was very close Symantec's Chief Information Officer, Sheila Jordan ("Jordan").  Jordan, in turn, reported to Defendant Noviello shortly after the Blue Coat acquisition.

[16] For ease of comprehension and readability, the Complaint uses the pronoun "she" and possessive "her" in connection with the former employees.  However, this convention is not meant to identify the actual gender of any of the former employees.

1  Company.  In fact, the sales representatives had to certify every quarter that they did not

2  make any side deals with customers.  Nonetheless, "We were told to do this (side deals) on

3  conference calls with multiple people on these calls.  They did not even try to hide it. We

4  all knew that it was illegal and that you could not do that."  The former Account Manager

5  described this as typifying the Blue Coat mentality.

6      110.   A former Account Manager who worked at Symantec's Herndon, Virginia

7  office from 2012 to August 2018 confirmed that the way of doing business changed at

8  Symantec after the Blue Coat executives took power.  Specifically, she explained that the

9  Company was channel stuffing to inflate its end of quarter numbers.  She recalled that, for

10  example, in the fourth quarter of fiscal year 2017, Symantec's new Vice President of Sales,

11  Craig Weimer – who came over from Blue Coat – convinced the Symantec distributor

12  Terra Soft to create a fictitious $800,000 invoice which was booked as revenue in Q4 2017.

13  Symantec de-booked the revenue in fiscal year 2018 because there was no real customer

14  order.

15      111.   A former Healthcare Account Executive at Symantec from June 2016 until

16  January 2019, also confirmed the channel stuffing practices. According to the former

17  Healthcare Account Executive, the Company had provisional purchase orders, which

18  meant at times, if a deal did not come in quite yet, they would have a Symantec partner get

19  a purchase order for them. The former Healthcare Account Executive explained that this

20  applied to deals in general, both software and hardware. If they did not have a purchase

21  order from the end customer but the end customer said in email form that its intent was to

22  purchase X, the partner could issue a purchase order.  She recalled specific instances where

23  revenue was booked on such an email, but the deal ended up not coming through.  The

24  Healthcare Account Executive explained other misconduct as well.  For example, the new

25  Blue Coat management would often book revenue based on an email from a customer even

26  before products were shipped out and/or improperly recognized revenue even after

27  products were returned by customers. The Healthcare Account Executive referred to these

28  practices as "loosey goosey shit" that was "really cooking the books," and complained that

"They did this all the time after Blue Coat came in." The former Healthcare Account Executive recalled that one deal in which this occurred was a $3 million plus deal with the Mayo Clinic.

112.   A former employee, who worked at Symantec from November 2004 through April 2018, most recently as a Renewal Sales Representative from 2012 until April 2018, and was based in the Springfield, Oregon office, explained that after the Blue Coat acquisition, Symantec changed the way it was recognizing certain deals in order to recognize revenue sooner. Specifically, the former Renewal Sales Representative explained that after Blue Coat took over Symantec, if you brought in revenue for a three-year deal, Symantec would recognize the revenue for all three years when it was booked. With this new practice, the Company was showing a higher revenue plan for the first year of business instead of a consistent business plan. The former Healthcare Account Executive referenced in Paragraph 112, similarly confirmed that the Company created new revenue by booking three-year deals and booking all the revenue in the first year.

113.   The former Renewal Sales Representative recalled a three-year deal with the State of Michigan for approximately $1 million that she believed had been recognized all at once in this manner. She explained that "quite a bit" of the renewal business, which was about 60% of business compared to new sales, was pulled forward before Symantec would normally have recognized the deal. With regard to larger deals with customers such as BlackRock, Verizon, or Wells Fargo, this could mean that millions of dollars were impacted.

114.   The former Renewal Sales Representative further elaborated that starting in early 2018, the Company would recognize deals *even if they were a month early* and she was pressured to pull in as many deals as she could before the end of the quarter. Thus, the Company could show as much revenue in the current quarter as they could, but they robbed the next quarter. She took this as a sign that the Blue Coat management was going to bail out of Symantec after the first year or two. As set forth herein, her insights turned out to be correct. The former Renewal Sales Representative further confirmed that employees were

1   pressured to pull in as many orders as they could before the new quarter, which according

2   to her, was not stable accounting.

3        115.   A former Director of Enterprise Ecommerce Payment and Risk, who worked

4   at the Company from 2000 until January 2020 and reported to the Senior Director of Order

5   Operations, Aidan Flynn, who in turn reported to the VP, Quote to Cash, Mark Flowers,

6   revealed that she personally submitted complaints to Symantec's ethics hotline relating to

7   inappropriate revenue recognition conduct. Specifically, she recalled how the Company

8   allowed customers to skip out on paying certain contractual obligations in order to get new

9   contracts signed, but never accounted to for the missed payments.

10        116.   The accounts of these five former Symantec employees were corroborated

11   and expanded upon by numerous additional former employees of Symantec, who were

12   interviewed by the Class Action plaintiffs and who similarly described rampant revenue

13   recognition improprieties at the Company.   The accounts of these additional former

14   employees, set forth in ¶¶117-148 below, are excerpted verbatim from the Class Action

15   Complaint.

16        117.   For example, a former Vice President ("VP") and Chief Security Officer

17   ("CSO") from 2014 through June 2017 worked at Symantec headquarters for 7.5 years. For

18   the first 3.5 years of her tenure as the CSO, she reported to Symantec's Chief Information

19   Officer, Sheila Jordan, who in turn reported to Defendant Noviello. During the last six

20   months of her tenure as CSO, she reported to Symantec's General Counsel, Scott Taylor.

21        118.   Symantec's former VP and CSO recalled Defendant Clark making lots of

22   references about their ability and flexibility to shift and record revenue. Clark would

23   regularly talk about opportunities to be flexible in how they were spreading out revenue

24   over time for these big and expensive hardware purchases. Clark talked frequently about

25   the ability to manipulate or adjust revenue by various periods or a year. The intimation was

26   that if they had already made their target for a particular quarter, then they would not

27   deliver and record revenue until the next quarter. Clark specifically discussed this issue at

28   senior leader meetings with executives which occurred approximately monthly. She said

1   that these calls included the next layer below Clark's immediate direct reports. Clark's

2   views on "opportunities" to be "flexible" with respect to revenue recognition were not a

3   secret.

4          119.    Symantec's former VP and CSO confirmed that from the time that Defendant

5   Clark became Symantec's CEO, it felt like they were working at Blue Coat, so it seemed

6   that whatever went on at Blue Coat would go on at Symantec. Many of the Blue Coat

7   processes were not fit for a public company the size of Symantec.  Symantec's former VP

8   and CSO confirmed that there was a lot of discussion about the ethics of the sales team and

9   sales leadership that took over from Blue Coat, including general behavior around closing

10  deals. The former VP and CSO confirmed that the legal team expressed significant concern

11  to her that this practice was happening to the point that the legal team undertook a review,

12  which was multiple prongs.   There were discussions amongst peers around executive

13  behavior at sales conferences in Las Vegas that were not up to Symantec's ethical

14  standards. There were investigations into specific deals and the behavior of the sales team

15  around closing deals. According to the former VP and CSO, there was a significant review

16  of Symantec's channel partners and resellers to figure out who met Symantec's moral

17  structure, including reviewing the use of slush funds to send customers various things.  The

18  investigations were led by Cameron Hoffman, head of investigations at Symantec, under

19  Scott Taylor.

20         120.    A former Senior Manager, Pricing & Licensing from July 2011 through June

21  2017, who had worked at Symantec for 18 years in the Company's Springfield, Oregon

22  office, said that Blue Coat management imposed unethical accounting practices at

23  Symantec. She explained, for example, that Symantec was trying to figure out a way to

24  change from a subscription model to a licensing model so that they could bring all the

25  revenue in at once and not defer it. There were still some products that were subscription-

26  based, but approximately 70% of the subscription products were changed to licenses.

27         121.    Symantec's former Senior Manager, Pricing & Licensing, further confirmed

28  that she was sure that people were trying to shove revenue through at the end of the quarter.

For example, a few people said that they had been asked at quarter-end to put a bunch of orders through, when they knew that the orders would not be processed, just to meet numbers and then after end of quarter, back them out. Specifically, the Senior Manager, Pricing and Licensing stated that there was inappropriate pushing through of deals which was just a "flat-out, let's just push that through and we will back it out at the end of the quarter type request." She described how the request came at quarter-end from a Vice President who came from Blue Coat; she knew about this issue because at quarter-end everyone was working long hours together and all sat together.

122.   The Senior Manager, Pricing and Licensing, discussed one situation in which a colleague, Ronda Turner Wilson, an Associate Manager at Symantec, was asked by a Vice President on the Symantec sales side to process a "high dollar" order without appropriate documentation. The Senior Manager, Pricing and Licensing stated that Wilson reported her concerns to the Ethics Committee through Symantec's ethics hotline. The Vice President's request occurred at a quarter-end. The Senior Manager, Pricing and Licensing stated that Symantec used an Oracle database to track deals and you would be able to tell if a deal was improper because all of the signed contracts and documents that needed to be assigned to the deal would not exist. You would also see an order booked and then a return after the quarter ended which would be a huge red flag.

123.   Specifically, one of the Vice Presidents called the Springfield office and spoke with managers in Order Management, telling them to put numerous orders through at the end of the quarter. You had to have a signed contract in order to put orders through, and they did not have the signed contracts and the things the Company normally required in order to put orders through. According to Symantec's former Senior Manager, Pricing & Licensing, this raised a lot of red flags because there are certain processes with contracts, and with Symantec, for which there was no wiggle room. The concern was that these were not solid, signed deals, and should not have been put through.

124.   Chris Kearney, a Regional Vice President of Sales at Blue Coat and then Symantec from May 31, 2016 until he was fired in retaliation for reporting accounting

misconduct in September or October 2018, confirmed that improper accounting practices occurred at Symantec, that deals were pushed through at the end of the quarter, and that senior executives, including Michael Fey, Steve Tchejeyan, Marc Andrews, and possibly Defendant Clark attended meetings every quarter to track the revenue coming in from deals at the end of the quarter.[17]  Mr. Kearney was based in Florida but reported into Symantec's Mountain View California headquarters.  Mr. Kearney has been in the industry for 20 years, and during his tenure at Symantec was responsible first for territories that went up through Washington DC, Virginia, and up through Michigan and Ohio, and later in his tenure at Symantec was responsible for the entire southeastern United States. Initially, Mr. Kearney reported to Craig Weimer, but from approximately April 2018 until the end of his tenure, Mr. Kearney reported to David Auslander.  Mr. Kearney had a team of nine field account managers reporting to him; his team was responsible for the entire Symantec product line.

125.     Mr. Kearney explained that on June 29, 2018 (a Friday), the tail end of the first quarter of Symantec's Fiscal Year, his direct manager, Auslander, asked him to go to a Symantec partner called Optiv, and request a purchase order for product that was not ordered by the end user, Chico's.  The deal was valued at approximately $750,000.  Mr. Kearney knew and had told management that this deal was not going to happen for the quarter – indeed, he knew that the customer did not have it in the budget and was not going to do it.  Then, Mr. Kearney received a text message from Auslander. The text message, which Mr. Kearney received on June 29, 2018, stated:

> Optiv, when they know a deal is going to happen but we can't get a PO [purchase order] in time, has been willing to cut us a PO for a few extra points. Ask the rep you are working with and see if they will go up their chain. … Not that you need any more incentive, but Fey just asked about Chico's [the end user in the Optiv deal] ***because he needs the end quarter revenue***.

126.     Mr. Kearney understood that the senior executives of Symantec, including Fey, Tchejeyan, Marc Andrews, and possibly Defendant Clark were holding their quarterly

---

[17] Mr. Kearney agreed to be identified by name in the Class Action Complaint.

meeting where they sit in the same room at the Mountain View headquarters and track deals as they come in.  Chris Weimer would host a similar meeting each quarter in Symantec's New York office for the East Coast.  This deal with Optiv was one of the deals they were tracking.  In sum, Mr. Kearney understood from Auslander's text message that he was telling Mr. Kearney that the President of the Company is tracking the deal, and they need it for end quarter revenue so let's get it done.  Mr. Kearney also knew from Auslander's text message that this practice occurred with other orders, and that these orders were at least $750,000 but much larger and would have gone up to ***tens of millions of dollars***.

127.   Mr. Kearney was in shock at Auslander's request.  This request was "absolutely" a violation of Symantec policy and the accounting rules.  As Mr. Kearney explained, you are not allowed to take an order from a customer without an order coming back from the customer.  At the end of the quarter, employees have to sign and verify that they do not know of any deals that have gone through the channel with side agreements and such.  Mr. Kearney did not sign this document for this quarter.

128.   In response to Auslander's text message on Friday, June 29, 2018, Mr. Kearney told him that it was a finance deal, so they could not do anything.  Over the weekend, ***Mr. Kearney called Symantec's whistleblower hotline and reported what happened***.  The following Monday, Mr. Kearney received a call from Auslander telling Mr. Kearney that he was ***not a team player and was not willing to do what it takes***.  Auslander told Mr. Kearney to resign now, or he would write Mr. Kearney up and Mr. Kearney would be gone by the end of the quarter. Until that point, the Company had no reason to fire Mr. Kearney.  Mr. Kearney had received good reviews from his past boss.

129.   Mr. Kearney reported this blatant retaliation and misconduct. One day later, on the following Tuesday, Mr. Kearney spoke to people from the Audit Committee and the General Counsel, including Carolyn Herzog, and made them fully aware of everything, including the text message and Auslander's threat to Mr. Kearney's job, as well as Mr. Kearney's refusal to sign the affidavit for the quarter verifying that he knew nothing

improper was going on. But the Audit Committee **did not take any action** in response to Mr. Kearney's report, and told him to just keep doing his job. Mr. Kearney also reported the misconduct to Steve Tchejeyan, but Tchejeyan told him to just worry about his job. Tchejeyan further told Mr. Kearney that if he spoke to the Audit Committee, he did not want to talk to him.

130.   A few months later, in September or October 2018, at the end of the following quarter (as Auslander had threatened Mr. Kearney he would), Mr. Kearney was fired.  Mr. Kearney was told that he was fired because he was not meeting his numbers, but in reality, it was because he refused to get the Optiv deal done improperly.

131.   In addition to the Audit Committee, Mr. Kearney reported his concerns to the SEC because he knew the Audit Committee was sweeping it under the rug.  In addition to the incident described above, Mr. Kearney told the SEC about another situation involving accounting misconduct at Symantec. Specifically, any deal that was over $500,000 had to go through a review process.  If it was a cloud deal, which is a subscription deal, it had to be reviewed by Tchejeyan and Fey, who would determine whether or not they could **change the SKUs on those deals** in order to make them "on premise" software so that they could **recognize all the revenue at once** instead of monthly.

132.   Mr. Kearney explained that the Company started selling cloud subscriptions, which caused a shift in revenue from taking all the revenue upfront to being ratable.  The Company miscalculated how fast people would switch to subscription products.  Therefore, after that switch, Symantec wanted to review every deal to see if they could change it to an "on premises" license SKU in order to count the revenue upfront.  Mr. Kearney said that "a ton" of deals would be over $500,000 and be reviewed.  For example, Mr. Kearney had one deal himself with the end customer, Altria, a Philip Morris company, that involved ratable software products and partner IBM, and went through this process.  Mr. Kearney knew that management was looking at Chico's and coming up with old SKUs to change the product line to those SKUs to be able to count them.

133.    Similarly, a Regional Sales Manager at Symantec from September 2016 to November 2018, who worked in Georgia, stated that around April or May of 2018, a Senior Vice President forced through a deal that was not yet booked and that was worth almost eight figures (*i.e.*, nearly $10,000,000).  The Senior Vice President had originally asked another manager to accept the deal even though there was no purchase order, but the manager refused because it was against the manager's ethics.  The deal was pushed through anyway.  The Regional Sales Manager stated that the manager in question brought this to "everyone's attention," including Mike Fey, Steve Tchejeyan, and some Senior Vice Presidents.  The Regional Sales Manager stated that she was not interviewed in connection with the Audit Committee investigation and would have told the Audit Committee about this deal.

134.    Additionally, a former Account Executive – who worked at Symantec as an Account Executive from November 2013 until July 2018 (working in Symantec's Springfield Oregon office at first, but then working remotely for the last three years of her tenure) and who worked with government and education accounts – stated that Symantec would allow customers to merely sign the intent to write the purchase order and Symantec would book it as closed business.  She initially worked with government and education accounts in California, Oregon, Washington, and Alaska and then her territory later switched to Texas, Oklahoma, and Louisiana when she moved to Texas.

135.    According to the former Account Executive, Symantec would also take "an IOU" from its channel partners to get the deal done.  The channel partner would foot the bill to let Symantec hit its numbers.  The former Account Executive thought that one or two deals a year happened in this manner.  The former Account Executive estimated that if a salesperson in the field had 100 deals a year, and 1% were brought that way, approximately $10 million would be brought it that way.  The former Account Executive recalled one deal for $300,000 for a client in upstate New York that was done in this manner.  The former Account Executive explained, for example, if Company ABC said that it would cut a purchase order on the second of the month but the end of Symantec's

1    quarter is a few days earlier on the 30th, the partner would hold the note for 2-3 days and

2    then Symantec would book that as closed business.  The partner would pay Symantec and

3    would write Symantec the purchase order, and would cover the customer until the customer

4    paid.

5        136.    The former Account Executive similarly stated that she knew quite a few

6    representatives in the Plano, Texas office that were encouraged to book orders on just an

7    intent to sign a purchase order, rather than an actual purchase order.  This practice happened

8    more on the enterprise side, which had more "flexibility," than the government side.

9        137.    According to several former employees, Symantec also pulled in deals in

10   advance to recognize revenue.  For example, a former Symantec Manager Bill and Collect-

11   Finance, Americas, from January 2014 until October 2017, who worked at Symantec for

12   over 18 years and worked in the Springfield, Oregon office, described how Symantec was

13   bringing in deals two to three quarters in advance just to make numbers.  The former

14   Manager Bill and Collect-Finance explained that the new sales team was allowed to bring

15   in deals "that were sort of half baked."   The former Manager Bill and Collect-Finance,

16   who had a background in sales, knew that deals were allowed to go through when

17   customers really did not have a thorough credit check.

18       138.    There were a few multi-million dollar deals where the former Manager Bill

19   and Collect-Finance and her boss were told to ignore the fact that the deals were

20   inappropriate and that the customers were not going to be able to pay two to three quarters

21   out.  The former Manager Bill and Collect-Finance explained that around January 2016,

22   one deal was worth approximately $6 million, and they were allowed to bring it in about

23   two quarters ahead of time to make numbers for the end of the fiscal year.  According to

24   the former Manager Bill and Collect-Finance, deals like that occurred every quarter after

25   the Blue Coat acquisition.  The amount of deals improperly being pushed through was

26   millions of dollars.

27       139.    The former Manager Bill and Collect-Finance further explained that a lot of

28   customers were sending her emails saying that they did not want to sign the deal with

1  Symantec, but the sales rep forced them to.  She received three such emails in the quarter

2  prior to her departure from the Company.  Moreover, the former Manager Bill and Collect-

3  Finance stated that Symantec would promise the customer something to make these deals.

4  Specifically, at DigiCert (where the former Symantec employee worked at the time the

5  Class Action complaint was filed),[18] she saw two instances where the customers had been

6  promised a number of free security certifications from Symantec.  Symantec promised

7  them X number of free security certificates to bring this deal now, and the customer would

8  pay for it with extended terms.  The extended terms either did not come through Finance,

9  or if they did, Finance was forced to push them through.  According to the former Manager

10  Bill and Collect-Finance, revenue had to have been recognized improperly because

11  DigiCert was still trying to get paid for deals that occurred over a year and a quarter ago.

12       140.    The former Manager Bill and Collect-Finance further explained that the

13  practice of pushing deals through continued at least until after she left the Company.  The

14  former Manager Bill and Collect-Finance frequently received calls from the highest

15  executive staff, such as Garfield, telling them to release those orders or to allow those

16  orders to go out.  There would be a fight about it, but Garfield would indicate that the order

17  to do so had come from someone else above him.  He would quote Defendant Clark or

18  Noviello.

19       141.    In addition, a Senior Financial Analyst working at Symantec on a contract

20  basis from May 2017 to July 2017, who was tasked with transitioning the

21  merger/acquisition to Symantec of Watchful Software and who worked in New Jersey,

22  stated that she questioned the way that Symantec was bringing in revenue.  Specifically,

23  the former Senior Financial Analyst explained that Watchful Software had a lot of deferred

24  revenue, including maintenance revenue, that went on for years.  According to the former

25  Senior Financial Analyst, Symantec discounted that deferred revenue to approximately

26  50% and recognized it all upfront.  The former Senior Financial Analyst provided the

27  ───────────────

28  [18] DigiCert acquired Symantec's Website Security and related PKI solutions in 2017.

following example of this practice: take a subscription for a three-year sale that was going to be $10,000 recognized over a three-year period. Symantec would say that they were not going to recognize this over three years. Instead, they were going to make it $5,000 and recognize it all today. But it was revenue that was going to be earned over time.

142. Moreover, Eloisa Schnurr, a Senior Manager in Finance at Symantec who coordinated Symantec's integrations, told the former Senior Financial Analyst that the former Senior Financial Analyst did not need to record deferred revenue entries because "we got rid of that."

143. The former Account Executive referenced in ¶135above similarly stated that she left Symantec because Symantec wanted employees to pull in deals during Q1, Q2, or Q3 at half the revenue to make that quarter look better. The former Account Executive stated that a substantial amount of the deals in 2017 and 2018 were pulled in from future quarters, and that one of the reasons she left the Company was because her quota was based off of the prior year plus an expected growth, and pulling sales forward ate into future quarters and made her job that much harder. The former Account Executive stated that 20% of renewals were brought in early and discounted and that 20% of her renewals for 2018 would be 20% of $500,000. With regard to the East Coast, the former Account Executive indicated that approximately $100,000 per territory for 19 reps on average, so perhaps $2 million would be brought in early.

144. The former Account Executive provided an example that occurred around October 2017, wherein Symantec gave the state of Oklahoma an extremely discounted price – approximately $50,000 in discounts on a deal worth $400,000 – to bring the deal in the quarter before it was supposed to close. The products involved included Symantec EndPoint Protection and Control Compliance suite and certain Blue Coat proxies.

145. The former Business Development Manager also faced situations where Symantec was giving discounts to partners of 3-5 points or more to get customers to buy products at quarter end or year-end. One such deal involved a million dollar deal with Itaú, a financial institution in Brazil, in 2017. The former Business Development Manager also

1    knew of past cases where a partner told Symantec that a deal that had not yet come through
2    from a customer but would come through in the future, but Symantec was still registering
3    the deal as completed and closed.  This would mean that the Company was recognizing
4    revenue on the deals because it was registering them as closed in Salesforce.

5    146.   The former Business Development Manager stated that pushing through
6    deals that should not have gone through to meet quarterly or yearly targets happened all
7    the time.  The former Business Development Manager remembered a deal worth
8    approximately $3-5 million with Wells Fargo in 2018 that the Company booked in an
9    earlier quarter than it was supposed to be booked. She estimated that out of the $80 million
10   that her business unit made per year, 20% of their accounts were pulled into an earlier
11   quarter.

12   147.   The former Business Development Manager stated that frequently the
13   customer received a certificate for a product but it would need date adjustments for the
14   starting date.  The customer was not entering the same specific date and would lose a few
15   days if not corrected.  The customers would tell her that the certificate is for date Y but that
16   the former Business Development Manager was bringing them date X.  This happened
17   more with renewals, and according to the former Business Development Manager, this was
18   a way to recognize the numbers earlier.  This happened pretty often, and it would happen
19   depending on the compensation policy because the sales team and leadership were trying
20   to achieve the targets and goals.  Leadership in the renewals process would have been
21   involved in the decision to recognize deals early; it would not have been the decision of
22   one sales representative.

23   148.   The former Business Development Manager was aware of deals booking
24   early because she knew when the bid was about to come and when Symantec was
25   negotiating with a customer.  The former Business Development Manager would know
26   that the bid had not happened yet, but would see the deal go through in Salesforce.

27
28

### c.      Multiple Year-End Transactions Were "Double-Booked"

149.   As set forth below, Defendant Clark was personally and directly involved in approving six "double digit" million-dollar deals – which can be estimated to amount to a total of at least $63 million dollars – that a former Symantec employee believes were double-booked in 4Q17 and 1Q18.  This sum was material both to Symantec's reported financial results as well as Defendants' ability to meet their bonus targets for 2017.

150.   Specifically, the former Symantec Account Manager who managed the Verizon account, said that individuals who came over from Blue Coat to Symantec were violating the rules applicable to public companies, including the Sarbanes-Oxley Act of 2002 ("SOX").  As this former Account Manager put it, "It was almost like they did not understand the rules of a publicly traded company, or they just didn't care."  She explained that the Company was not accurately and completely recording some financial information related to revenues, and there were breaches of SOX on multiple levels with the new management team coming in through the Blue Coat acquisition.  The former Account Manager left Symantec because she knew these issues would come out.  The former Account Manager worked at Symantec from December 2013 until October 2017 in the Tampa/St. Petersburg area, working remotely and reporting to different managers over time, including Regional Vice President Rich Ruggiero (based in New York) and, subsequently, Tim Hankins (a former Blue Coat employee also based in New York who was "very close" to former COO, Michael Fey).  Among other things, the former Account Manager handled the Verizon account.

151.   The former Account Manager stated that her manager, Tim Hankins, was fired because of unethical behavior and that Michael Fey followed quickly behind him. She stated that there was an internal ethics investigation going on at Symantec in addition and in parallel to the Audit Committee investigation.

152.   The former Account Manager saw the first breach in the fourth quarter of fiscal year 2017.  Specifically, the former Account Manager was responsible for driving all net new purchases as well as maintaining and overseeing renewals of existing solutions.

There are specific approval processes that have to go through Symantec's systems to ensure that renewals stay at a run rate. It is very strict and run rates that occur on renewals cannot go below a certain level.  According to the former Account Manager, it takes a while to get all the approvals for these deals and if there are any changes or additional discounting during the negotiations, it has to go back through the approval process.

153.    As noted, the former Account Manager explained that she managed the Verizon account, which was Symantec's largest account on the East Coast (she also handled the AT&T account for a period of time).  She explained that Verizon was negotiating, and certain management got worried about closing a $13 million deal at the end of the fourth quarter of fiscal year 2017, which included a new product—Data Loss Prevention Connector—and renewed products such as Data Center Security, and Symantec Endpoint Protection.  According to the former Account Manager, Steve Tchejeyan, Head of Global Sales at Symantec, breached SOX specifications.  Tchejeyan spoke with one of the contacts he knew at Verizon from his Blue Coat days that was involved in the transaction, and without consulting the former Account Manager, her boss, or her boss's boss, and without getting any approvals through the system, made a verbal agreement to give Verizon $1 million off the entire transaction.

154.    This created tremendous havoc throughout Symantec's whole process. For example, according to the former Account Manager, approvals had to be made and overridden because renewals were not allowed to go below a certain amount.  The former Account Manager explained that relevant accounting practices do not allow renewals to go below a certain number called a run rate.  The deal created a lot of issues for the renewal team because they were discounting on products they cannot discount that low, but they all had no choice.  Without approvals and without consulting anyone downstream, Tchejeyan made a personal, verbal deal with an executive at Verizon that he had contact with.  This executive did not even own all of the products at issue, it was merely someone Tchejeyan had contact with from his Blue Coat days.  Tchejeyan's actions breached SOX.  The former Account Manager stated that the Pricing and Licensing employees would have been well

1    aware of this improper deal because it fell outside of the rules and regulations for booking

2    deals.

3         155.   The former Account Manager further explained that the $13 million Verizon

4    deal happened on Friday, March 31, 2017. The cut-off for year-end was March 31 at

5    midnight Pacific time.  She received her sales order number right before the year-end

6    cutoff, which meant the deal made it through the system and she would receive

7    compensation/credit for it in that fiscal year (*i.e.*, 2017).  She noted that they were

8    upgrading the financial system that weekend to an Oracle application. But, when the former

9    Account Manager came back to work on the Monday (*i.e.*, April 3, 2017) and checked the

10   Oracle application in which everything was booked, the Verizon deal was no longer booked

11   with a Q4 end date in the new system and, instead, it had a Q1 end date.  The deal also did

12   not have the right products and included products that Verizon did not even own.  The

13   former Account Manager believes that someone manually changed the booking in the

14   system to go into Q1 2018 because each line item in the system said "Manual Adjustment,"

15   which the former Account Manager described as a "huge accounting flag."  The former

16   Account Manager explained that if this was just a system malfunction, the relevant

17   products for the Q4 deal and the Q1 deal would be the same, but they were different in the

18   system.

19        156.   The former Account Manager further stated that many people know about

20   this within Symantec.  She explained that, after her manager – who at the time was Regional

21   Vice President Rich Ruggiero – did some digging, Mr. Ruggiero reported to her that the

22   booking of a Q4 deal in Q1 happened to five other Symantec Account Managers. The

23   former Account Manager elaborated that the five other deals were all "big," "double digit"

24   million- dollar deals likely involving some of Symantec's largest customers that were

25   booked in Q4 but ended up in Q1.

26        157.   With respect to her $13 million Verizon deal, the former Account Manager

27   went to her boss and her boss's boss to ask what happened.  Ultimately, the former Account

28   Manager had to write a justification to Defendant Clark documenting the order numbers

1   for Q4 to prove that it actually booked in Q4, and the former Account Manager ultimately

2   received credit for the deal as a Q4 deal at the Q4 rate.   The former Account Manager

3   knows that Defendant Clark was fully aware of the issue, and Defendant Clark responded

4   to the former Account Manager's email telling her that the deal was approved. The other

5   five account managers who experienced the same issue all similarly had to write to

6   Defendant Clark to get credit for the deals as Q4 transactions.   Indeed, Defendant Clark

7   was the only person who had the authority to approve the account managers getting paid

8   for these orders in Q4.   According to the former Account Manager, one need only "audit"

9   Defendant Clark's emails to prove that he knew that this was happening.

10         158.   The former Account Manager elaborated that she believed that these six

11   "double digit" million-dollar deals were "double booked" in both Q4 of 2017 and Q1 of

12   2018.   In that regard, the former Account Manager was paid as though the $13 million-

13   dollar Verizon deal was booked in Q4 of 2017, but she could see in Symantec's system

14   that someone had manually changed it to Q1 of 2018 – and that it remained booked in Q1

15   of 2018.   Indeed, she reported that Symantec never fixed the issue in the system.   According

16   to the former Account Manager, this told her that the deal was counted in both the previous

17   fiscal year in 4Q17 and then counted again in 1Q18 and, for this reason, she believes the

18   Company double booked the deal.   The former Account Manager stated that she carried a

19   resignation letter with her from March 2017 through October 2017 when she left Symantec

20   because she was so concerned about how this deal occurred.

21         159.   Relatedly, the former Account Manager recalled that around the same time

22   the "double booking happened" the Company announced that Symantec had "adopted a

23   mutual arbitration agreement program ('Arbitration Agreement')."   The Arbitration

24   Agreement required employment-related disputes to be referred to confidential arbitration.

25   While employees could opt-out of this agreement (which the former Account Manager

26   did), she (and other employees) were "very suspicious" that the timing coincided with the

27   above-described events.   Further, the former Account Manager stated that she was ***not***

28   interviewed in connection with the Audit Committee internal investigation.

160.   The former Verizon Account Manager's report was corroborated by the former Account Manager referenced in Paragraph 111.  She recalled a conversation with the Verizon Account Manager in in 2018 in which the Verizon Account Manager disclosed the $13 million double-booked Verizon deal and how the Verizon Account Manager was "livid" and "concerned" about what had happened.  Similarly, the former Director of Enterprise Ecommerce Payment and Risk, alleged in Paragraph 116, stated that she learned that the Company had double-booked revenue from Verizon and other large deal in 4Q17 and 1Q18 while performing an internal audit.  She further explained that as a former employee in the managed credit and collections department, she received a lot of "pushback" from senior management when attempting to collect from Verizon during that time frame.  She believed this occurred as a result of the Verizon deal being double booked.

161.   These six "double booked" deals in 4Q17 and 1Q18 were material to Symantec's reported financial results.  Even if each of the five other "double digit" million-dollar deals were the minimum – *i.e.*, $10 million each – the total amount double booked would be at least $63 million (*i.e.*, 5 x $10 million + $13 million = $63 million).  This was *5.4%* of Symantec's reported net revenues for 1Q18. Symantec's software sales were pure profit and, as such, the revenue from these transactions flowed directly to Symantec's earnings.   Further, if these double-booked deals totaled at least $63 million, the six transactions accounted for approximately *17%* of Symantec's non-GAAP operating income for 1Q18 of $377 million (*i.e.*, $63 million / $377 million).

162.   These double booked transactions were also material to Defendant Clark and former CFO Noviello hitting their bonus targets for fiscal 2017. As also discussed below, Defendant Clark and Noviello "achieved" their 2017 bonus targets by a razor thin margin – *i.e.*, by only $46 million.  Thus, if Symantec's revenue was overstated by $46 million, management would have missed the minimum revenue target for compensation.  In that event, the revenue-related portion of managements' bonus would have fallen to zero percent rather than the 100% based on the amounts management reported.

| Metric | Minimum Threshold | Amount Reported | Delta |
|--------|-------------------|-----------------|-------|
| Revenue | $4,040,000,000 | $4,086,000,000 | $46,000,000 |

163.   Further, the second portion of managements' bonus was driven by non-GAAP operating income.  For FY17, Symantec reported non-GAAP operating income of $1,197 million.  This income level equated to a bonus payout of 125% of the target.  That bonus payout, however, would have declined incrementally if reported income declined, which it would have without the double-booked transactions.

164.   Given that the six double booked deals totaled at least $63 million (as set forth above), they had an outsized impact on managements' achievement of the 2017 bonus targets.  First, without the $63 million in double-booked transactions, Defendant Clark and Noviello would have missed the revenue target entirely – *e.g.*, $4,086,000,000 – $63,000,000 = $4,023,000,000 or $17,000,000 less than the minimum revenue threshold.  Second, the operating income target would have fallen to $1,134 million or approximately 76% (rather than 125%) of the income-related target.  Taken together, Defendant Clark and former CFO Noviello would have realized only approximately 40% (*i.e.*, the average of 0% of revenue and approximately 76% of operating income) of their 2017 bonuses rather than the 111% they received based on the improperly reported numbers.

165.   The former Account Manager further explained that her boss, who came over from Blue Coat and was good friends with Michael Fey, asked her multiple times on conference calls to make a verbal agreement with Verizon.  The former Account Manager refused and found the request shocking.  According to the former Account Manager, there is a compliance document that everyone at Symantec has to sign that states that they have made no side agreements.  A verbal agreement is considered a side agreement.

166.   The former Account Manager's boss requested that the former Account Manager enter into verbal agreements on conference calls with other people on the former Account Manager's team 2-3 more times on different calls about different products. The team members were asking themselves what was going on, and what kind of business

processes do these people follow. Entering into such a verbal agreement would be grounds for termination.

**B.     Defendants' Non-GAAP Reporting was Misleading and Violated SEC Rules and Regulations**

**1.     SEC Guidance for Non-GAAP Measures**

167.    Symantec reported "non-GAAP financial measures" in earnings releases and financial statements.  Such adjusted financial measures are not required disclosures under GAAP or SEC rules.  The intended purpose of including such supplemental financial measures is to allow management to present an adjusted picture of the company's past or future financial performance.  These adjusted financial measures typically remove the effect of certain revenues and expenses that may be non-recurring or not part of the company's ongoing business operations.  If a company takes a defined GAAP measure, such as net income, and adjusts it to include or exclude particular revenues or expenses, the adjusted number is the non-GAAP measure.

168.    Investors, analysts, and other market-makers focused heavily on Symantec's adjusted metrics during the Relevant Period.  Moreover, Defendants used these adjusted metrics almost exclusively when describing Symantec's performance, as well as planning and forecasting future periods.  The Company reported non-GAAP measures for net revenues, operating income, operating margins, net income, and earnings per share.

169.    Because of the importance of the adjusted numbers, Symantec used them to determine executive compensation, including bonuses, stock grants, and the amount of those bonuses and stock grants.  Symantec set non-GAAP metric targets and corresponding compensation payouts for each fiscal year.

170.    Due to companies' increased reliance on these adjusted metrics, and because the metrics allow some leeway for management to control (and potentially abuse), the SEC has issued rules, regulations, and guidance that apply when a company publicly discloses or releases financial information that includes an adjusted measure.  Among others, Regulation G (17 C.F.R. § 244.100), which applies to the disclosure of adjusted measures,

prohibits a company from making public an adjusted financial measure that is misleading or omits to state a material fact. 17 C.F.R. § 244.100(b) provides:

> A registrant, or a person acting on its behalf, shall **not make public a non-GAAP financial measure that**, taken together with the information accompanying that measure and any other accompanying discussion of that measure, **contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.**

171.    The SEC further prohibits a company from filing with the SEC an adjusted measure that adds back normal, recurring expenses that are necessary to operate the Company's business. 17 C.F.R. § 229.10(e)(1)(ii)(B), provides:

> A registrant must not: (B) Adjust a non-GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the nature of the charge or gain is such that it is reasonably likely to recur within two years or there was a similar charge or gain within the prior two years.

172.    The SEC also publishes Compliance & Disclosure Interpretations ("C&DIs") containing questions and answers relating to adjusted financial measures. The C&DIs include the following questions and answers:

> **Question:** Can certain adjustments, although not explicitly prohibited, result in a non-GAAP measure that is misleading?
>
> **Answer:** Yes. **Certain adjustments may violate Rule 100(b) of Regulation G because they cause the presentation of non-GAAP measures to be misleading.** For example, presenting a performance measure that excludes normal, recurring, cash operating expenses necessary to operate a registrant's business could be misleading.
>
> **Question:** Can a non-GAAP measure be misleading if it is presented inconsistently between periods?
>
> **Answer**: Yes. **For example, a non-GAAP measure that adjusts a particular charge or gain in the current period and for which other, similar charges or gains were not also adjusted in prior periods could violate Rule 100(b) of Regulation G unless the change between periods is disclosed and the reasons for it explained.** In

addition, depending on the significance of the change, it may be necessary to recast prior measures to conform to the current presentation and place the disclosure in the appropriate context.

173. It is thus a violation of SEC Regulation G and Regulation S-K for a company to report adjusted financial measures that are misleading, omit to state a material fact necessary to make them not misleading, and/or exclude expenses in an adjusted measure that are normal and/or recurring and are necessary to operate the company's business.

174. In addition to the SEC's clear and specific guidance in the C&DI's regarding accurate reporting of adjusted financial measures, the SEC's Division of Corporate Finance further published the following directive: "If management is presenting the non-GAAP calculation as an alternative or pro forma measure of performance, the staff discourages adjustments to eliminate or smooth items characterized as nonrecurring, infrequent, or unusual."

175. Furthermore, pursuant to SEC guidance, "Whenever one or more non-GAAP financial measures are included in a filing with the Commission: (i) The registrant must include the following in the filing: … *A statement disclosing the reasons why the registrant's management believes that presentation of the non-GAAP financial measure provides useful information to investors* regarding the registrant's financial condition and results of operations…..[and] To the extent material, a statement disclosing the additional purposes, if any, for which the registrant's management uses the non-GAAP financial measure that are not [otherwise] disclosed."

### 2. Defendants Misled Investors About the Reasons for Adjustments to Non-GAAP Measures

176. During the Relevant Period, to calculate its non-GAAP measures, including non-GAAP operating income and non-GAAP operating margin, Symantec excluded certain expenses that were otherwise included in GAAP financials. For example, non-GAAP operating income was adjusted as follows:

| (in millions) | FYE 2017 | FYE 2018 |
|---|---|---|
| Operating Income (GAAP) | ($100) | $49 |
| | | |
| Expenses Added Back as Non-GAAP Adjustments | | |
| Deferred revenue fair value adjustment | 144 | 126 |
| Inventory fair value adjustment | 24 | 0 |
| Stock-based compensation | 440 | 619 |
| Amortization of intangible assets | 293 | 453 |
| Restructuring, transition and other costs | 273 | 417 |
| Acquisition-related costs | 120 | 60 |
| Litigation settlement | 0 | 2 |
| Total non-GAAP adjustments | 1,294 | 1,677 |
| | | |
| Operating Income (Non-GAAP) | $1,194 | $1,726 |

177.   As shown above, one of the Company's adjusted measures removed Symantec's "transition and other costs," which Symantec described as costs that the Company did not incur "in the ordinary course of business."  Internally, the Company often referred to these expenses as "transition and transformation" or "T&T" costs.  According to the Company's reported 10-K's, Symantec incurred $94 million in T&T costs in 2017 and $272 million in T&T costs in 2018.

178.   As required by the SEC, the Company provided an appendix titled "Explanation of Non-GAAP Measures and Other Items" in its Forms 8-K filed on May 10, 2017 and August 2, 2017. This appendix provided Symantec's purported objective in reporting non-GAAP measures.  It stated:

> We believe our presentation of non-GAAP financial measures, when taken together with corresponding GAAP financial measures, provides meaningful supplemental information regarding the Company's operating performance for the reasons discussed below. Our management team uses these non-GAAP financial measures in assessing our operating results, as well as when planning, forecasting and analyzing future periods. **We believe that these non-GAAP financial measures *also facilitate comparisons of our performance to prior periods and to our peers* and that investors benefit from an understanding of the non-GAAP financial measures. Non-GAAP financial measures are supplemental and should not be**

considered a substitute for financial information presented in accordance with GAAP.

179.    This explanation and the reporting of adjusted T&T costs were materially misleading because Symantec's "peers" did ***not*** adjust their non-GAAP measures for T&T expenses.  In fact, Symantec had no sound or supportable benchmarking analysis that would support the accuracy or reliability of this statement.  Indeed, Mr. Brown, the VP of Finance, sent Defendant Noviello an email on September 8, 2017 explicitly stating that **"We don't have any clear/current benchmarking analysis against peer companies"** with regard to non-GAAP measures. (Emphasis in original.)  Symantec thus did not systematically review the non-GAAP measures used by its "peers" nor did Symantec compare whether the non-GAAP measures it employed would make comparing Symantec to its peers any easier.  Just the opposite. Moreover, any comparison between Symantec and its peers was made more difficult – if not impossible – because Symantec was excluding hundreds of millions of dollars in expenses from its non-GAAP measures that its peers were not.

180.    In its 2017 Form 10-K, Symantec listed a number of its competitors, broken out by product market. Symantec's stated competitors in more than one product markets include: Cisco Systems, Inc.; Dell EMC; Division of Dell Technologies, Inc.; IBM Corporation; McAfee, Inc.; Microsoft Corporation; and Zscaler, Inc. Each of these companies, with the exception of Zscaler, Inc., had multiple acquisitions over the past few years proceeding Symantec's 2017 Form 10-K.  Although Symantec's self-identified peers incurred the same types of costs as Symantec, ***none*** of these companies made adjustments to operating income similar to the "transition costs" adjustment made by Symantec.

181.    As part of E&Y's analysis of Symantec's non-GAAP measures started in September 2017, E&Y reported that only two out of Symantec's 38 "peers," or about 5%, were adjusting their non-GAAP measures for "transition costs."  Even then, one of the two companies that was adjusting T&T costs had stopped doing so by March 31, 2017 – Symantec's fiscal year end date.  Accordingly, despite claiming the non-GAAP measures

made comparison to other companies easier, ***only one of Symantec's peers was adjusting for T&T expenses*** during the Relevant Period. E&Y therefore concluded that Symantec was an ***"outlier in terms of the number of [non-GAAP measures] in comparison to our peers."*** E&Y even warned that Symantec's [r]isk in terms of comparison to peer's [non-GAAP measures] reporting" for its T&T costs was "High."

182.   After E&Y's report, Symantec modified its disclosures to remove the language about comparison to peers. Symantec's new disclosure, first included in its Form 8-K for Q2 2018 filed on November 1, 2017, stated that "We believe that these non-GAAP financial measures also facilitate comparisons of our performance to prior periods and that investors benefit from an understanding of the non-GAAP financial measures." Noticeably absent is any mention of comparison to "peers."

183.   However, this revised disclosure was still misleading. First, the Company never disclosed to investors that its previous non-GAAP measures did not facilitate comparison to its peers and never explained the reason for the change. Second, the Company still claimed that the non-GAAP measures facilitated comparison to the Company's prior quarters. But without disclosing that the prior quarter's adjustments were purportedly made to facilitate comparison to "peers" that did not exist, the comparison to Symantec's own prior quarters was itself misleading.

184.   Moreover, as discussed below, Defendants were misleadingly manipulating the Company's non-GAAP measures in 2017 and 2018 by classifying ordinary expenses needed for the Company's ongoing activities as T&T costs. However, Defendants were not manipulating these costs prior to the Blue Coat merger. Therefore, the fraudulently manipulated non-GAAP measures in 2017 and 2018 were ***not*** comparable with Symantec's prior periods which contained no such improper manipulations.

185.   In short, Defendants (i) simply made up that its non-GAAP measures were reported as a way to facilitate comparison to peers and, (ii) once they were caught by E&Y, changed the justification for providing adjusted financial metrics but never provided investors a rationale for the shifting explanation. Defendants obviously did not want to

disclose the real reason for using non-GAAP measures: so Defendants could control and manipulate the accounting in order to reach benchmarks and qualify for large incentive compensation payouts that were tied to the adjustable metrics.

### 3. Symantec Manipulated its Non-GAAP Measures by Excluding Recurring Operating Expenses Incurred in the Ordinary Course as T&T Costs

186.   Not only did Defendants mislead investors by providing false rationales for non-GAAP measures, the metrics themselves were false and misleading because they were being manipulated.   Despite publicly claiming otherwise, Symantec regularly classified expenses incurred in the ordinary course to operate the Company's ongoing business as T&T costs.

187.   Symantec's reported transition costs increased dramatically during the Relevant Period, as reflected below:



188.   With respect to Q2 2018, in its November 3, 2017 Form 10-Q, Symantec reported that transition costs had increased to $76 million, and that the Company had

incurred $120 million in transition costs over the past two quarters. As a result, the Company stated that it had actually incurred $44 million in transition costs in Q1 2018, when it had previously reported in its 1Q 2018 Form 10-Q filed on August 4, 2017 that transition costs for the quarter were $28 million. Symantec provided no explanation for raising its transition costs for Q1 2018 by $16 million, or nearly 60%.

189.     In addition, when Symantec belatedly filed its Form 10-K for fiscal year 2018 on October 28, 2018, Defendants revealed that Symantec had incurred $272 million in transition costs for the full fiscal year 2018, compared to the $94 million it reported in transition costs for fiscal year 2017. As reflected below, this represented a nearly 200% year-over-year increase in transition costs:



190.     The huge increase was due in part to Defendants regularly classifying expenses incurred in the ordinary course to operate the Company's ongoing business as T&T costs. This accounting manipulation, which was prevalent throughout the Relevant Period, violated both the SEC's guidance and the Company's public statements about its non-GAAP measures. SEC requirements make clear that a non-GAAP measure that "excludes normal, recurring, cash operating expenses necessary to operate a registrant's business could be misleading."

191.   Defendants attempted to hide their wrongdoing by giving seemingly valid explanations for what was included in "transition" expenses.  The Company's Form 8-K for Q4 2017, filed on May 10, 2017, misleadingly explained that such transition expenses were **not** incurred in the ordinary operation of Symantec's business:

> We have engaged in various restructuring, separation, transition, and other activities over the past several years that have resulted in costs associated with severance, facilities, transition, and other related costs. Separation and associated costs consist of consulting and disentanglement costs incurred to separate our security and information management businesses into standalone companies, as well as costs to prune selected product lines that do not fit either our growth or margin objectives. **Transition and associated costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes.** Additionally, other costs primarily consist of asset write-offs and advisory fees incurred in connection with restructuring events. **Each restructuring, separation, transition, and other activity has been a discrete event based on a unique set of business objectives or circumstances, and each has differed from the others in terms of its operational implementation, business impact and scope.  We do not engage in restructuring, separation, transition, or other activities in the ordinary course of business.** While our operations previously benefited from the employees and facilities covered by our various restructuring and separation charges, these employees and facilities have benefited different parts of our business in different ways, and the amount of these charges has varied significantly from period to period.  **We believe that it is important to understand these charges and that investors benefit from the presentation of non-GAAP financial measures excluding these charges to facilitate a more meaningful evaluation of our current operating performance and comparisons to our past operating performance.**

192.   While the definition of "transition costs" was changed several times throughout the Relevant Period to include "continuing significant transition costs associated with the implementation of a new enterprise resource planning system and costs to automate business processes," "costs associated with divestitures of our product lines and businesses," and "formal discrete strategic information technology initiatives," these statements all were materially false and misleading because they failed to disclose to

investors the essential fact that hundreds of millions of dollars in ordinary expenses needed for the ongoing business were being classified as "transition expenses."

193.    Symantec improperly manipulated T&T costs through multiple projects:

a.    **Project Athena**

194.    In June 2017, the Company initiated "Project Athena" to consolidate and overhaul Symantec's Enterprise Resource Planning ("ERP") systems.  According to a former Symantec employee (whose identity was sealed in the Class Action), however, "the project's sole purpose was to move recurring costs into one-time expenses." Indeed, many of the project's initiatives were necessary for ongoing business operations but were falsely labeled as T&T costs.

195.    For example, one of the tasks under Project Athena was updating the Company's software to calculate and report revenue in compliance with a new FASB accounting standard ASC 606.  Symantec considered costs associated with the ASC 606 implementation a T&T expense and therefore excluded it from its non-GAAP measures. However, implementing and complying with new or existing accounting rules is an ordinary business expense which companies incur with respect to their ongoing operations. Therefore, including these expenses as T&T costs is false and misleading, especially as Symantec's disclosures claimed that T&T expenses were not incurred in the Company's normal course of business.

196.    E&Y's findings specifically concluded that "costs associated with accounting implementation projects, such as the new revenue standard and related implementation of RevPro system" were ***"T&T costs [that] could be challenged as being normal or recurrent costs"*** due to the ***"nature of the costs and the frequency of the adjustments."***  These findings were presented to the Audit Committee, with Defendants Clark and Noviello in attendance, on November 16, 2017.  Remarkably, the Company continued to treat expenses incurred in implementing the ASC 606 accounting standard as a T&T cost through at least March 2018.

197.    Another aspect of Project Athena that was treated as a T&T cost was the "Buy-Sell" initiative.  Due to changes is international tax rules, Symantec decided that its foreign subsidiaries, who previously operated as "intercompany service provider[s]," would now function as buy-sell distributors.  The stated reason for the change was to "mitigate tax exposure and comply with foreign government tax policies."  Under a buy-sell model, the Company estimated that it would "forgo tax increases of approximately $125M annually for the Enterprise Business."

198.    Initially, Symantec's technical accounting department determined that the buy-sell initiative did not "fit our definition of T&T."  Nevertheless, Symantec attributed more than $20 million of costs associated with the buy-sell initiative as T&T costs.  This was false and misleading because expenses relating to mitigating tax exposure is a task all companies undertake in the normal course of business and in furtherance of ongoing business activities.

199.    This conclusion was also confirmed by E&Y's report, which noted that the "Buy Sell implementation project" were expenses that "could be viewed as recurring cash operating expenses" and are not T&T costs.  Again, despite the fact that E&Y's findings were presented to the Audit Committee, including Defendant Clark, on November 16, 2017, Defendants continued to treat the buy-sell initiative as a T&T cost through March 2018.

200.    Project Athena also included expenses for a "controls" initiative.  Internal documents explained: "Risk Assessment Analysis will be documented for each consolidation and any controls deemed insufficient will be resolved and signed-off by the business leaders and agreed upon with CRA."  Thus, the "controls" initiative was designed to test and remediate the Company's internal controls affected by the consolidation and ensure that its ongoing controls were sufficient.  Symantec recorded up to $1.3 million of expenses related to Project Athena's controls initiative as T&T costs in fiscal year 2018.

201.    However, as part of their ongoing business, all companies are required to devise and maintain a system of internal accounting controls sufficient to provide

1   reasonable assurances that its financial recordings are accurate.   Therefore, expenses

2   incurred in resolving "controls deemed insufficient" are expenses incurred in the ordinary

3   course of business and are incurred as part of Symantec's ongoing business operations.

4   Defendants misleadingly categorized many of these ordinary expenses as T&T costs.

5       202.   Throughout Q4 2017 and the full fiscal year 2018, Symantec's Project

6   Athena alone falsely excluded more than *$38 million* of expenses incurred in the ordinary

7   course and for its ongoing business operations from its non-GAAP measures by claiming

8   such expenses were merely T&T costs.

9                      b.   **Project Bedrock**

10      203.   Project Bedrock was another initiative for which the Company falsely

11   categorized expenses as T&T costs by Symantec.   The project was designed to upgrade

12   Symantec's security systems and centralize its security resources.

13      204.   Like with the buy-sell initiative under Project Athena, Symantec's technical

14   accounting team originally found that Project Bedrock did ***not*** qualify for T&T

15   categorization.   After the initial denial, Symantec's tax department asked technical

16   accounting to reassess the treatment, but the department ***again*** found that the project did

17   not fit under the Company's T&T definition and was instead a regular operating expense.

18   Symantec's general counsel, Scott Taylor, then got involved.   On July 21, 2017, he

19   forwarded the technical accounting team's rejection directly to Defendants Clark and

20   Noviello and asked them for "some help with Technical Accounting."   Defendants Clark

21   and Noviello then emailed each other with a plan to "discuss live," *i.e.*, to avoid creating a

22   paper trail.

23      205.   After Defendants Clark and Noviello were brought in for "help," the

24   expenses associated with Project Bedrock were classified as T&T and were excluded from

25   Symantec's non-GAAP measures.   Because of Defendant Clark and Noviello's direct

26   involvement – and in contradiction to technical accounting's multiple rejections –

27   Symantec falsely categorized over *$5 million* of expenses incurred in connection with the

28   Company's ongoing business as T&T costs during fiscal year 2018.

206.     This treatment for Project Bedrock was also improper because the total costs for the project was only $17 million.  However, under Symantec's internal policies as set forth in the Accounting & Compliance, Technical Accounting, *Non-GAAP Adjustments*, policy from December 29, 2017, only projects with more than $25 million in total expenses can be categorized as T&T costs.  Indeed, during his exit interview Defendant Garfield explained that he instituted a "dollar threshold for approval of $25M" to ensure that the non-GAAP measures were a "true representation of ongoing costs of running the company."  Categorizing expenses that fall below the threshold as T&T costs creates another financial reporting issue.  Without consistency, the adjustments and their effects on non-GAAP operating income cannot rationally be compared to prior quarters where such expenses would not have been excluded, *i.e.*, *as* falling under the threshold.

### c.     **Project Ace**

207.     Expenses associated with Project Ace were also improperly treated as T&T costs. The project had two components: a potential divesture of a business unit to AT&T and an arrangement with AT&T to market Symantec products to AT&T customers.  The deal was never finalized, but nevertheless, Symantec categorized approximately $4.3 million in research and due diligence costs from the deal as T&T costs in fiscal year 2018.

208.     Categorizing these expenses as T&T costs was materially false and misleading.  Indeed, Abby Morrill, the head of Symantec's technical accounting team, originally found that Project Ace expenses were *not* T&T because (a) the project was not approved by the Board for non-GAAP treatment, and (b) Symantec had told the public that it was "looking to do acquisitions each quarter and thus, the costs to do the due diligence, research, etc. are recurring and thus [operating expenses]."  Ms. Morrill explained her rationale to Mr. Brown, who was the VP of Finance at the time, but given the intense pressure to meet budget, Mr. Brown overrode her determination, and the Project Ace expenses were misleadingly categorized as T&T costs.  On September 22, 2018, Mr. Brown informed Defendant Noviello of technical accounting's determination that the expenses did not qualify as T&T, as well as his "call" to override the determination.

209.   Given that these expenses were part of the normal, ongoing operating expenses for Symantec and that technical accounting team determined they were not T&T costs, Defendants violated SEC guidance and regulations by excluding Project Ace's expenses from Symantec's non-GAAP measures.

### 4.   Former Employees Confirmed that Non-GAAP Measures Were Widely Manipulated and Incapable of Calculation

210.   All of Symantec's reported T&T costs were false and misleading because the Company provided false reasons for reporting and using those numbers.  At an absolute **minimum**, Symantec falsely categorized approximately **$50 million** of ordinary course expenses incurred in connection with the Company's ongoing business as "T&T" costs during fiscal years 2017 and 2018 based on the projects addressed above.  However, the total amount of the fraud may never truly be known.

211.   During his exit interview, Defendant Garfield explained that "figuring out a restatement" to fix all the expenses incorrectly categorized as T&T expenses would "be impossible" because the Company did not "track" what expenses were properly called transitory and which were not.  Indeed, Garfield explained that employees put forth an "effort to expand the definition of Transition cost" which was **"ridiculous,"** and that management was **"putting all different kinds of things under transition"** and **"into GAAP-only that shouldn't be there."**  Indeed, E&Y's report confirmed that for certain of Symantec's costs, "such as T&T and acquisition and integration, **sufficient controls do not exist** to validate that those costs are of the appropriate nature and type for that categorization."  VP Brown confirmed that Symantec did **not** have "a review process of the actual expenses hitting GAAP-only accounts."

212.   Accounts from former employees confirm that the improper categorization of T&T costs was widespread and explains why Garfield thought the extent of the problem was unknowable.  For example, the former Director Enterprise Ecommerce Payment and Risk stated that she "**was in shock and awe** at the way Blue Coat chose the way to do things," and that "this was the main thing, they were using transaction costs and

capitalizing them."   The former Director Enterprise Ecommerce Payment and Risk confirmed that Blue Coat management recorded continuing non-transition operating expenses and recurring operating expenses as transition costs.

213.   The improper accounting of T&T costs was corroborated by numerous additional former employees, whose accounts were set forth in the Class Action Complaint. The accounts of these additional former employees, set forth in ¶¶214-218 below, are taken verbatim from the Class Action Complaint.

214.   Symantec's former VP and CSO explained that she had a lot of insight and exposure to Symantec's classification of project costs as transformative or transition costs that could be excluded from non-GAAP income because a huge number of projects that Symantec was attempting to do that for fell under the CIO (her former boss), and because significant ERP [enterprise resource planning] projects, significant cloud infrastructure projects, and many of the security issues that she was personally responsible for were pushed into that bucket.

215.   Symantec's former VP and CSO explained that they were under incredible scrutiny at the budget level, and one way to maintain operational budget was to classify some of these projects as transformational. The option to classify projects as transformational was available to them and increasingly widely used.  It was suggested that they consider using that option so as not to have to fund through their operational run budget.  There was a justification process and guidance given to justify whether a cost qualified was transformational, and her team went through a number of them with Jordan. According to Symantec's former VP and CSO, "it was being quite aggressively used."

216.   Symantec's former VP and CSO explained that there were a number of things that were not going to get done unless they were classified as transformational, and Symantec started using this bucket more following the Blue Coat acquisition.  She further explained that the practice of classifying costs as transformational or transformative, and specifically using a transformational bucket and capitalizing the labor under that, definitely accelerated following the Blue Coat acquisition.  If labor could be capitalized under that,

it would be.  As Symantec's former VP and CSO stated, "the numbers were huge" in that bucket; they were in at least the high tens of millions.  Some of the projects, including those around the cloud transformation and cloud build out, had big dollar numbers.  According to Symantec's former VP and CSO, the high dollar amount projects went through more scrutiny.

217.   Symantec's former VP and CSO further explained that some of her projects that would normally be put through as operational run projects were now being put into this transformational bucket and could be capitalized.  Symantec's former VP and CSO stated that the process of classifying costs as transformative "was used as a mechanism to be able to get large pieces of work done that otherwise wouldn't fit into operational budgets, knowing that you would pay the price when depreciation hits in the future."  In her opinion, this practice was aggressive.  Symantec's former VP and CSO explained that costs in the transformative bucket were being capitalized but would then depreciate, which would show as a hit against operational budget in future years.  They were essentially smoothing out the hit over multiple years, rather than taking it all at once.

218.   Symantec's former VP and CSO further explained that Jordan (CIO) worked closely with a member of the Finance team on the process of classifying costs as transformation costs. Jordan was under a lot of pressure and scrutiny from Defendant Clark and Noviello.  According to Symantec's former VP and CSO, there was an inner sanctum and Jordan was not part of it. Jordan was under quite a lot of scrutiny from Clark from the time he took over, which was evidenced in the fact that she was pushed down in the organizational chart underneath Noviello.  Based on Symantec's former VP and CSO's personal conversations with Jordan, she knew that she was under tremendous scrutiny from Noviello to justify her job and explain cost management in IT.  Symantec's former VP and CSO confirmed that more costs were moved in the direction of transformative or transformational costs once Blue Coat came in.

219.   Symantec's former VP and CSO further explained that Jordan had the incentive to want to get things done, and classifying project costs as transformation or

transformative was a mechanism through which to do it. Jordan was pressing or pushing employees to consider opportunities to classify costs this way, especially in her infrastructure space where a big amount of her spend occurred. Jordan herself was under pressure from the management team to do the same. Jordan was looking at all avenues to manage the operational budget, and this was one of the avenues. There was constant budget pressure during this period, and there was especially pressure when it would have been a poor financial move to stop a project. It was the former VP and CSO's understanding, confirmed by the messaging Jordan conveyed to them, that she was under continued budget pressure and continued pressure to look at financial costs, and this was a mechanism through which they could get stuff done. According to Symantec's former VP and CSO, there were a number of projects well in place when Blue Coat showed up, and there was pressure to find ways to continue them.

220.    For example, Symantec's former VP and CSO stated that one type of project they were classifying as transformative or transitional was the building of a private cloud using Cisco technology. This was an extension of Jordan's data center strategy of where they were going to be in the next 4-5 years. Symantec's former VP and CSO looked at that as an extension of what they had to do in terms of operational run, and she questioned whether it was transformative for the business or just future planning for ongoing run.

221.    Symantec's former VP and CSO confirmed that many things were put in the transformation/transformative bucket that were questionable as to whether they were really transformation or for ongoing run. There was a significant uptick in the usage of transformational costs and the Company's ability to spread costs out, and she had questions about the appropriateness of the decisions. They had not used this mechanism a lot earlier in the former VP and CSO's tenure.

222.    Symantec's former Senior Manager Information Technology at Symantec from 2010 until October 2017, who had worked at Symantec for 20 years and was based out of the Springfield, Oregon office and reported to Denell Dickenson, the director of the business operations team, was responsible for the financial operations for her overall team

in the sense that she interacted with the finance team and finance controller to ensure that things were reported properly and was essentially the internal financial coordinator. The former Senior Manager Information Technology was not part of the Finance Department, but she was the internal person who handled the finances for the network hosting data center under Chandra Ranganathan.

223.   The former Senior Manager Information Technology confirmed that there was a lot of pressure to cut expenses and the budgets were being cut tremendously. According to the former Senior Manager Information Technology, the biggest issue they had when talking about projects was being able to label the work as totally transformational or not totally transformational and being able to tie any kind of action as being a transformational cost as opposed to a cost to just keep things running or in other words, an operational cost.

224.   The former Senior Manager Information Technology explained that the approach the Company took was a percentage approach. Therefore, a percentage of the project would be called transformational with no real way of tracking whether it was real. The reality could have been over that percentage or under that percentage. Every project in a category got the same percentage, which was merely an educated guess by the SVP, Ranganathan. Projects were placed into categories. One category would be 50%; another would be 25%; and some would be 100% because some projects were obviously 100% transformational. Projects would be put into these different categories, and then it was determined that a certain percentage of that project would be classified as transformational/transitional cost even if it was normal operating cost.

225.   The former Senior Manager Information Technology stated that she pushed back against Ranganathan and Dickenson, including with respect to implementing new procedures and developing new technologies, as developing technologies to make things easier to use is more operational. For example, for one project involving Cognizant there was a team working simultaneously on a transformational project and an operational project, and the percentage classification for the transformation bucket was applied to both.

226.   The former Senior Manager Information Technology stated that the percentage system was aggressive. She questioned why this project is 50% and why this one is 25% if they could not sit down and analyze and actually track what is transformative and what is operational, but they did not have the time to do that kind of analysis. They did not have the time due to budget pressure but also due to time pressure. The former Senior Manager Information Technology was concerned that the way the percentages were decided was risky and that they would not be able to justify it down the line.

227.   The former Senior Manager Information Technology confirmed that in addition to Ranganathan, Michael Gittleman (finance controller) and the team responsible for the bucket, the overall IT operations team, knew about the aggressive percentage classification.

228.   The former Senior Manager Information Technology further confirmed that they were under incredible scrutiny at the budget level, and one way to maintain operational budget was to classify some of these projects as transformational.  The former Senior Manager Information Technology further confirmed that "transformation bucket" was the term they used at Symantec, and that the numbers in that bucket were huge and in at least the high tens of millions.  The former Senior Manager Information Technology further explained that they had a huge budget provided for transformational costs, and the Company slashed the operational budget to nothing.  The operational budget was slashed down to the bare bones.  Because transformational costs are not GAAP associated, they were able to spend money there instead.

### 5.   Defendants Knew or Recklessly Disregarded that Symantec's Reported T&T were Inflated and Misclassified

229.   Numerous facts demonstrate that Defendants Clark, Noviello, and Garfield knew or recklessly disregarded that Symantec's T&T costs were improper.  As noted above, Defendant Clark served as a member of Symantec's Board of Directors throughout the Relevant Period.  Defendant Garfield presented at a May 19, 2017 Audit Committee meeting, with Defendants Clark and Noviello in attendance, where he disclosed a

"*significant deficiency*" in the Company's non-GAAP reporting, explaining that the *"control enhancement was overwhelmed by the volume and complexity of non-GAAP activity"* and that the *"[d]ifference between GAAP and non-GAAP has increased dramatically."*

230. In addition, "transition costs" were approved by Symantec's Board of Directors during the Relevant Period. Specifically, in Symantec's Form 10-Q for the third quarter of fiscal 2018 (September 30, 2017 through December 29, 2017), filed with the SEC on February 2, 2018, Defendants stated: "Transition costs are incurred in connection with Board of Directors approved discrete strategic information technology transformation initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automatic business processes." Defendants admitted the same in Symantec's Form 10-K for the fiscal year ended March 30, 2018, filed with the SEC on October 26, 2018. The fact that Defendant Clark was personally and directly involved in approving the improper transition costs at issue here – and was aware that the non-GAAP reporting suffered from a significant deficiency – gives rise to a strong inference that he knew (or recklessly disregarded) that the transition costs were inflated and misclassified during the Relevant Period.

231. Moreover, the facts set forth in the unsealed version of a Verified Stockholder Derivative Complaint (the "Derivative Complaint")[19]– together with the Court's discussion of those facts and documents in its July 3, 2019 Order unsealing most of the Derivative Complaint (the "Unsealing Order")[20] – indicate that accounting problems

---

[19] The Derivative Complaint, captioned *Lee v. Clark, et al.*, Case No. 3:19-cv-02522-WHA (the "Derivative Action"), includes factual allegations based on "documents and information" produced by Symantec "pursuant to 8 Del. C § 220." Defendants Clark, Noviello and Garfield are named defendants in the Derivative Action and Defendant Symantec is a nominal defendant.

[20] The "Unsealing Order" refers to the Court's July 3, 2019 "Order re Amended Administrative Motion To File Under Seal" in the Derivative Action, which ordered that the vast majority of the redacted information in the Derivative Complaint be unsealed by July 18, 2019.

1  at Symantec were a main focus of, and specifically discussed in, Symantec Board and Audit

2  Committee meetings that included Defendant Clark as well as other top executives,

3  including Defendants Noviello and/or Garfield. The Derivative Complaint and the

4  Unsealing Order indicate that Defendants Clark, Noviello, and Garfield were each present

5  for an Audit Committee meeting on May 19, 2017 during which they discussed and

6  reviewed "errors in financial reporting and recording, including "significant" deficiencies

7  related to the Fiscal Year 2017 10-K. *See* Derivative Complaint, ¶106; Unsealing Order at

8  4:1-3. The Derivative Complaint further confirms that the Board approved adjustments to

9  GAAP operating income for the purpose of determining executive compensation awards,

10  including transition costs. *See* Derivative Complaint, ¶98.

11       232.  On August 1, 2016, Defendant Clark attended a Symantec Audit Committee

12  meeting involving Garfield – who presented information warning those in attendance of

13  issues with the newly-installed management, including ensuring that sufficient controls

14  existed at Blue Coat, and certain risks from the implementation of a new revenue

15  recognition standard, including, inter alia, risks involving the Blue Coat integration, the

16  availability of accounting resources, lack of IT resources to support critical system updates

17  and implementation, and data quality concerns. *See* Derivative Complaint, ¶85.

18       233.  On October 31, 2016, the Audit Committee held a meeting attended by

19  Garfield during which they discussed the impact of the Blue Coat acquisition on the

20  Company's financial results.  Specifically, they discussed that "T&T [transition and

21  transformation] expenditures expected to exceed Board Approved Range" and that the

22  "executive team is requesting approval of a revised Transition and Transformation plan

23  with an expense range of $110M to $140M." The "executive team" included the Defendant

24  Clark and former CFO Noviello at the time. The Audit Committee also reviewed deferred

25  revenue in the context of current liabilities: "$255M increase [in deferred revenue] due to

26  the acquisition of Blue Coat deferred revenue" had resulted in a $70 million quarter-over-

27  quarter increase; a $152 million decrease year-to-date; and $784 million decrease year-

28  over-year to deferred revenue. *See* Derivative Complaint, ¶88.

234.    During the same October 31, 2016 Audit Committee meeting, the attendees (including Garfield), discussed and reviewed questions from the SEC concerning, inter alia, (i) "the ongoing impact of changes to [the Company['s] renewal practices" to a decrease in revenue; and (ii) the relative contribution of each factor "underlying a variance in cost of revenues." *See* Derivative Complaint, ¶89.  Martin Espinosa, the Company's Chief Audit Executive, provided the Audit Committee with an update on internal audit matters, "including management of the Blue Coat integration related risks on a go-forward basis and SOX compliance process and controls."  Espinosa "responded to questions from the Committee based on the Committee's review of the materials provided."  Garfield discussed "the treatment of deferred revenue from the Blue Coat acquisition, the SEC comment letter received by the Company and the resolution of the issues raised in the letter." Moreover, the Audit Committee "requested that it receive copies of comment letters going forward." *See id*. ¶90.

235.    On January 30, 2017, Defendant Clark attended an Audit Committee meeting, which included several other Symantec Directors.  *See* Derivative Complaint, ¶¶93-94; Unsealing Order at 3:5-7.  The Audit Committee reviewed and discussed financial metrics for the third quarter of 2017.  They noted that "Total Non-GAAP Revenue increased 20% due to Blue Coat contribution" and that "ES [Enterprise Segment] revenue outperformance driven by higher than expected bookings and higher than expected yield on bookings.  Blue Coat revenue impacted by lower yield due to cross sell and CASB resulting in more ratable revenue recognition, plus large unshipped JPMorgan order." Furthermore, the Audit Committee would "continue[ to] focus on expense management" but "revenue growth lags bookings growth due to deferred revenue recognition." Moreover, they noted that "yield represents the amount of in-period billings that are recognized as revenue in-period" and that the "key drivers of yield include the mix of up front license vs. ratably recognized bookings, linearity of renewal bookings, discounting, and shift to subscription."  *See* Derivative Complaint, ¶93.

236.   On January 31, 2017, the Symantec Board of Directors held a meeting with both Defendant Clark and CFO Noviello in attendance.  During the meeting, Noviello gave a presentation that included an overview of FY18 planning outlook on a non-GAAP revenue and operating income basis and reviewed Symantec's "non-GAAP Reconciliation," which was a detailed table outlining the items added to GAAP revenue, operating income, and net income to produce non-GAAP metrics. Specifically, the Board (including Defendant Clark) was informed that restructuring, separation and transition costs impacted non-GAAP operating income. *See* Derivative Complaint, ¶¶96-97.

237.   On March 9 and 10, 2017, Defendant Clark and Noviello were present for a Board meeting during which they discussed the Company's fiscal 2018 financial plan and three-year outlook. With Defendant Clark and Noviello exiting the room, the other Board members "discussed the financial metrics for measuring performance against the FY18 Financial Plan and the PRU/VCP [Value Compensation Plan – *i.e.*, Executive Compensation Plan] awards . . . , and noted that the Board would need to retain discretion in determining the awards under the VCP to take into account the impact of one-time or unusual events, such as . . . certain one-time expenditures for transition and transformation projects . . . , which could affect the adjusted operating income and operating margin metrics under the VCP." The Board approved the FY18 financial plan and compensation plan and "reserve[d] the right to approve all adjustments made to GAAP operating income to determine non-GAAP operating income for the purpose of determining awards under the VCP . . . such as . . . . certain one-time expenditures for transition and transformation projects . . . ." *See* Derivative Complaint, ¶98.  Thus, the Board approved adjustments to non-GAAP operating income for the purpose of determining executive compensation awards, including transition costs.  The foregoing likewise confirms Board-level awareness and concern that Defendant Clark and Noviello had the ability and incentive to manipulate "operating income and operating margin metrics" through "certain one-time expenditures for transition and transformation projects," including to inflate their incentive compensation.

238.    During a May 8, 2017 Audit Committee meeting, Defendants also discussed "concerns of the SEC" and the "Audit Committee's understanding of SEC regulations." *See* Unsealing Order at 3:21-28. Specifically, the Audit Committee reviewed seven "primary areas of SEC comments (as noted by Sulliven [sic] and Cromwell)" regarding non-GAAP measures: "1. failure to present GAAP measure with equal or greater prominence; 2. inadequate explanation of usefulness of non-GAAP measure; 3. misleading adjustments, such as exclusion of normal, recurring cash expenses; 4. inadequate presentation of income tax effects of non-GAAP measure; 5. individually tailored revenue recognition or measurement methods; 6. misleading title or description of non-GAAP measure; [and] 7. use of per share liquidity measures." *See* Derivative Complaint, ¶101. Thus, immediately prior to the start of the Relevant Period, Defendant Clark and Noviello – and, indeed, the SEC – were focused on the Company's reporting of non-GAAP measures, including how the "exclusion of normal, recurring cash expenses," such as the transition costs at issue in this case, could be "misleading adjustments."

239.    Then, on August 7, 2017 Garfield gave an extraordinarily candid exit interview to a Symantec Board member (Anita Sands) highlighting the serious problems that Symantec had with its T&T expenses and other non-GAAP measures. The contemporaneous notes from this exit interview flag the ***"pressure to make Non-GAAP operating margin,"*** including ***"an effort to expand the definition of Transition costs"*** that was ***"ridiculous,"*** and warned that this issue was what the Audit Committee "need[s] to worry about most" as it was ***"potentially illegal."***  The notes of Garfield's exit interview also indicate that he stated:

> What is happening is … they [are] driving the non-GAAP number up … A couple of hundred of million of extra Non-GAAP dollars for Fiscal 18 drives the VCP, and they can ***triple their income***. Even Greg [Clark] would get something like a ***3x payout***. ***We've created a compensation plan that drives people to do something that's wrong.***

240.    Defendants Clark and Noviello both knew about Garfield's exit interview. Indeed, Defendant Noviello asked Mr. Garfield's replacement, Matthew Brown, for some

"talking points" relating to Symantec's non-GAAP accounting.  In a September 8, 2017 email, Mr. Brown provided his "unfiltered views," explaining that, among other things, the Company's "**non-GAAP policy whitepaper [was] not firmly grounded in guidance from the SEC**," the policy was "**inconsistent**," the Company had no "**clear/current benchmarking analysis against peer companies**" in terms of non-GAAP accounting policies, there was "**a lack of understanding of the policy by key stakeholders**." (Emphasis in original.)

241.   On October 31, 2017, the Symantec Board of Directors met with Defendants Clark and Noviello in attendance.  *See* Derivative Complaint, ¶136.  During the meeting, Noviello discussed the usage of Non-GAAP financial measures.  *See id*. As discussed above, E&Y had been engaged to study the "usage, policies, and controls related to [non-GAAP measures]," and the Board was informed as to the initial results of E&Y's work and "remedial activities the Company ha[d] completed to date and will take in the next two quarters." *Id.*

242.   The October 31 meeting was summarized in a November 16, 2017 presentation prepared by Defendant Noviello and viewed by Defendant Clark.  The November 16 presentation also contained E&Y's benchmarking analysis, which "showed that Symantec [wa]s *an outlier* in terms of the number of NGMs in comparison to [its] peers and *d[id] not comply* to some of the SEC guidance on usage and reconciliations to GAAP." E&Y's report also concluded that Symantec's "guidelines, processes and controls around NGMs and T&T costs [we]re not detailed and processes not fully memorialized, and as such, there [wa]s *risk around completeness and accuracy of [the Company's] non-GAAP reporting.*"  Moreover, E&Y concluded that for T&T costs, *"sufficient controls do not exist* to validate that those costs are of the appropriate nature and type for that categorization."  The Board also went through each major T&T project and were made aware that each presented a higher-than-average risk of *"Non-compliance with SEC Guidance for Non-GAAP Presentation."*

243.     During meeting, Symantec's "Board requested that management approach its work with the assumption that we will have to address comments regarding non-GAAP measures from SEC review of the FY18 10-K" and "The Board requested that with respect to any benchmarking that identified high risk items (peer practices, SEC regulatory risk), management ensures strong documentation and process around these items."

244.     E&Y also warned Symantec that "the costs included in Transition and transformation (T&T) *have the appearance of recurring operating expenses."* E&Y flagged this issue as *"Highest risk – likely to result in SEC scrutiny or require change to historic results."* Despite E&Y flagging the Company's classification of and controls relating to T&T costs as Symantec's highest risk issues, Symantec did not immediately change how it classified T&T costs, despite implementing other smaller changes (that did not impact Defendant Clark and Noviello's compensation) to its financial disclosures concerning NGMs.

245.     Thus, by November 2017, Defendants Clark and Noviello were made aware, from various sources, including current and former employees and an outside consultant, that Symantec's T&T classifications were *"potentially illegal,"* rendering the Company an *"outlier"* among peers, and that the Company suffered from significant internal control deficiencies surrounding T&T costs.

246.     On December 20, 2017, Defendant Clark and Noviello were present for an Audit Committee meeting during which Fenwick & West LLP reviewed and discussed its "analysis of the Company's use of non-GAAP financial measures, including the materials and periods reviewed, the scope of the compliance and risk review performed, observations and recommendations based on the observations." *See* Derivative Complaint, ¶148; Unsealing Order at 4:22-26.

247.     In addition, as set forth in the Derivative Complaint, Defendant Clark was presented at Board meetings with evidence of "the alleged misconduct," including aggressive accounting practices to overstate revenue and operating income metrics that

1    would increase his compensation, so he had personal knowledge of the inaccuracy of the

2    Company's financial metrics.  *See* Derivative Complaint, ¶197.

3         248.    As set forth above, Defendants Clark and Noviello were personally involved

4    in discussions and meetings – several of which were held at the level of and involved

5    Symantec's Board of Directors and Audit Committee – concerning *inter alia* (a) non-

6    GAAP adjustments, "transition costs" and the accounting for those costs, (b) Board

7    approval of adjustments to GAAP operating income for the purpose of determining

8    executive compensation awards, including transition costs; (c) ***"errors in financial***

9    ***reporting and recording,"*** which included ***"significant"*** deficiencies and misstatements in

10   Symantec's Fiscal Year 2017 10-K; (d) employees flagging ***"debatable," "ridiculous"***

11   ***"potentially illegal"*** treatment of T&T costs that was ***"inconsistent"*** with peers; (e) the

12   hiring of E&Y, an outside accounting firm, to review the Company's "policies and

13   procedures regarding non-GAAP measures" (as well as consulting an outside law firm); (f)

14   E&Y's findings, recommendations, and "remedial activities" undertaken by the Company

15   during the Relevant Period; and (g) presentations from E&Y about increased scrutiny from

16   the SEC concerning non-GAAP reporting and changes that Symantec had to make in order

17   to comply with SEC guidance about non-GAAP reporting, all powerfully contribute to

18   establishing a strong inference of each Defendants' scienter.

19         **6.    Defendants Deceptively Switched Bonus Payments From Cash to**
           **Restricted Stock Units to Boost Non-GAAP Operating Income.**
20
21         249.    Defendants Clark and Noviello instituted additional schemes to ensure they

22   qualified for their outsized VCP bonuses. As noted, Defendants Clark and Noviello were

23   eligible for VCP bonuses if the Company reached specified non-GAAP operating income

24   targets in fiscal year 2018.   Therefore, Defendants were motivated to manipulate the

25   characterization of normal operating expenses, incurred in the ordinary course of

     conducting business, as T&T costs which would increase non-GAAP operating income.
26
27         250.    Accordingly, in addition to manipulating the T&T costs, Defendants

28   implemented a scheme to switch employee bonus payouts under the Executive Annual

Incentive Plan ("EAIP") and the Annual Incentive Plan ("AIP") from cash to restricted stock units immediately convertible to cash for fiscal year 2018.  Under GAAP, the employee bonuses were considered operating expenses whether paid out in stocks or in cash; however, in calculating its non-GAAP measures, Symantec *excluded* stock-based compensation from non-GAAP operating income.  Therefore, when employee bonuses were paid in stock versus cash, Symantec's non-GAAP operating income increased – without any increase in revenue or a decrease in expenses.

251.    In fiscal year 2017, the AIP and EAIP were paid in cash.  According to a February 22, 2017 email from Sean Delehanty, Symantec's Senior Vice President of Finance, Symantec executives began discussing converting the bonus payments to stock awards immediately convertible to cash, specifically to "***save on non-GAAP opex [operating expenses] in FY18***."  The topic was again discussed at an executive team meeting held in late February 2017, with Defendant Noviello in attendance.  The initial estimates claimed that over $52 million in fiscal 2018 non-GAAP operating income would be salvaged by this change.  Indeed, in a Board presentation on March 9, 2017 relating to fiscal year 2018, Defendant Noviello highlighted "an opportunity to shift AIP/EAIP" from "cash awards to equity awards."

252.    However, not all Symantec employees were in favor of the shift as it would be costly to implement and help top executives reach their 2018 benchmarks without providing any real benefits to the Company.  On March 20, 2017, Miguel Jimenez, Symantec's Director of Financial Planning and Analysis, objected that no "credit should be given towards achieving operating margin by changing the EAIP and AIP bonuses from cash to stock for [senior] directors and a[b]ove" because "[t]his does not generate any income and ***is just financial engineering*** . . . if anything this charge will cost the company more given all the work stock administration and HR will need to undertake to enable the changes."

253.    Despite these concerns, Defendants went forward with this "financial engineering" and the change in bonuses was approved in June 2017, effective in fiscal year

2018.   These changes, together with an alteration to retention bonuses which were also now paid in stock, ultimately allowed Symantec to artificially increase the fiscal 2018 non-GAAP operating income by over $29 million, according to an analysis conducted by the Lead Plaintiffs' accounting expert in the Class Action based on, *inter alia*, a review of documents produced by Symantec in the Class Action.

254.   Under the SEC's C&DI guidance, it is misleading to present non-GAAP measures "inconsistently between periods."  The guidance specifically notes that "a non-GAAP measure that adjusts a particular charge or gain in the current period and for which other, similar charges or gains were not also adjusted in prior periods could violate Rule 100(b) of Regulation G unless the change between periods is disclosed and the reasons for it explained."

255.   Symantec never disclosed the shift in AIP and EAIP payments from cash to stock-based compensation, the rationale behind the change "to save on no-GAAP opex," or the resulting increase in non-GAAP operating income.  This omission resulted in a violation of SEC rules and guidance because the Company was now reporting inconsistently between reporting periods.  Indeed, AIP and EAIP bonuses were previously included in the calculation of non-GAAP operating income in fiscal year 2017 and before, but were excluded from the fiscal year 2018 metric.  Furthermore, the Company never provided a rationale for making that change.  This was misleading in light of the Company's repeated statements that its non-GAAP financial measures "facilitate comparisons to our performance in prior periods."

256.   Further proving that there was no rational basis to the shift to stock-based compensation, the Company *re-instituted* cash bonuses in 2019 for AIP and EAIP. Thus, the short switch to stock-based income was nothing but a scheme instituted to inflate the non-GAAP operating income in fiscal year 2018.

1
2

**C.    Analysts and Investors Relied Heavily on Symantec's Reported GAAP and Non-GAAP Financial Results**

3    257.    The portfolio manager and analysts who purchased Symantec common stock

4    on behalf of the Plaintiffs, as well as other market participants, focused heavily on

5    Symantec's reported GAAP revenue and non-GAAP metrics. By manipulating these

6    metrics, Defendants were not only able to meet compensation targets, they were able to

7    falsely assure the market that the Blue Coat and LifeLock acquisitions, which they heavily

8    promoted to investors as "transformative" and composing the future of Symantec, were

9    successful, and that Symantec was on track to achieve its cost-reduction goals.

10    258.    For example, on May 10, 2017, Symantec filed a Form 8-K and issued a press

11    release to announce its fourth quarter and fiscal year 2017 results.  In the press release, the

12    Company reported quarter and annual GAAP revenues, both companywide and for the

13    Enterprise Security segment: "Q4 GAAP revenue $1.115 billion, up 28% year over year";

14    "Fiscal Year 2017 (FY17) GAAP revenue $4.019 billion, up 12% year over year"; "Q4

15    Enterprise Security segment GAAP revenue up 40%; [and] FY17 Enterprise Security

16    segment GAAP revenue up 22%."

17    259.    On the same day, Jefferies reported that "non-GAAP operating margin of

18    26.7% was ahead of consensus 26%," and "non-GAAP EPS was in-line at $0.28." Jefferies

19    further wrote that "mgmt is tracking ahead on cost efficiencies." Significantly, Jefferies

20    also noted that analysts and other market participants had to rely on Symantec to accurately

21    report the impact of the Blue Coat and LifeLock acquisitions on its accounting: "Cash flow

22    from operations of $313 was below consensus of $359 million, but we note this metric is

23    difficult for the Street to model well given accounting adjustments related to the Blue Coat

24    and LifeLock acquisitions." Barclays Capital similarly wrote on May 11, 2017, "4Q17

25    results roughly in line against high expectations," as "SYMC reported 4Q17 non-GAAP

26    revenue/EPS of $1,176M/$0.28 vs. Street's $1,181M/$0.28."

27    260.    Defendants and analysts also continued to credit Blue Coat and the new

28    leadership of Defendant Clark and Noviello with Symantec's reported success. For

1   example, on May 10, 2017, Defendant Clark specifically attributed the Company's revenue

2   growth to the successful integration of Blue Coat: "The industrial logic of combining

3   Symantec and Blue Coat is proving out, with Enterprise Security growing organically year

4   over year and Blue Coat cloud subscription revenue growing 67%. . . . We are on-track to

5   deliver long-term, sustainable growth and industry-leading profitability as the new

6   Symantec."

7       261.   On May 11, 2017, Cowen & Company similarly wrote that Blue Coat

8   "finally provides [Symantec] with a legitimate network security presence, as well as

9   stronger footing in the cloud. Moreover, we believe the influx of leadership talent at SYMC

10   was much needed, and that CEO Greg Clark is a great fit."

11       262.   The market continued to focus throughout the Relevant Period on

12   Symantec's GAAP and reported non-GAAP results as a measure of the Company's

13   financial success, as well as the success of the Blue Coat acquisition and the leadership of

14   Defendant Clark and Noviello. For example, on August 2, 2017, Symantec reported its Q1

15   2018 results on Form 8-K. In the accompanying press release, the Company promoted its

16   GAAP revenue growth, stating, "Q1 GAAP revenue $1.175 billion, up 33% year over

17   year." In the subsequently issued Quarterly Report filed on Form 10-Q, the Company

18   specifically attributed the revenue growth to Blue Coat's and LifeLock's contributions:

19   "Revenue increased by 33%, driven by a 34% and 31% increase in revenue from our

20   Enterprise Security and Consumer Digital Safety segments, respectively, primarily due to

21   the acquisitions of Blue Coat, Inc. ('Blue Coat') and LifeLock, Inc. ('LifeLock')."

22       263.   On August 3, 2017, JPM Securities LLC echoed Defendants' remarks in a

23   report entitled, "A Good Management Team in a Good Space":

> We maintain our Market Outperform rating on Symantec and raise our price
> target to $36 from $35 after the company reported strong F1Q18 results
> yesterday, including non-GAAP EPS of $0.33 (consensus $0.31) on revenue
> of $1.23B (consensus $1.20B), and guided above expectations for FY18 non-
> GAAP EPS and revenue – leaving the stock flat in the aftermarket. Both
> enterprise and consumer segments came in ahead of expectations as the
> integration of Symantec, Blue Coat, and LifeLock seems to be working and
> as the sales force restructuring went smoothly, in our opinion.

1

2      264.   Barclays Capital similarly observed on August 3, 2017, "Revenue of ~$1.3B

3   was ahead of our estimate by ~21M, with both consumer and enterprise exceeding our

4   estimates." In the same report, Barclays Capital wrote: "Management noted they remain

5   ahead of schedule with the $580M of cost efficiencies from SYMC, Blue Coat and

6   LifeLock, which helped drive the upside in the quarter and we think makes the margin

7   ramp this year more linear than previously thought."

8      265.   On November 1, 2017, Symantec released its financial results for Q2 2018

9   on Form 8-K. In the Company's press release, Defendants again focused on the Company's

10  year-over-year GAAP revenue growth: "Q2 GAAP revenue $1.240 billion, up 27% year

11  over year." In the later-filed Form 10-Q, the Company again identified the Blue Coat and

12  LifeLock acquisitions as the catalysts for the reported revenue growth: "Revenue increased

13  by 27%, driven by a 20% and 37% increase in revenue from our Enterprise Security and

14  Consumer Digital Safety segments, respectively, primarily due to the contributions from

15  the acquisitions of Blue Coat, Inc. ('Blue Coat') and LifeLock, Inc. ('LifeLock'),

16  respectively."

17     266.   The next day, on November 2, 2017, Credit Suisse stated, "$0.40 non-GAAP

18  EPS on $1.276bn revenue compares with $0.42/$1.276bn consensus," and "[o]n an

19  adjusted basis, FY18 guidance was essentially maintained, as was longer term mid-to-high

20  single digit growth targets for F18/19."

21     267.   On January 31, 2018, the Company announced its financial results for Q3

22  2018 on Form 8-K, together with a press release. As in previous quarters, the Company

23  emphasized its growing year-over-year GAAP revenue: "Q3 GAAP revenue $1.209

24  billion, up 16% year-over-year." Further, in detailing the financial highlights for the past

25  nine months in the Company's later-filed Quarterly Report, Defendants emphasized that

26  "Revenue increased by 25% compared to the corresponding period in the prior year, driven

27  by a 15% and 38% increase in revenue from our Enterprise Security and Consumer Digital

28  Safety segments, respectively, primarily due to the contributions from the acquisitions of

Blue Coat and LifeLock." Evercore ISI further observed in a report dated February 1, 2018, that "non-GAAP EPS saw outperformance in the quarter" and that the Company also saw "upside to non-GAAP margins from further cost control."

### D. Symantec Had Ineffective Internal Controls

#### 1. Defendants' Obligation to Maintain Effective Internal Controls Over Financial Reporting and Disclosure Controls and Procedures

268.   Symantec was obligated under SOX Section 404 to maintain effective internal controls over financial reporting ("ICFR").[21] Specifically, SOX Section 404 requires Symantec to assess its ICFR, and disclose whether or not such controls are effective, including the identification of any "material weaknesses" or "significant deficiencies" in those controls. Section 404 further requires Symantec's CEO and PAO to personally certify the effectiveness of Symantec's ICFR each quarter.

269.   A "material weakness" is a deficiency or combination of deficiencies in a company's ICFR, which creates a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. A company's ICFR cannot be considered effective if one or more material weakness exists. Internal controls that impact significant accounting estimates or critical accounting policies are generally considered to be higher risk. A "significant deficiency" is a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting.

---

[21] In early 2003, the SEC staff issued the Report Pursuant to Section 704 of the Sarbanes-Oxley Act of 2002 (the "Section 704 Report"). In compiling the information for the Section 704 Report, the SEC staff studied enforcement actions filed during the period of July 31, 1997 through July 30, 2002. The greatest number of enforcement actions related to improper revenue recognition. A common theme in these enforcement actions related to "side letters," or verbal side agreements, that were not considered in recognizing revenue. *See also* SEC FRR 104, "The Significance of Oral Guarantees to the Financial Reporting Process."

270.    Company management is further required to ensure that testing procedures are performed to assess the operating effectiveness of the company's internal controls. If management is aware or determines that the design or operation of a control does not allow management or company employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis, this means that a control deficiency exists. Management is then required to evaluate the control deficiency to ascertain the likelihood that the deficiency or combination of deficiencies could result in a significant deficiency or a material weakness.   Under SEC Release No. 33-8810, a company should "perform more extensive testing in high-risk areas."

271.    All significant deficiencies and material weaknesses must be reported to the company's audit committee. Moreover, a single material weakness renders the company's ICFR ineffective, and any material weakness must be publicly disclosed. Significantly, the SEC has observed that disclosures regarding management's remediation efforts "may call into question the validity and completeness of the material weaknesses disclosed."

272.    Further, Section 302 of SOX required Symantec provide quarterly and annual certifications evaluating the effectiveness of its disclosure controls and procedures ("DCP").  With respect to its non-GAAP measures and related disclosures, E&Y provided Symantec with "Recommendations" for its "Disclosure Processes and Controls." E&Y identified that Symantec's ICFR should be considered up to the establishment of its GAAP measure, and effective DCP are required for the calculation of Non-GAAP measures.  An article published by Deloitte titled "Controls and Non-GAAP Measures" similarly states:

> Because the starting point for a non-GAAP measure is a GAAP measure, ICFR would be relevant to consider up to the point at which the GAAP measure that forms the basis of the non-GAAP measure has been determined. ***However, regarding controls over the adjustments to the GAAP measure and the related calculation of the non-GAAP measure — including the oversight and monitoring of the non-GAAP measure — we believe that it is appropriate to consider such controls within the realm of DCPs***
>
> ***

The SEC's final rule on certifications states that Section 302 of the Sarbanes-Oxley Act of 2002 requires management to certify on a quarterly basis that DCPs are effective "to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act [footnote omitted] is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms." Earnings releases containing non-GAAP measures are often furnished on Form 8-K, which does not require certifications of the effectiveness of DCPs. However, the final rule also indicates that "[d]isclosure controls and procedures . . . are required to be designed, maintained and evaluated to ensure full and timely disclosure in current reports." Therefore, *registrants that use non-GAAP measures in earnings releases furnished on Form 8-K — or those that use them in Forms 10-Q and 10-K (outside the financial statements), which would be explicitly covered by Section 302 certifications — should consider the appropriateness of their DCPs in the context of their non-GAAP information*.

273.    Symantec's management, as opposed to its auditors, had the responsibility of establishing and maintaining ICFR and DCP as well as ensuring that they lead to a fair presentation of Symantec's financial statements.  Public Company Accounting Oversight Board standards require that every auditor report include a statement that "management is responsible for maintaining effective internal control over financial reporting and for assessing the effectiveness of internal control over financial reporting."

274.    Accordingly, Symantec's management acknowledged its responsibilities in the 2017 Form 10-K filed on May 18, 2017, by stating:

Our management (with the participation of our Chief Executive Officer and Chief Financial Officer) has conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act). *Based on such evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of the end of the period covered by this report.*

*Our management is responsible for establishing and maintaining adequate internal control over financial reporting* (as defined in Rules 13a-15(f) and 15d- 15(f) of the Exchange Act) for Symantec. Our management, with the participation of our Chief Executive

Officer and our Chief Financial Officer, has conducted an evaluation of the effectiveness of our internal control over financial reporting as of March 31, 2017, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO")… Our management has concluded that, as of March 31, 2017, *our internal control over financial reporting was effective at the reasonable assurance level based on these criteria*… There were no changes in our internal control over financial reporting during the quarter ended March 31, 2017, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

275.    Furthermore, Defendants Clark and Noviello signed certifications throughout the Relevant Period asserting that the Company had disclosed all significant deficiencies and material weaknesses in the design or operation of ICFR.  In each quarter during the Relevant Period, Symantec stated that its CEO and CFO have "concluded that our disclosure controls and procedures were effective at the reasonable assurance level" and that there were "no changes in our internal control over financial reporting."

### 2.    Symantec Had Inadequate Internal Controls

276.    Contrary to the public statements, Symantec had inadequate internal financial and disclosure controls throughout the Relevant Period.

277.    As noted above in Sections V.A. and V.B., Symantec inappropriately booked revenues at quarters end in violation of GAAP and falsely overstated its non-GAAP measures by adjusting its normal operating expenses incurred in the ordinary course of conducting business. These practices would not be possible were proper controls in place.

278.    Moreover, Defendants Clark and Noviello were both present at a May 19, 2017 Audit Committee meeting when Defendant Garfield disclosed a *"significant deficiency"* in that Symantec's non-GAAP reporting was *"overwhelmed by the volume and complexity of non-GAAP activity."* Garfield also raised an additional *"significant deficiency"* regarding a restructuring charge *"that should not have been recorded."* Garfield reiterated the control issues in July 2017, when he announced his decision to leave the Company.   To facilitate the transition, Garfield prepared an "Accounting Re-Org," which was provided to Defendants Clark and Noviello.  The presentation stressed that "We

will need to make sure the incoming execs understand the recent control issues driven by complex systems and an organization starved of resources so they are better able to *remediate the issues and avoid more*."

279.   In September 2017, Mr. Garfield's replacement, Mr. Brown, identified further deficiencies in Symantec's controls.   In the email to Defendant Noviello on September 8, 2017, reproduced below with additional highlighting, Mr. Brown provided his "unfiltered views" on reporting and disclosing problems regarding Symantec's non-

From:          Matthew Brown
Sent:          Friday, September 08, 2017 10:56 AM
To:            Nick Noviello
Subject:       Non-GAAP talking points

Nick, I'm going to give you my unfiltered views for the talking points, and you'll need to temper them accordingly.

- **Current SYMC non-GAAP policy whitepaper is not firmly grounded in guidance from the SEC.** There's a section for guidance at the beginning of the policy, but then no linkage to the actual policy we've adopted on a line-by-line basis. See attached.
- **There are inconsistencies in our own policy.** For example, the descriptions/captions in the whitepaper don't match what we're actually disclosing, likely as a result of the policy not being kept current. For example, in our current external filings we say "Restructuring, transition and other", but in our whitepaper we say "Restructuring, separation, transition and other costs". In addition, we currently classify "Discontinued operations" as GAAP-only in our external filings, but that doesn't appear at all in our whitepaper. There's even a disconnect between our own internal workpapers, as the threshold descriptions don't match the whitepaper descriptions. See attached.
- **We don't have any clear/current benchmarking analysis against peer companies.**
- **We don't have a review process of the actual expenses hitting GAAP-only accounts.** Although we have an approval process for what can/cannot be coded to GAAP-only, nobody is reviewing what actually hits the accounts on a quarterly/monthly basis to ensure everything that's in there has actually been approved.
- **There's a lack of understanding of the policy by key stakeholders.** Generally speaking, employees don't understand what can/cannot be classified as GAAP-only and why. Guidance from the technical accounting team comes across as arbitrary and sometimes punitive. This is creating an environment of distrust on both sides.

I think those are the key points. Let me know if you'd like more details on these.

GAAP measures:

280.   Each of the items listed by Mr. Brown are significant control problems that were never disclosed to shareholders.

281.   E&Y's report received by both Clark and Noviello also highlighted ICFR and DCP control deficiencies that existed during the Relevant Period.   E&Y concluded that "Existing NGM policies lack specific, clear process and controls."   Specifically, it found:

- Although there has been a longstanding informal process of consultation with the [t]echnical accounting team, these polices do not include a specific requirement for technical accounting group to review the completeness and accuracy of the costs incurred and

projects included in these adjustments, particularly for more judgmental areas such as T&T and integration costs…

- The documentation of the project approval or disapproval and how it does or does not comply with the policy could be improved…

- For other costs, such as T&T and acquisition and integration, **sufficient controls do not exist** to validate that those costs are of the appropriate nature and type for that categorization…

- Symantec should consider…**Enhancing controls** over review and approval of the types of costs related to an approved T&T project that may be included in a non-GAAP adjustment for compliance with such project prior to inclusion as adjustment by appropriate personnel (e.g., project owners, Corporate Controllership team, Disclosure Committee).

282.    Again, despite these **known** problems, Defendants continued to claim that Symantec's ICFR and DCP were adequate, effective, and suffered from no known deficiencies.

283.    On September 24, 2018 Symantec's Audit Committee Investigation publicly **admitted** that the Company suffered from "relatively weak and informal processes with respect to some aspects of the review, approval and tracking of transition and transformation expenses."

284.    Then, in October 2018, Symantec's VP, Chief Audit Executive gave a presentation titled "FY2018 SOX Control Update," which noted an open significant control deficiency involving a "Control Gap Around the Executive Representation Letter Process" in connection with the Oracle Transaction. This control deficiency – which was not disclosed to investors during the Relevant Period – highlights the severity of the control problems at the Company as it involved the "key executives CEO & his direct reports, and COO & his direct reports … that may have contact with customers."  Indeed, as noted above, Defendant Clark, as CEO, was warned not to make side commitments as part of the Oracle Transaction, made the commitment anyway, and then lied to accounting personnel to cover-up the accounting problem.

285.   Clark's conduct, as the CEO of a public company, was extremely problematic.  According to the Committee of Sponsoring Organizations of the Treadway Commission, which developed and published the framework by which public companies like Symantec benchmark and measure their ICFR, "More than any other individual, the CEO sets the tone at the top that affects the control environment and all other components of internal control."  Defendant Clark, however, knew the gaps in Symantec's ICFR and exploited them.

### E.   As A Result Of Their Accounting Manipulations, Defendants Clark and Noviello Received Lucrative Executive Compensation Payouts

286.   Symantec provided Defendants Clark and Noviello both cash bonuses and stock bonuses as part of their compensation packages.   The Company disclosed its executive compensation targets and payouts for fiscal year 2017 in its Form 10-K/A filed with the SEC on July 25, 2017, and in its August 16, 2017 Proxy Statement. Under the Company's fiscal year 2017 executive compensation plan, executives received cash bonuses based on Company performance in fiscal year 2017, but the equity-based bonuses for fiscal year 2017 would be based on the Company's performance in fiscal year 2018.

287.   Importantly, the Company's compensation plan was described as "Majority of pay at risk" such that executives would only receive a majority of their compensation if Symantec achieved certain goals.

288.   As illustrated by the charts below from the Company's August 16, 2017 Proxy Statement, the levels of compensation were as follows:

- For adjusted revenue: (a) at the achievement level of between $4.04 billion to $4.12 billion adjusted revenue, an executive would be awarded up to a funding level of 100% of the award; and (b) above the $4.12 billion target level, funding increased incrementally, up to a cap of 150% based on a maximum achievement level of $4.162 billion.
- For adjusted operating income: (a) at the threshold achievement level of 95.4% of the adjusted operating income target, an executive would be awarded 50% of their possible target compensation as proposed by the Company; (b) above the threshold achievement level, the funding level increased

incrementally, up to a funding level of 100% of the award at a target achievement level of 100%; and (c) above the target achievement level, funding increased incrementally, up to a cap of a 150% funding based on a maximum achievement level of at least 109.1% of the target.



289.   Thus, for the cash awards in fiscal 2017, there was **no** payout compensation if the non-GAAP revenue fell below the threshold achievement level of $4.04 billion. There was also **no** payout if non-GAAP operating income fell below the threshold achievement level of 95.4% of the targeted $1.143 billion, or approximately $1.09 billion.

290.   As set forth in the chart below, for fiscal year 2017, ended March 31, 2017, the Company represented in its August 16, 2017 Proxy Statement that it reached a 100% achievement on its revenue target, or $4.086 billion. The Company further represented that

| | Target ($)(millions) | Actual ($) (millions) | Achievement (%) | Funding (%) |
|---|---|---|---|---|
| **Fiscal 2017** | | | | |
| Operating Income | 1,143 | 1,197 | 104.7 | 125.8 |
| Revenue | 4,040 - 4,120 | 4,086 | 100 | 100.0 |
| Fiscal 2017 Funding | | | | 111.5 |

it reached a 104.7% achievement on its operating income target, or $1.197 billion. The Company approved a payout of 111.5%.

291.   As a result, under the fiscal year 2017 executive compensation plan, Defendant Clark received bonus compensation in the amount of $743,333 (111.5% of his target amount of $666,667) and former CFO Noviello received bonus compensation in the amount of $479,673 (111.5% of his target amount of $430,200), as set forth in the chart below.

292.   The "transition costs" for fiscal year 2017 amounted to $94 million. Importantly, the difference between (i) the $1.09 billion that Symantec needed to hit 95.4% of the target and receive any target compensation at all, and (ii) the $1.197 billion that Symantec reported for fiscal year 2017 executive compensation purposes, which allowed

| Name | Non-GAAP Operating Income Funding & Non-GAAP Revenue Funding (%) | Individual Performance Modifier Funding (%) | Total Payout as % of Target Opportunity (%) | Payout Amount ($) |
|---|---|---|---|---|
| Gregory C. Clark | 111.50 | n/a | 111.50 | 743,333 |
| Nicholas R. Noviello | 111.50 | 100 | 111.50 | 479,673 |

Symantec to achieve 104.7% of the target, was $107 million. Accordingly, the "transition costs" line item comprised 87.9% of the $107 million Symantec needed to achieve its executive compensation target. Without the inflated "transition costs" metric, Defendants Clark and Noviello would have received far less compensation for fiscal year 2017.

293.   In addition to cash incentives, Defendants Clark and Noviello also received equity incentive awards under their fiscal year 2017 VCP, including Performance-based Restricted Stock Units ("PRUs"). Under the Company's fiscal year 2017 VCP plan, executives received specified levels of PRUs based on the Company's achievement of a percentage of the 2018 non-GAAP operating income target of $1.56 billion, with a minimum of $1.513 billion to be bonus eligible at all.  If non-GAAP operating income was between $1.513 billion and $1.56 billion, the PRUs would only be funded at just 50%. Historically, PRU awards had been tied to non-GAAP operating margin, but in March 2017, the Company decided that the VCP – and therefore the 2017 PRUs – would be based

1  on non-GAAP operating income in fiscal year 2018 instead. Accordingly, the 2017 VCP

2  awards tied the PRUs to future non-GAAP operating income target for the first time.

3      294.  For fiscal year 2018, the Company represented that it reached a 109.29%

4  achievement on its adjusted non-GAAP operating income target, or $1.705 billion. Thus,

5  the Company exceeded its fiscal 2018 non-GAAP operating income target by $145 million

6  (*i.e.*, $1.705 billion minus $1.56 billion). This excess was more than entirely fueled by the

7  Company's outsized transition cost adjustment of $272 million. *See* 2018 10-K, p.156.  By

8  comparison, transition costs in fiscal 2016 were only $92 million and in fiscal 2017 were

9  only $94 million. *Id.* Thus, even the incremental transition costs recorded in fiscal 2018

10  exceeded $178 million (i.e., $272 million minus $94 million) and alone allowed the

11  Company's executives to meet compensation targets.  Without even just this increment,

12  management would have achieved less than 100% of its target (i.e., $1.705 billion minus

13  $0.178 billion equals $1.527 billion, which is less than $1.56 billion) rather than the 109%

14  reported, which allowed the dramatic compensation increase to be met.  The Company's

15  achievement of $1.705 billion in non-GAAP operating target (well above the target level

16  of $1.56 billion), resulted in a payout of 268.2% of target under the FY 2017 PRUs.

17  According to the terms of the FY 2017 PRUs, 250% of the plan payout was earned at the

18  end of the fiscal year, and the additional 18.2% was paid out at the end of fiscal 2019,

19  provided the executive was employed by Symantec through the end of fiscal 2019 (which

20  was in March 2019).

21      295.  The Class Action Complaint set forth the report of Symantec's former

22  Principal Compensation Analyst who explained troubling aspects of the Company's VCP

23  plan and its perverse incentives, expanding on the forceful comments made by Defendant

24  Garfield during his exit interview.   The accounts of the Principal Compensation Analyst,

25  set forth below, are taken verbatim from the Class Action Complaint.

26      296.  Symantec's former Principal Compensation Analyst at Symantec from 2011

27  until April 2018 who worked at the Company's Mountain View headquarters, and reported

28  to Yoshino Harte, Director of Executive Compensation, built an Excel tool that could be

1   used on a self-service basis by certain Company employees to calculate their payout under

2   the PRUs at any given point in time. Company employees could also access their PRU

3   payouts through a third-party website and by a form letter that the former Principal

4   Compensation Analyst would send out to all PRU participants a couple times per year.

5       297.    According to the former Principal Compensation Analyst, the VCP [Value

6   Compensation Plan] for Fiscal Year 2017 was unlike any compensation plan at Symantec

7   before or since in several important ways.  First, it was to be paid out after two years, which

8   is very short term in the industry.  All other PRU plans before and since had been on at

9   least three-year cycles.  Second, while all other PRUs had been awarded based on a mixture

10  of various metrics, as well as the performance of the Company's stock, the VCP was based

11  solely on operating income margins.  According to the former Principal Compensation

12  Analyst, the VCP misaligned executives' incentives, pushing them to enhance the

13  operating income margin and short-term gains at the potential cost of long-term strategic

14  growth.  A few percentage points increase in operating income could translate into millions

15  of dollars in compensation. Indeed, according to the former Principal Compensation

16  Analyst, even $12 or $13 million was a significant dollar value with respect to the VCP,

17  especially for high level executives like Defendant Clark and Noviello.  They had so many

18  units in this plan that a change like that would have been equivalent to millions and millions

19  of dollars in payout.

20      298.    This created a lot of drive to push the operating income margin, causing a lot

21  of cost cutting initiatives.  Indeed, according to the former Principal Compensation

22  Analyst, there was a decision made by senior leadership, including Defendant Clark and

23  CFO Noviello, to pay out annual bonuses for senior director positions and above in equity

24  instead of cash, for all people in the U.S., Ireland, and India.  This was a cost-cutting

25  measure, and it enabled the Company to recognize the cost as stock and not a regular

26  operating expense which would, in turn, increase the operating income margin.  In other

27  words, the Principal Compensation Analyst confirmed that this was done in order to

28  increase the "stock based compensation" metric that was an input into the Company's non-

GAAP operating income.  Symantec's reported adjusted stock-based compensation metric for non-GAAP operating income in its FY 2017 10-K was $440 million.[22]

299.    The former Principal Compensation Analyst further explained Symantec's decision to pay the bonuses in equity for the 2017 PRUs was very unusual, she had never heard of any other company doing this, and it is industry standard to pay bonuses in cash. Moreover, the offer letters for these employees explicitly said that the employees would be paid in local currency, so they were going against those agreements.  The Principal Compensation Analyst knew that the Board was informed of this decision because she had access to the Board minutes and Board agenda, and she was personally involved in preparing slide decks for Board meetings.

300.    Further, the former Principal Compensation Analyst confirmed that the VCP's sole reliance on operating income as a metric was very narrowly minded, as opposed to standard fiscal metrics that companies would want to see incorporated into PRUs. According to the former Principal Compensation Analyst, Defendant Clark and Noviello pushed for the operating income metric as a condition of joining Symantec.  The former Principal Compensation Analyst understood from her experience that the VCP's structure was due to pressure from Blue Coat employees during negotiations, including Defendant Clark and Noviello.

301.    An accounting professor from the Wharton School of Business, Professor Wayne Guay, analyzed the Symantec's incentive plan, including the PRUs received by Defendants Clark and Noviello under the 2017 VCP; his report was submitted in the Class Action litigation.   In conducting his analysis, Professor Guay reviewed confidential discovery material from the Class Action, including a presentation from Mercer – Symantec's compensation consultant – Compensation Committee board minutes, as well as Symantec's public filings with the SEC.  His report summarized the Board's discussions leading to the decision to tie the VCP  awards to non-GAAP operating income as well as

---

[22] Symantec's Fiscal Year 2017 Form 10-K, dated May 19, 2017, at 53.

1   the rationale behind the funding threshold levels used under the VCP.  Professor Guay

2   commented that the VCP created "financial incentives" to maintain revenues at all costs

3   "in spite of their overall impact on operating margin," and how the VCP incentivized

4   management "to accelerate revenues from future periods into FY18."

5       302.    Professor Guay also analyzed and calculated the precise amounts Defendants

6   Clark and Noviello ultimately received under the VCP.  He did so by determining the

7   number of shares provided to each Noviello and Clark based on the final funding levels of

8   the VCP and then multiplying the number of shares by both the average price per share

9   during the Relevant Period and the price per share on the dates the shares were delivered.

10  As set forth in the table below, Defendant Clark received a total of over *$54 million* under

11  and Noviello received more than *$13 million*.

| | Target # PRUs | Actual Funding | PRUs in FY18 | PRUs in FY19 | Total PRUs | VCP Value Per Average Stock Price | Actual VCP Payout[23] |
|---|---|---|---|---|---|---|---|
| **Clark** | 961,670 | 268.2% | 2,404,175 | 175,024 | 2,579,199 | $71,142,585 | $54,041,606 |
| **Noviello** | 242,774 | 268.2% | 606,935 | 44,185 | 651,120 | $17,959,976 | $13,642,826 |

15      303.    Importantly, the VCP funding was based on the reported $1.705 billion in

16  non-GAAP operating income.  As noted, the minimum threshold for any funding under the

17  VCP was $1.513 billion. Without the non-GAAP manipulations made in fiscal year 2018

18  (including the $272 million in T&T costs and the more than $30 million saved by shifting

19  to stock-based compensation), Symantec's non-GAAP operating income for 2018 would

20  have been under $1.403 billion, or below the threshold amount.  Thus, Defendants would

21  have received *zero* payment under the VCP.

---

[23] 2018 VCP shares are based on stock price as of October 1, 2018, when the first payment was made; VCP shares for 2019 are based on stock price as of April 1, 2019, when the second payment was made.

**F.    Defendants Clark, Noviello, and Garfield Realized Nearly $20 Million By Selling Symantec Shares at Fraud Inflated Prices**

304.    The Individual Defendants capitalized on their access to material non-public information by selling large amounts of their personally held Symantec common stock during the Relevant Period, at a time when they could maximize their insider profits before the fraud was revealed.  The Company's stated Insider Trading Policy "prohibits our directors, officers, employees and contractors from purchasing or selling Symantec securities while in possession of material, non-public information[,]" and "from short-selling Symantec stock or engaging in transactions involving Symantec-based derivative securities, including hedging transactions."

305.    In violation of Symantec's stated policy and the Exchange Act, Defendants Clark, Noviello, and Garfield unloaded their personally held shares for nearly $20 million in insider trades. In total, during the Relevant Period: (i) Defendant Noviello made approximately $12.89 million in insider sales; (ii) Defendant Clark made approximately $6 million in insider sales; (iii) Garfield made nearly $900,000 in insider sales. The sales made by Defendant Clark, Noviello, and Garfield are illustrated in the following charts:

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|
| NOVIELLO | 5/15/2017 | 27,741 | $32.45 | $900,154 |
| NOVIELLO | 7/12/2017 | 10,034 | $30.00 | $301,020 |
| NOVIELLO | 8/28/2017 | 14,925 | $30.00 | $447,750 |
| NOVIELLO | 9/7/2017 | 7,688 | $30.00 | $230,640 |
| NOVIELLO | 11/6/2017 | 375,000 | $29.38 | $11,018,400 |
| **Totals** | | **435,388** | | **$12,897,964** |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|
| CLARK | 8/28/2017 | 186,433 | $30.00 | $5,593,251 |
| CLARK | 8/31/2017 | 13,567 | $30.00 | $407,010 |
| **Totals** | | **200,000** | | **$6,000,261** |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| GARFIELD | 5/23/2017 | 18,069 | $29.39 | $531,032 |
| GARFIELD | 6/2/2017 | 11,397 | $30.06 | $342,626 |
| **Totals** | | **29,466** | | **$873,657** |

306.    These stock sales are suspicious in amount and in timing.  During the prior period of similar length,[24] neither Defendant Clark nor Noviello sold any Symantec shares they owned or controlled.  Similarly, during the prior period, Defendant Garfield sold 20,947 shares for proceeds of $434,061, approximately 50% of his Relevant Period sales.

307.    Although Defendants Clark and Noviello enacted some or all of their trades pursuant to Rule 10b5-1 trading plans, the plans were adopted during the Relevant Period when they were already in possession of material, nonpublic information. For example, Noviello adopted a new Rule 10b5-1 plan during the Relevant Period on September 13, 2017, shortly after Defendant Garfield gave his exit interview and right after Mr. Brown informed Noviello that Symantec's non-GAAP policies were severely lacking.  Under this new plan, Noviello sold 375,000 shares for over $11.018 million in gross proceeds on November 6, 2017.  His previous Rule 10b5-1 trading plan was adopted in March of 2017, thereby suggesting that Noviello took advantage of his knowledge of material non-public information and adopted a new plan to enact his November trades. Additionally, Defendant Clark enacted his trades pursuant to a Rule 10b5-1 trading plan adopted on May 31, 2017, during the Relevant Period, and while in possession of material non-public information. Accordingly, the 10b5-1 plans do not shield Defendants Clark and Noviello from liability.

## VI.    DEFENDANTS MISLED INVESTORS REGARDING SYMANTEC'S GROWING DEFERRED REVENUES

308.    During the Relevant Period, Defendants made materially false and misleading statements and omissions relating to the increasing length of Symantec's sales contracts. As such, investors were deceived about the true reason for, and nature of, Symantec's increasing deferred revenues and purported growth during the Relevant Period.

[24] Defendants Clark and Noviello joined Symantec in August 2016. The "prior period" for Clark and Noviello is thus limited to the days that they were at Symantec.

A. **Symantec's Deferred Revenue Growth and Contract Duration Increased During the Relevant Period**

309.    During the Relevant Period, Symantec focused on driving sales of multi-year term licenses and maintenance contracts, which was often internally referred to at Symantec by the acronym "MY" for "multi-year."  By lengthening its customer contracts, Symantec increased its deferred revenues, but reduced the Company's in-period revenues. Sealed documents referenced by the Class Action plaintiffs in connection with summary judgment briefing stated that during the Relevant Period, *"the Enterprise Security business was elongating contract duration, which allowed it to achieve internal bookings targets but future period revenue would fall well short of expectations"* and *"Driving longer-term contracts helped achieve the bookings forecast but does not help achieve revenue, thus why the revenue missed and continues to be weak."*

310.    Moreover, Symantec's multi-year or MY deals were often accompanied by significant discounts. Multiple documents confirm that the length of Symantec's contracts was increasing during the Relevant Period.  For example, an April 2018 internal analysis done by a Symantec Board member found that "Symantec experienced [a] 19% increase in contract duration from Q1 to Q4 FY2018 (20%+ YoY)" and that the Company's "[r]atable shift in TOV [total observed volume] [was] largely driven by duration."

311.    Defendants admitted that contract lengths had increased on May 10, 2018, when Symantec disclosed for the first time that "Contract duration for our ratable business was approximately 18.5 months in Q4, up from slightly under 18 months in Q3, approximately 16.5 months in Q2 and approximately 15.5 months in Q1."  The Audit Committee's internal investigation confirmed that the "Overall Trend" was that Symantec's contract length increased from "Q1 FY18" through "Q4 FY18" with the increased length clear in both new and renewal business.

**B.      Defendants Misled Investors Regarding the Reasons for Deferred Revenue Growth**

312.    Instead of disclosing that contract duration was increasing, resulting in increased deferred revenue, Defendants concealed the elongating contract duration and misled investors regarding the true reason for the increased deferred revenue and purported growth.

313.    During the Company's Q2 FY18 earnings call on August 2, 2017, instead of explaining that increased contract duration was driving growth, Defendants boasted about Symantec's "growth while substantially improving profitability in our Enterprise Security business."

314.    Similarly, during the Company's earnings Q2 FY18 earnings call on November 1, 2017, rather than disclose that increased contract duration was driving the increase in deferred revenues, Clark told investors the increase was being driven by an increase in cloud subscription sales.  For example, Clark stated: "These trends, however, are also affecting our in-period revenue recognition. The mix of our bookings are shifting towards more ratable revenue recognition as customers are increasingly adopting our cloud subscription and virtual clients' products in multi-product deals."[25]  Similarly, Defendant Noviello stated that "we're really excited about that deferred revenue growth … [w]e look at the combination of in-quarter recognized revenue and deferred revenue as a strong indicator of the health of our business segments," adding that increased deferred revenue "is a tailwind to revenue going forward."

315.    At the Q3 FY18 conference call on January 31, 2018, Defendant Clark stated that Symantec's "Enterprise segment … recognized less revenue than we forecast," which he attributed to "an increasing mix shift towards our ratable subscription and cloud-delivered products that reduced in-period revenue recognition."  Clark and Noviello

---

[25] "Ratable revenue" means revenue recognized over the life of a contract, as opposed to recognizing the revenue upfront

repeated substantially the same statements in response to questions from analysts as well as in the Company's Form 8-K filed on January 31, 2018 and Form 10-Q filed on February 1, 2018.[26]

316.    Defendants' misrepresentations and omissions regarding the Company's growing deferred revenues deceived investors.  Because Defendants measured total growth by in-period revenue plus deferred revenue—the increase in deferred revenue gave the appearance of growth, especially given Defendants' claims that it was due to increased sales of subscription products.  During his deposition in the Class Action, Defendant Garfield explained why these misrepresentations were materially misleading, stating "[i]f implied billings is going up not because you … have more customer and more business being done, but rather you're just lengthening the term of your contract, your revenue is not going to go up and it potentially could be misleading to an investor."  Garfield added:

> Q. [If you have a one-year subscription deal and a three-year subscription deal and] both deals are for $1 million … why would people need to know the three-year duration?  I'm trying to understand that.
>
> [Objection]
>
> A. SaaS contracts are typically for an amount per year. So say its $1 million per year, is what the service cost … say you sign it on the last day of the quarter, $1 million is going into deferred revenue.  If you sign a three-year deal, but it's $1 million a year, that's a $3-million deal.  And so $3 million would go into deferred revenue. So it would look like deferred revenue is increasing faster.  If the impact of those lengthening contracts were what would cause a material change in your deferred balance *so that it wasn't clear whether it was increased business or contract length*, I felt that *the company should disclose what that contract length change was.*

---

[26] A former Symantec employee deposed in the Class Action noted that Symantec specifically failed to disclose "lengthening contract duration" during the Q3 FY18 earnings call.

317.    Accordingly, Defendants misled investors by affirmatively misrepresenting that the increase in deferred revenue was due to a "shift[] towards more ratable" products when in reality it was due to increased contract duration.   Further, by failing to provide the details of Symantec's increasing contract duration, investors were misled about the true reason for, and nature of, Symantec's increasing deferred revenues and, ultimately, its purported growth during the Relevant Period.

318.    According to sealed documents in the Class Action, multiple former employees of Symantec confirmed in sworn testimony that Defendants' statements above relating to contract duration, deferred revenue, and growth were materially misleading. Furthermore, an April 2018 analysis conducted by a member of Symantec's Board of Directors determined that:

- There was a ***"[s]ignificant increase in duration (19% increase Q1 → Q4) across most SYMC and BC products.*** Duration increase most dramatic on new bookings (23% increase) but also being seen on renewals (14% increase)."

- No significant evidence to support a shift towards ratable solutions over the course of FY18. Shift in ratable as a % of TOV appears ***entirely driven by contract duration."***

319.    Internal Symantec Board materials also flagged that "overall, the contract term for all ratable products increased to 2.0 years from 1.4 years in the prior year quarter and from 1.9 year in the prior quarter" and showed that "E[nterprise] S[ecurity] Total Avg Contract Term YoY%" had increased by 18% in Q1 FY18, 20% in Q2 FY18, 40% in Q3 FY18, and 31% in Q3 FY18 on an adjusted basis.

320.    There is no question that Defendants were aware that increasing contract length, rather than new business, was driving deferred revenue growth.  As early as May 2017, Defendants were aware that the Company's contract length was increasing, and by June or July 2017, multiple internal Company documents demonstrated quite clearly that contract terms were increasing.

321.    Defendants Clark and Noviello were focused on the effect of increasing contract duration prior to and throughout the Relevant Period.  Symantec's former VP of Enterprise Finance testified in the Class Action that Defendant Clark was "as of April 26, 2017 … **asking about the effect of multiyear [contracts]."**  Further, on May 6, 2017, Defendant Noviello received a **"duration analysis"** indicating that **"duration had an impact"** on the business. Noviello inquired further and directed staff to provide him with additional analysis.

322.    Internal emails between Symantec officials from June/July 2017 state **"[l]ooks pretty straightforward"** that **"[t]erm is lengthening, resulting in higher growth rates for TCV [total contract value] than for [annual contract value]."**  Indeed, a former Symantec executive expressly stated in an internal email that he "[c]an't find any fault in the analysis" and that the analysis **"doesn't seem that complicated."**

323.    Furthermore, it was Symantec's internal business strategy to sell "more multiyear contracts."  Internal Symantec emails produced by Defendants and publicly filed in the Class Action confirm that: "Fundamentally, part of our strategy … is to try to lock customers into [multiyear] deals," "we will be selling MY [multi-year] to lock in customers," and "In order to meet the higher bookings number, larger deals are required which have … longer contract terms." Moreover, a former VP of Finance from Symantec's Enterprise Security group testified in that **"our strategy with the combined company was … to do more multiyear contracts."**

324.    Finally, throughout FY 2018, Symantec employees voiced concerns to senior executives about the trend of selling longer-term contracts.  For example, on October 24, 2017, Matt MacKenzie, Chief of Staff, emailed Mr. Clark telling him **"[i]mpact of 1H [multi-year] bookings tilt vs plan is estimated to cost us 13M in revenue/qtr."**[27]

---

[27] Additional information and evidence regarding Symantec's increasing contract duration and Defendants' awareness thereof at the time of their challenged statements is set forth in sealed material submitted by the Class Action plaintiffs at summary judgment.

## VII.   DEFENDANTS' MISREPRESENTATIONS ARE REVEALED

325.   Defendants' misrepresentations to investors initially emerged through two corrective disclosures in May and August 2018 that caused substantial declines in Symantec's share price.   Subsequent disclosures and events confirmed and expounded upon the May and August 2018 disclosures.

326.   First, on May 10, 2018, the Company stunned investors by disclosing that its Audit Committee had commenced an internal investigation due to a whistleblower's concerns, which that the SEC was also investigating.   This caused Symantec's stock price to plummet by approximately 33%. Second, on August 2, 2018, Defendants disclosed additional details concerning the Audit Committee's investigation, including that it was ongoing and would likely impact Q42018 results (which Symantec later admitted to be true), and disappointing results. This caused Symantec's stock price to decline by another 8%. As discussed in greater detail below, these two disclosures revealed, *inter alia,* that Defendants were engaged in accounting improprieties and that Defendants had misrepresented the success of the Blue Coat integration – which Defendants had attempted to hide by improperly recognizing revenue and manipulating transition cost disclosures – and caused Symantec's stock price to drop precipitously.

### A.   Symantec's Discloses an Internal Investigation By Its Audit Committee Following a Whistleblower Report to the SEC

327.   May 10, 2018, after market hours, Symantec released its fiscal fourth quarter 2018 earnings.[28]   While both the Enterprise Security and Consumer Digital Safety segments' fourth quarter results exceeded the Company's guidance and analysts' expectations, the news was greatly overshadowed by Symantec's concurrent

---

[28] In announcing the Company's quarterly results, Symantec's practice throughout the Relevant Period was to issue a press release and Form 8-K and host an earnings call with analysts shortly after the market closed that day. Within the next several days following the earnings press release, the Company issued its more detailed Quarterly Report on Form 10-Q.

announcement that the Audit Committee of the Board of Directors had commenced an internal investigation due to concerns raised by a former employee that were so serious that the Company brought them to the attention of the SEC. Symantec also announced that it retained independent counsel and other advisors to assist it in its investigation and would provide additional information to the SEC as the investigation proceeded. Given the investigation, the Company informed investors that its "financial results and guidance may be subject to change," and that it is "unlikely that the investigation will be completed in time for the Company to file its annual report . . . in a timely manner."

328.    Later that same day, Symantec held an earnings call with investors to discuss its results for Q4 2018. On the call, Defendants Clark and Noviello refused to comment on the internal investigation other than stating that "does not relate to any security concern or breach with respect to our products or systems." Defendants Clark and Noviello announced that the Company would be reducing its guidance on expected revenue, operating margin and earnings per share for the next quarter and the entire fiscal year of 2019 well below the Company's prior estimates and analyst consensus. Defendants Clark and Noviello blamed the continued shift to ratable sales in the Enterprise segment given the adoption of cloud solutions as opposed to on-premise applications.

329.    Defendants also revealed for the first time that Symantec's contract duration for its ratable business had been steadily and significantly increasing to the point that it was materially impacting the presentation of the Company's financials.   Specifically, Defendant Noviello revealed that contract duration for Symantec's ratable business had increased from "18.5 months in Q4, up from slightly under 18 months in Q3; approximately 16.5 months in Q2, and approximately 15.5 months in Q1," and highlighted that "increased contract duration" was one of the "primar[y]" reasons for the Company's low revenue guidance.

330.    After providing their prepared remarks, Defendants Clark, Noviello, and Symantec's Vice President of Investor Relations abruptly cancelled the question and answer session and refused to conduct follow-up calls with investors and analysts.

331. Analysts were blindsided by the Company's revelation of the internal investigation and immediately began expressing doubt about the Company's reported historical results and management's fiscal year 2019 guidance.

332. For example, analysts at Piper Jaffray reported on May 10, 2018 that Symantec's stock is down "due to the announcement that the company is conducting an internal investigation in connection with concerns raise by a former employee." The Piper Jaffray analysts further commented, "[w]e believe this investigation creates too much uncertainty to have confidence *in management's FY19 guidance*, as this could affect historical results and future demand trends" and noted as a risk "*leadership stability*."

333. Jefferies issued a report titled "F418: Does It Get Any Worse?," which stated that Symantec's F4Q results were "*overshadowed by an announcement of an internal investigation by the Board of Directors' Audit Committee due to a former employee's concerns*." Jeffries further noted that "*it is difficult for us to accept the company's guidance at face value given the ongoing investigation and [the] lack of Q&A with management*," and added that "[w]hile we understand that a mix-shift is a headwind to reported revenue, *we continue to struggle to understand this as the singular explanation for Enterprise segment weakness*." (Emphasis in original.)

334. BTIG analysts stated "[t]he *fog created by an internal investigation* of the company led by the audit committee of the board, with no semblance of detail provided to investors, *overshadows everything else* in Thursday's Q4 and FY 2018 earnings." They further stated "[w]e thought the company had started to find its stride in the Enterprise segment following the restructuring of its salesforce […] However, the Q1 and FY19 guidance, which imply a ~20% decline for Q1 and ~10%-11% decline for FY 2019, *make us wonder what, beyond accounting changes, is going on in the business*."

335. As for the Company's refusal to field analyst questions, an analyst at Susquehanna Financial Group, LLLP stated in a note to clients on May 11, 2018, *"We believe this raises a red flag as it relates to the potential severity of this issue."*

336.    Analysts at Cowen & Company remarked, "*this is undoubtedly a serious matter, and it could be awhile before transparency and investor confidence improves*" and further noted "*organic growth has been sluggish*."

337.    Analysts at Stephens reported, "We wonder if 1) something is *fundamentally wrong with the Enterprise segment*, or 2) guidance was dramatically haircut in case something comes of the internal investigation which would likely impact the Enterprise business instead of the Consumer business."

338.    Deutsche Bank analysts noted "the internal probe, *which must be serious to have forced the company to cancel the Q&A portion of the call"* and *"we're still not hearing enough of an uptick in tone from customer/partner checks about Symantec's competitiveness."*

339.    Analysts also took note of the Company's increasing contract length.  For example, analysts at Raymond James stated that the Company's Q1 2019 and FY 2019 guidance was "well below consensus, primarily due to Enterprise which is set to decline" due to factors including *"'increased contract duration.'"*  Similarly, RBC Capital Markets stated that "Organic revenue is expected to be flat, with enterprise down" due to "*increased duration,"* among other factors.

340.    On this news, Symantec stock declined on heavy trading over *33%*, from $29.18 per share on May 10, 2018, to $19.52 per share on May 11, 2018, representing the worst day of trading in Symantec stock in almost *17 years* and erasing roughly *$6 billion* of market capitalization.

341.    On May 14, 2018, in response to the dramatic drop in the price of its shares and demand for further transparency, Symantec released an updated statement regarding the Audit Committee's ongoing internal investigation.  The Company explained that the Audit Committee's internal investigation related to concerns raised by a former employee regarding the "[C]ompany's public disclosures, including commentary on historical financial results; its reporting of certain non-GAAP measures, including those that could impact executive compensation programs; certain forward-looking statements; stock

trading plans; and retaliation."   While the Company stated that it did not expect the investigation to have a "material adverse impact on its historical financial statements," Symantec again acknowledged that "[t]he [C]ompany's financial results and guidance *may be subject to change."*   Symantec also said nothing about the veracity of the Company's other statements that are the subject of the internal investigation, such as Symantec's public "commentary on historical financial results," the Company's purported "forward-looking statements," as well as matters pertaining to executive compensation programs.

342.   Shortly thereafter, on May 14, 2018, Symantec hosted a conference call with investors to provide "more information" about the internal investigation and the Company's fiscal year 2019 financial guidance and fiscal year 2020 financial outlook. But on the call, Defendant Clark did little more than acknowledge the investigation.  Defendant Clark explained on the call that Company executives "can't answer any questions about the investigation," and instructed investors to read a prepared statement, issued before the call, which stated:

> The Audit Committee of the Board of Directors has commenced an internal investigation in connection with concerns raised by a former employee regarding the Company's public disclosures including commentary on historical financial results, its reporting of certain Non- GAAP measures including those that could impact executive compensation programs, certain forward-looking statements, stock trading plans and retaliation. The Audit Committee has retained independent counsel and other advisors to assist it in its investigation. The Company has voluntarily contacted the Securities and Exchange Commission to advise it that an internal investigation is underway, and the Audit Committee intends to provide additional information to the SEC as the investigation proceeds. The investigation is in its early stages and the Company cannot predict the duration or outcome of the investigation. The Company's financial results and guidance may be subject to change based on the outcome of the Audit Committee investigation. It is unlikely that the investigation will be completed in time for the Company to file its annual report on Form 10-K for the fiscal year ended March 30, 2018 in a timely manner. At this time, the Company does not anticipate a material adverse impact on its historical financial statements.

343.    An analyst and trading expert at Seeking Alpha, concluded that given the Company's disclosures, "[t]here's a good chance Symantec will find a level of exaggeration in the previously-used non-GAAP adjustments," including for recurring operating costs.  The analyst added:

> If Symantec finds that some non-GAAP adjustments were indeed not called for, their removal will still have consequences. When you look at Symantec's earnings estimates, those are based on Symantec's non-GAAP reporting. Were Symantec to remove some of those non-GAAP adjustments, and immediately it would start reporting lower non-GAAP earnings. Even with no change to its historical financial statements and accounting practices. . . . Symantec was always pretty expensive (for a stagnated business) when it came to GAAP measures, and only the non-GAAP adjustments made it look more reasonable.

344.    Other analysts were in accord.  An analyst at Susquehanna Financial Group noted that "the potential for the investigation to conclude that non-GAAP numbers were presented inappropriately would not likely be favorable for the current executive team." Similarly in a note to clients, a Cowen & Company analyst warned clients that "we continue to have fundamental concerns," and to "avoid the shares."

345.    On May 16, 2018, *Probes Reporter*, which provides commentary and analysis on public company interactions with investors and with the SEC, reported that, contrary to the Company's statement that it had voluntarily contacted the SEC regarding the whistleblower's expressed concerns, the SEC was already investigating Symantec as early as April 17, 2018.  The *Probes Reporter* published a letter dated April 17, 2018, that it had received from the SEC in response to the *Probes Reporter*'s request for information concerning Symantec pursuant to the Freedom of Information Act.  In the letter, the SEC denied the request, explaining that it was withholding the information requested under federal exemptions protecting from disclosure records compiled for law enforcement purposes the release of which could reasonably be expected to interfere with enforcement activities.  The *Probes Reporter* explained that this letter likely meant that the SEC had

1    contacted Symantec and asked it to voluntarily produce certain information as part of an

2    informal inquiry.[29]

3    346.   On May 31, 2018, Symantec announced that it had received a deficiency

4    notice from NASDAQ stating that, as a result of failing to timely file its annual report on

5    Form 10-K for the year ended March 30, 2018, Symantec was not in compliance with

6    NASDAQ listing rules. The notice explained that Symantec had 60 calendar days from the

7    date of the letter to submit a plan to regain compliance, and that if the plan was accepted

8    by NASDAQ, Symantec would have until November 26, 2018 (i.e., 180 days) to regain

9    compliance.

10   347.   On May 31, 2018, a Credit Suisse analyst issued a report summarizing

11   opinions the firm had received from Ron Kiima, former assistant chief accountant for the

12   SEC. In the report, Mr. Kiima explained that following the May 10, 2018 announcement

13   of the internal investigation, he had concerns about, among other things, Symantec's

14   revenue recognition and M&A accounting. Following the Company's May 14, 2018

15   embellishment, Mr. Kiima understood the investigation to concern the Company's non-

16   GAAP adjustments, including those relating to restructuring, transition or other costs

17   removed from Symantec's reported adjusted metrics.

18   348.   On August 2, 2018, Symantec released its Q1 fiscal year 2019 earnings and

19   held a conference call with investors, announcing additional details concerning the internal

20   investigation and delivering another quarter of disappointing results. The Company said

21   that the investigation was still *"ongoing"* and that, while the Company did not anticipate

22   a material adverse impact on its historical financial statements for Q3 fiscal year 2018 and

23   prior, *"[o]ur fourth quarter fiscal year 2018 and subsequent periods remain open from*

24   *an accounting perspective, subject to adjustment for material updates."*

25

26   [29] John P. Gavin, CFA, *Investors Are Right To Worry About Symantec: It Appears The SEC*

27   *Has Been Investigating Since At Least April*, Probes Reporter (May 16, 2018), *available at*
     https://seekingalpha.com/article/4174685-investors-right-worry-symantec-appears-sec-

28   investigating-since-least-april.

349.    In addition, Defendants stated that implied billings fell $110 million shy of management's expectations and declined by $203 million year-over-year, to $996 million, or nearly 20% lower. Enterprise implied billings also declined by $203 million year-over-year, to only $453 million (31% decline), while Consumer Safety implied billings were flat. The Company attributed the billings miss to pipeline management issues isolated to North America that resulted in elongated deal closure rates. The Company also announced that it intended to cut 8 percent of its global workforce (or 1,000 employees) to reduce costs. The Company further issued reduced revenue and earnings guidance for its second fiscal quarter and 2019 fiscal year that fell short of analysts' expectations. In particular, the Company said it expected revenue in the range of $4.64 billion to $4.76 billion in the fiscal year, which was lower than the median forecast of $4.84 billion among analysts. It also said it expected earnings per share of 8 cents, compared to market forecasts of 17 cents.

350.    Analysts were "highly disappointed" by Symantec's report, questioned the veracity of the Company's justifications for the miss, and expressed a lack of confidence in management's guidance. Analysts at William Blair, for example, stated, "We view the magnitude of the miss as troubling and *another sign that the company is seeing deterioration in its core businesses* . . . [and] are *perplexed by the attribution of the miss largely to pipeline management, given the magnitude of the shortfall.* In our view, the company appears to be *structurally challenged* . . . . In our view the company needs to take more tangible steps to *right the ship and provide more transparency on the challenges. Our confidence level in the prediction of a return to growth in 2020 is not high."* Similarly, BTIG noted, "Mgmt. harped on the fact that a fuller, more integrated suite of products has led to longer sales cycles (specifically in the Americas) and that it's typical for most deals close in the last 3 weeks of the quarter. CEO Clark also mentioned on the call that numerous deals that had slipped in 1Q had since closed in 2Q. *We find these comments hard to reconcile with the lowering of FY19 guide after just one quarter."*

351.   In an August 3, 2018 report, an analyst at Morningstar Equity Research wrote that, after "scour[ing] Symantec's financial results for irregularities . . . investors should be aware of the two speculative theories that could have triggered the audit":

> *[W]e've noticed an expansion in the spread between both GAAP and non-GAAP results. It seems the restructuring line item of its income statement has increased, and it could be in the realm of possibility that management may have inflated restructuring expenses, by placing expenses that would have typically been regular operating expenses into this line item.* Whether an expense falls in the restructuring line item versus regular operating expense (S&M, R&D, or G&A) has no bearing on GAAP profitability, but when calculating non-GAAP Net Income, restructuring expenses are added back into the results. Thus, it is within the realm of possibility that *management inflated the restructuring line item to produce a better-looking non-GAAP EPS metric, allowing the firm to hit stock-based compensation targets*

352.   In response to these disclosures, Symantec stock declined nearly 8%, from $20.88 per share on August 2, 2018, to $19.25 per share on August 3, 2018, erasing roughly $1 billion of market capitalization.

**B.    Symantec's Audit Committee Investigation Confirms Multiple Aspects of Defendants' Misconduct**

353.   On September 24, 2018, Symantec announced that its Audit Committee, independent legal counsel, and a forensic accounting firm, had concluded their internal investigation into Symantec's improper accounting.   The announcement was carefully worded but disclosed numerous facts confirming Defendants' accounting misconduct.

354.   First, the Company admitted to internal control deficiencies, characterizing the controls as *"relatively weak and informal processes"* with respect to certain aspects of the review approval and tracking of transition and transformation expenses.

355.   Second, the Company admitted that it had identified certain behavior inconsistent with the Company's Code of Conduct and related policies, that these matters had been referred to the Company, and that the Company intended to take appropriate action.

356.   Third, the Company stated that in addition to the matters announced in May 2018, the Audit Committee had reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018, when $12 million of the $13 million should be deferred.  Accordingly, Symantec admitted that it must revise the financial results it disclosed on both May 10, 2018, and August 2, 2018, to take into account this deferral and any other financial adjustments required as a result of this revision.  This revelation concerned the Oracle Transaction, discussed above.

357.   Fourth, the Company disclosed that over a year prior, in the quarter ending September 29, 2017, "the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures."

358.   Fifth, Symantec announced that it would be making structural changes to its internal management. While no terminations of senior Symantec executives have been recommended as a result of the investigation, Symantec announced that it will appoint a separate CAO, appoint a separate Chief Compliance Officer reporting to the Audit Committee, and adopt enhanced internal controls.

359.   Sixth, Symantec stated that it intended to belatedly file its annual financial report on or before October 27, 2018 – approximately five months late.

360.   Finally, the Company disclosed that the SEC had commenced a formal investigation into Symantec's accounting.

361.   Notwithstanding these significant disclosures and conclusions, the Audit Committee's investigation was cursory, inadequate, and incomplete—essentially, a whitewash designed to prevent a complete loss of investor confidence and an outright freefall in Symantec's share price.

362.   First, multiple former Symantec sales managers, sales representatives, business development personnel, and other employees with firsthand, percipient knowledge of the accounting manipulations – including Defendant Clark's awareness that large deals were being prematurely booked, double-booked, or otherwise improperly

recorded – were not interviewed in connection with the Audit Committee's investigation. The Audit Committee's failure to interview such employees undermines the thoroughness and legitimacy of its investigation and the veracity of its conclusions.

363.    Second, Defendant Clark regularly attended Audit Committee meetings and, as such, was able to exert improper influence and control over any investigation conducted by the Audit Committee. Indeed, as confirmed in the Derivative Complaint, Defendant Clark attended *eight* Audit Committee meetings in 2017.

364.    Third, the Audit Committee members were focused on and aware of (or recklessly disregarded) the accounting improprieties described above, including the fact that transition costs had been improperly accounted for by Defendants. Thus, the Audit Committee members conducting the investigation had conflicting interests and were motivated to cover-up their own knowing or reckless misconduct.

365.    Finally, on information and belief, the Company retaliated against one or more former employees interviewed in connection with the Audit Committee's investigation who described being instructed by superiors to engage in revenue misconduct but refused to do so.

366.    Had these and other facts relating to Defendants' fictitious accounting and other unethical conduct been disclosed, the price of Symantec common stock would have fallen even further.

## VIII.  DEVELOPMENTS AFTER THE RELEVANT PERIOD

### A.    Widespread Executive Terminations and Departures

367.    In the wake of the revelation of the fraud, virtually Symantec's entire senior executive team was terminated, including both Defendant Clark and Noviello, as well as multiple other senior executives who had come to Symantec as part of the purportedly "transformative" Blue Coat acquisition.

368.    On November 29, 2018, the Company announced that Michael Fey, Symantec's President and Chief Operating Officer, had resigned "effective immediately" and that Defendant Clark had been appointed as President in his stead.  According to a

Form 8-K filed by the Company on November 29, 2018, under the terms of Fey's separation agreement, Fey agreed, in part, to: (i) forego severance benefits or payments, rights to any unvested equity awards, and any cash bonus payments; and (ii) not exercise, sell or transfer any shares subject to currently vested or exercisable Company stock options previously awarded for 12 months.  Fey's separation agreement also contained a general release and waiver of claims by Fey against the Company.

369.    The media immediately questioned the true circumstances surrounding Fey's resignation, and Defendants refused to address those concerns. For example, a November 29, 2018 CRN news article reported that: "Symantec declined to comment on whether Fey's departure was connected to the findings from the investigation."  The next day, a November 30, 2018 RBC Capital Markets analyst report stated: "Overall we are surprised by the move, and to us it appears that this was rather sudden and not a voluntary decision by Mr. Fey." Indeed, according to the allegations in the Class Action Complaint, the former Symantec Account Manager identified in ¶109 confirmed that Fey left Symantec in connection with the Audit Committee investigation and an internal Ethics Committee investigation.  Mr. Kearney similarly confirmed that Fey left in connection with the Audit Committee investigation, and was paid millions of dollars.

370.    At the exact same time that Fey left Symantec, multiple other senior executives left the Company, including Chief Marketing Officer Michael Williams and Senior Vice President Bradon Rogers.  Significantly, Symantec did not disclose any of those departures when it announced Fey's "resignation."  As Bloomberg observed in a November 30, 2018 article entitled Three Executives Depart in Major Leadership Shuffle at Symantec, "Symantec announced Thursday that President and Chief Operating Officer Michael Fey had resigned, but didn't publicize the other executive departures."  Symantec again refused to provide any information concerning the departures of these senior executives.  As the same Bloomberg article reported, "A company spokesman said Symantec wouldn't be making any further public comments on the executive changes."

371.    On January 31, 2019, Symantec announced Noviello's departure ostensibly to "pursue other opportunities." The market again reacted to this news with concern, especially on the heels of the departure of Fey and other senior Symantec executives.  For example, as analysts at Trefis observed in a February 1, 2019 article, the fact that there had been "a spate of executive exits (the COO in November and now the CFO) while the audit committee review fades is not necessarily the most inspiring set of events for investors." In addition to Trefis, other analysts directly connected Noviello's departure with the Audit Committee investigation.  For example, Macquarie reported on January 31, 2019 that "CFO Nick Noviello will be stepping down, clearing some clouds around the stock from investigations & class action suits, though our concerns persist."

372.    The same analyst report cited the Class Action and the ongoing SEC investigation as additional reasons for Noviello's departure. Specifically, Macquarie stated: "CFO Nick Noviello will be stepping down over the coming months, an outcome we view as reasonable following the co.'s Internal Audit Committee investigation, an ongoing SEC investigation, and a class action suit with allegations of accounting fraud." In the Class Action Complaint, Mr. Kearney confirmed his understanding that Noviello left in connection with the Audit Committee investigation.   Defendant Noviello ceased employment on May 24, 2019, only after he received his full VCP 2017 PRU awards.

373.    On May 9, 2019, the Company announced that Defendant Clark would be leaving the Company without a permanent replacement, and attributed Clark's departure to "personal issues."[30]  Again, the market questioned the true circumstances of Defendant Clark's departure.  Specifically, during a May 9, 2019 investor call, Brad Alan Zelnick, an analyst from Credit Suisse, asked:

> [I]n the spirit of transparency, which you mentioned several times, I think I need to ask, is Greg's departure in any way related to a disagreement with the Board or the company or in and way related to

---

[30] Notably, while the Company told investors on May 9, 2019 that Defendant Clark had "resigned" to spend time with his aging father, CFRA reported on July 15, 2019 that Clark "has partnered with buyout firms Advent and Permira" and "could make a competing offer for Symantec."

either the still unresolved SEC investigation or any pending litigation against the company?

In response, Symantec's new interim president and CEO Richard Hill did not deny the connection, and instead he evasively stated:

> **So I can't answer for Greg. You certainly can talk to him as much as you want. From my perspective, there comes a time when CEOs, things happen in companies**, CEOs aren't – didn't do it or didn't have an effect on it other than you're at the top of the pyramid. And when you're at the top of the pyramid, sometimes things happen. **So that's the best I can do with an answer. Because I don't have definitive**. And there's no connection, absolutely, to the investigation that I know of. At least no one's ever said that to me. **I can say that factually**.

374. Analysts took note of this obviously evasive answer. For example, a May 10, 2019 Credit Suisse report stated that "While Mr. Hill indicated Mr. Clark's departure was not due to any personal disagreement with him or any litigation that he was aware of, he stopped short of speaking on behalf of the entire board or denying any nexus with ongoing litigation or the company's still unresolved SEC investigation."

375. The executive-level housecleaning continued.  On July 10, 2019, Bloomberg reported that Symantec's Head of Global Enterprise Sales, Marc Andrews, was leaving the Company, along with Denny Young, Symantec's former Vice President of Operations at Enterprise Security; Bryan Barney, the Company's former SVP, GM of Enterprise Security; Javed Hasan, former SVP, Endpoint, IAAS & Datacenter products; and Steve Schoenfeld, former SVP, Product Management.  Both Andrews and Schoenfeld had come to Symantec from Blue Coat. The same Bloomberg article reported that Defendant Clark had been terminated "following the disclosure of internal investigation in May [2018]," that Clark's departure created **"organizational disruption and distraction,"** and that Symantec was experiencing **"fundamental turbulence."**

376. Finally, multiple other senior executives who were formerly at Blue Coat departed Symantec, including: (a) Francis C. Rosch, Symantec's former Executive Vice President for Consumer Digital Safety, who was principally responsible for managing the integration of LifeLock into Symantec's Consumer Digital Safety business segment and

achieving the Company's project cost savings synergies; (b) Joe McPhillips, the Company's former Director of Channel Sales for Symantec's Pacific region and who came over from Blue Coat; and (c) Brian Kenyon, the former Chief Strategy Officer who had served in that role since August 2016 since coming over through acquisition of Blue Coat.

## IX.   DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS AND MATERIAL OMISSIONS

377.   Throughout the Relevant Period, Defendants made false and misleading statements in which they misrepresented or omitted material facts concerning Symantec's financial and operating results, including in (a) presentations and commentary on Symantec's historical financial results; (b) statements of non-GAAP measures; (c) explanations of non-GAAP measures; (d) affirmations of effective internal controls for financial reporting; and (e) certifications pursuant to SOX attesting to the accuracy of Symantec's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

### A.   Fourth Quarter Fiscal Year 2017 And Fiscal Year 2017

378.   On May 10, 2017, after market hours, the Company filed with the SEC its quarterly report for the fourth quarter and fiscal year ended March 31, 2017, on Form 8-K. The Company held an earnings call also on May 10, 2017 to discuss its results for the fourth quarter and fiscal year ended March 31, 2017. On May 19, 2017, Symantec filed with the SEC its Annual Report on Form 10-K signed by Defendants Clark, Noviello, and Garfield. As set forth below, the 4Q2017 Form 8-K, the 2017 Form 10-K, and Defendants' May 10, 2017 earnings call contained materially false and misleading statements about Symantec's: (i) reported revenue; (ii) statements relating to non-GAAP measures; and (iii) effective internal controls for financial reporting.

379.   ***Improper Recognition of Revenue.***   In its Forms 8-K and 10-K, Symantec reported quarterly GAAP revenue of $1.115 billion and fiscal year 2017 GAAP revenue of $4.019 billion. On the Company's Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.353 billion as of March 31, 2017.

380.    In the section of the 2017 Form 10-K entitled "Notes to the Consolidated Financial Statements," Defendants affirmed, "The accompanying consolidated financial statements of Symantec and our wholly-owned subsidiaries are prepared in conformity with generally accepted accounting principles in the United States ('U.S. GAAP')." Defendants also set forth the Company's policy for revenue recognition, which provides, among other things, "We recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability is probable."

381.    Defendants' statements regarding the Company's reported revenue, deferred revenue, and compliance with GAAP and its internal revenue recognition policy, as set forth above, were false and misleading and omitted material facts. Throughout the Relevant Period, Symantec improperly recognized revenue in violation of GAAP.  *See* Section V(A)-(B). Contrary to GAAP, Symantec recognized revenue on sales that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, where the customer was unable or unwilling to pay and/or where the Company had not satisfied its performance obligation. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP. Consequently, Symantec's reported fourth quarter fiscal year 2017 and fiscal year 2017 GAAP revenue in the Company's Forms 8-K and 10-K were overstated, the Company's reported deferred revenue for those same periods was understated, the Company's 2017 Form 10- K was not prepared in accordance with GAAP, and the Company was not complying with its internal revenue recognition policy.

382.    ***Misstatements Relating To Non-GAAP Measures:***  In the Company's Q4 FY17 Form 8-K, Defendants supplemented Symantec's reported GAAP financial results with a presentation of Symantec's adjusted financial measures.  Symantec reported non-GAAP revenue for Q4 2017 of $1.176 billion and $4.163 billion for fiscal year 2017. The Company also reported non-GAAP operating income for Q4 2017 of $314 million and $1.194 billion for fiscal year 2017.

383.   In the Company's Q4 FY17 Form 8-K and 2017 Form 10-K, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the Company reported "Restructuring, separation, transition, and other" expenses for Q4 2017 of $72 million, and $273 million for the entire fiscal year.  In Note 4 to the Consolidated Financial Statements in the 2017 Form 10-K, the Company provided further information regarding the nature of this line item expense, including a description of the type of costs that the Company recorded as "transition costs," and represented that the Company had incurred $94 million in so-called transition costs for fiscal year 2017:

> Note 4. Restructuring, Separation, Transition, and Other Costs
>
> . . . Transition costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes.
>
> . . .
>
> We incurred $94 million in continuing operations transition expense during fiscal 2017.

384.   In the "Explanation of Non-GAAP Measures and Other Items" attached as Appendix A to the Q4 FY17 Form 8-K, Defendants explained their reasoning for reporting non-GAAP measures as follows: "We believe that these non-GAAP financial measures also facilitate comparisons of our *performance to prior periods and to our peers* and that investors benefit from an understanding of the non-GAAP financial measures."  In the same document, Defendants further explained the "Restructuring, separation, transition and other" adjustment, stating that the Company removed this expense because these costs, including the Company's transition costs, were purportedly "discrete events" and costs not incurred in the "ordinary course of business":

> Restructuring, separation, transition and other: We have engaged in various restructuring, separation, transition, and other activities over the past several years that have resulted in costs associated with severance, facilities, transition, and other related costs. . . . Transition and associated costs primarily consist of consulting charges associated with the implementation of new enterprise resource

planning systems and costs to automate business processes. . . . ***Each restructuring, separation, transition, and other activity has been a discrete event based on a unique set of business objectives or circumstances, and each has differed from the others in terms of its operational implementation, business impact and scope. We do not engage in restructuring, separation, transition, or other activities in the ordinary course of business***.

385.  Symantec used its adjusted measures to inform investors about the Company's financial condition. For example, on May 10, 2017, Symantec held a quarterly earnings call, during which Defendant Clark emphasized the Company's "strong" financial performance and outlook, highlighting the Company's adjusted revenue and operating margins:

> Enterprise Security profitability has improved dramatically with Q4 fiscal year 2017 operating margins up 17 points year-over-year. Consumer Security revenue growth performed better than our guidance and LifeLock came in above our revenue expectations as well. Overall, we continue to perform ahead of plan on our cost efficiencies and synergies. Total company margins were at the high end of our guidance. And as a result, we delivered EPS at the high end of our guidance, including LifeLock.
> . . .
> Consumer Security exceeded the high end of our revenue guidance on an organic basis and LifeLock performed above revenue expectations with strong underlying growth metrics. LifeLock renewal rates increased year-over-year and cumulative ending numbers were up 8% year-over-year. This is an impressive result amidst the significant acquisition and integration activity.

386.  Similarly, Noviello emphasized the Company's adjusted operating margin on the call, representing the increasing margin was the product of the Company's execution on its cost-savings initiatives and synergies:

> Our fourth quarter non-GAAP revenue was $1.176 billion[.]
>
> . . .
>
> Non-GAAP operating margin for the fourth quarter was 27%. . . . Operationally, our strong non-GAAP operating margin was driven by continued execution against our cost-savings initiatives and synergies.

Fully diluted non-GAAP earnings per share was $0.28 . . . . Excluding LifeLock, fully diluted non-GAAP earnings per share was $0.29, at the high end of our $0.27 to $0.29 guidance range.

. . .

Enterprise non-GAAP operating margin was 16%, up 17 points year-over-year.

. . .

Our Consumer Security segment non-GAAP . . . operating margin was 42%.

. . .

Including LifeLock, non-GAAP operating margin remained at 29%. Non-GAAP EPS was $1.18, including a $0.01 headwind from LifeLock, which is an increase of 15% year-over-year and above our original guidance of $1.06 to $1.10 provided in May 2016.

387. Defendants' presentation and commentary regarding Symantec's reported adjusted measures, including the Company's net revenues and operating expenses, and statements regarding the Company's "Restructuring, separation, transition, and other" expenses and "transition costs" as set forth above were false and misleading and omitted material facts.

a. As described above, throughout the Relevant Period, Symantec improperly recognized revenue. *See* Sections V.A. and VI. Symantec recognized revenue on sales that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, where the customer was unable or unwilling to pay and/or where the Company had not satisfied its performance obligation. Symantec also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy. Consequently, Symantec's reported fourth quarter fiscal

year 2017 and fiscal year 2017 adjusted revenue in the Company's Form 8-K was overstated.

b.   Defendants overstated Symantec's non-GAAP operating income.   *See* Section V.B.  Defendants recorded regular ongoing business costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Separation, Transition, and Other Costs" line item. The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket.  Moreover, by virtue of the "Restructuring, separation, transition and other" adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business. Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, separation, transition and other" line item expenses were misstated.  Defendants reported non-GAAP operating income for Q4 2017 and for fiscal year 2017, as well as other reported adjusted metrics dependent on these figures, such as operating margin and EPS, as set forth in the Company's 4Q 2017 Form 8-K and Defendants' commentary, were also misstated.

c.   Additionally, while the Company's approach to recognizing "transition costs" changed after the Blue Coat acquisition, the description of "transition costs" remained the same or did not meaningfully change so as to disclose how Symantec was recording transition costs.  For this reason, Defendants' claim that the non-GAAP measures facilitated comparison to "prior periods" was false and misleading as well.

d.   Defendants' justification for reporting the non-GAAP measures was also false because Symantec's "peers" did not adjust for transition expenses.

Indeed, E&Y confirmed that Symantec was an "outlier" because less than 5% of Symantec's peers excluded transition costs from their non-GAAP measures. Therefore, the non-GAAP measures did not facilitate comparison to Symantec's peers because Symantec had adjusted millions of dollars from its non-GAAP operating measures while its peers did not.

388.   ***False Internal Controls And SOX Certifications:*** In the section of the 2017 Form 10-K titled, "Controls and Procedures," Defendants affirmed that Symantec had evaluated the Company's internal control over financial reporting, that the Company's internal control over financial reporting was effective, and that there were no changes in the Company's internal control over financial reporting during the quarter ended March 31, 2017, that materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

389.   In addition, the 2017 Form 10-K contained certifications pursuant to SOX Sections 302 and 906 signed by Defendants Clark and Noviello attesting to the accuracy of financial reporting, the disclosure of material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

390.   Defendants' statements regarding the Company's internal control over financial reporting and in their SOX certifications were false and misleading. In truth, Symantec did not have effective internal controls over financial reporting, including for the recognition of revenue and review, approval and tracking of transition and transformation expenses.  Indeed, E&Y confirmed that for certain costs "such as T&T and acquisition and integration, sufficient controls do not exist to validate that those costs are of the appropriate nature and type for that categorization."  In addition, contrary to their SOX certifications, Defendants Clark and Noviello knew that the 2017 Form 10-K contained untrue statements of material fact and that the financial statements and other financial information included in the 2017 Form 10-K did not fairly present in all material respects the financial condition and results of operations of Symantec for fiscal year 2017.  Moreover, Defendants failed to disclose all significant deficiencies and material weaknesses in the design and operation

of Symantec's internal control over financial reporting likely to adversely affect Symantec ability to record, process, summarize and report financial information, as well as the financial fraud that Defendants and other employees with significant roles in Symantec's internal control over financial reporting were committing.

## B.   First Quarter Fiscal Year 2018 Results

391.   On August 2, 2017, Symantec filed with the SEC its financial results for the first quarter fiscal year 2018 for the period ending June 30, 2017, and supplemental financial information and commentary by Noviello on Form 8-K. On August 4, 2017, Symantec filed with the SEC its quarterly report for the first quarter fiscal year 2018 for the period ending on June 30, 2017, on Form 10-Q, which was signed by Defendant Clark and Noviello.  As set forth below, the Q1 FY18 Form 8-K and Q1 FY18 Form 10-Q contained materially false and misleading statements about Symantec's (i) reported revenue; (ii) statements relating to non-GAAP measures; and (iii) effective internal controls for financial reporting.

392.   ***Improper Recognition of GAAP Revenue:*** In the 1Q2018 Form 8-K and 1Q2018 Form 10-Q, Symantec reported quarterly GAAP revenue of $1.175 billion. On the Company's Condensed Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.329 billion as of June 30, 2017.

393.   In the section of the Q1 FY18 Form 10-Q titled, "Notes to Condensed Consolidated Financial Statements," Defendants affirmed that Symantec's financial statements were prepared in accordance with GAAP.  Likewise, in the section entitled "Critical Accounting Policies And Estimates," Defendants confirmed Symantec's adherence to its stated revenue recognition policies by affirming there "have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements during the three months ended June 30, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017."

394.    Defendants' statements regarding the Company's reported revenue, deferred revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above, were false and misleading and omitted material facts.   Throughout the Relevant Period, Symantec improperly recognized revenue in violation of GAAP. *See* Section V(A)-(B).   Contrary to GAAP, Symantec recognized revenue on sales that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, where the customer was unable or unwilling to pay and/or where the Company had not satisfied its performance obligation.   Symantec also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP.   Consequently, Symantec's reported first quarter fiscal year 2018 GAAP revenue in the Company's Forms 8-K and 10-Q was overstated, the Company's reported deferred revenue for those same periods was understated, the Company's Q1 FY18 Form 10-Q was not prepared in accordance with GAAP, and the Company was not complying with its internal revenue recognition policy.

395.    ***Misstatements Relating to Non-GAAP Measures:*** In the Company's 1Q2018 Form 8-K, Defendants supplemented Symantec's reported GAAP financial results with a presentation of Symantec's adjusted financial measures. The Company reported non-GAAP revenue for Q1 2018 of $1.228 billion and non-GAAP operating income of $221 million.

396.    In the Company's Q1 FY18 Form 8-K and Q1 FY18 Form 10-Q, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein Symantec reported "Restructuring, transition, and other" expenses for the first quarter of fiscal year 2018 of $88 million.   In Note 4 to the Consolidated Financial Statements in the Q1 FY18 Form 10-Q, the Company provided further information on the nature of this line item expense, including a description of the type of costs that it recorded as "Transition Costs," and represented that it had incurred $28 million in transition costs over the first quarter fiscal year 2018:

Note 4. Restructuring, Transition and Other Costs

. . . Transition costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes.

[W]e expect continuing significant transition costs associated with the implementation of a new enterprise resource planning system and costs to automate business processes.

Restructuring, transition and other costs summary

For the three months ended June 30, 2017 we incurred the following restructuring, transition and other costs:

| (In millions) | | June 30, 2017 |
|---|---|---|
| Severance and termination costs | $ | 27 |
| Other exit and disposal costs | | 32 |
| Asset write-offs | | 1 |
| Transition costs | | 28 |
| Total restructuring, transition and other | $ | 88 |

397.   In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," Defendants explained how the Company's adjusted measures for Q1 2018 were derived, including the Company's adjusted operating expenses and operating income. As for the Company's adjusted expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, transition and other," removing operating expenses of $88 million for Q1 2018.

398.   In the "Explanation of Non-GAAP Measures and Other Items," attached as Appendix A to the Q1 FY18 Form 8-K, Defendants explained their reasoning for reporting non-GAAP measures was because "We believe that these non-GAAP financial measures also facilitate comparisons of our performance to prior periods and to our peers and that investors benefit from an understanding of the non-GAAP financial measures."  Appendix A also explained the reasoning for making the "Restructuring, transition and other" adjustment, stating that the Company removed this expense because these costs, including

1    its transition costs, were purportedly "discrete events" and costs not incurred in the

2    "ordinary course of business":

> Restructuring, transition and other: We have engaged in various restructuring, transition and other activities over the past several years that have resulted in costs associated with severance, facilities, transition, and other related costs. Transition and associated costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes. . . . ***Each restructuring, transition and other activity has been a discrete event based on a unique set of business objectives or circumstances, and each has differed from the others in terms of its operational implementation, business impact and scope. We do not engage in restructuring, transition or other activities in the ordinary course of business.***

399.    Defendants used these adjusted measures to inform investors about Symantec's financial condition.  On August 2, 2017, Defendants held a quarterly earnings call during which Noviello made the following statements regarding the Company's first quarter fiscal year 2018 financial results, promoting the Company's adjusted operating margin and EPS:

> Operating margin for the first quarter was 31%, above our guided range of 27% to 29%, driven by top line outperformance and continued execution against our cost savings initiatives and synergies. We remain ahead of schedule to achieve our expected net cost efficiencies as well as our expected Blue Coat and LifeLock cost synergies, which gives us further confidence around our guidance and the significant increase in operating margins we expect this year. . . . Fully diluted earnings per share was $0.33, above our $0.28 to $0.32 guidance range.

> Enterprise Security operating margin was 17%, up 11 points year-over-year, driven by our cost savings initiatives.

> Q1 FY '18 Consumer Digital Safety operating margin was 47%, driven in part by top line growth and the faster realization of LifeLock synergies.

400.    Defendants' presentation and commentary regarding Symantec's reported non-GAAP financial measures, including the Company's non-GAAP net revenues and

non-GAAP operating expenses, and statements regarding the Company's "Restructuring, transition, and other" expenses and "transition costs" as set forth above were false and misleading and omitted material facts.

    a.    As described above, throughout the Relevant Period, Defendants improperly recognized revenue. Section V(A)-(B). Symantec recognized revenue on sales that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, where the customer was unable or unwilling to pay and/or where the Company had not satisfied its performance obligation. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy. Consequently, Symantec's reported first quarter fiscal year 2018 adjusted revenue in the Company's Form 8-K was overstated.

    b.    Defendants overstated Symantec's non-GAAP operating income. Section V(B). Defendants recorded regular ongoing business costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Transition and Other Costs" line item. The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket. Moreover, by virtue of the "Restructuring, transition and other" adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business. Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, separation, transition and other" line item expenses were misstated. Moreover, Defendants reported adjusted operating income for Q1 2018, as well as other

reported adjusted metrics dependent on this figure, such as operating margin and EPS, as set forth in the Company's Q1 FY18 Form 8-K and Defendants' commentary, were also misstated.

c.    Additionally, while the Company's approach to recognizing "transition costs" changed after the Blue Coat acquisition, the description of "transition costs" remained the same or did not meaningfully change so as to disclose how Symantec was recording transition costs.  Defendants also failed to disclose that employee bonuses under the AIP and EAIP were now being paid in restricted stock units immediately convertible to cash, which were excluded expenses from the Company's non-GAAP measures. For this reason, Defendants' claim that the non-GAAP measures facilitated comparison to "prior periods" was false and misleading as well.

d.    Defendants' justification for reporting the non-GAAP measures was also false because Symantec's "peers" did not adjust for transition expenses. Indeed, E&Y confirmed that Symantec was an "outlier" because less than 5% of Symantec's peers excluded transition costs from their non-GAAP measures.  Therefore, the non-GAAP measures did not facilitate comparison to Symantec's peers because Symantec had adjusted millions of dollars from its non-GAAP operating measures while its peers did not.

401.   ***False Internal Controls And SOX Certifications:***  In the section of the Q1 FY18 Form 10-Q titled, "Controls and Procedures," Defendants affirmed that they had evaluated Symantec's internal control over financial reporting, that the Company's internal control over financial reporting was effective, and that there were no changes in the Company's internal control over financial reporting during the quarter ended June 30, 2017, that materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

402.   In addition, the Q1 FY18 Form 10-Q contained certifications pursuant to SOX Sections 302 and 906 signed by Defendants Clark and Noviello attesting to the

1  accuracy of financial reporting, the disclosure of material changes to the Company's

2  internal control over financial reporting, and the disclosure of all fraud.

3        403.   Defendants' statements regarding the Company's internal control over

4  financial reporting and in their SOX certifications were false and misleading.  In truth,

5  Symantec maintained ineffective internal controls over financial reporting, including for

6  the recognition of revenue and review, approval and tracking of transition and

7  transformation expenses.   Indeed, on May 19, 2017, Garfield confirmed that the

8  Company's non-GAAP reporting control enhancement was "overwhelmed by the volume

9  and complexity of non-GAAP activity."  E&Y further confirmed that for certain costs

10  "such as T&T and acquisition and integration, sufficient controls do not exist to validate

11  that those costs are of the appropriate nature and type for that categorization."  In addition,

12  contrary to their SOX certifications, Defendants Clark and Noviello knew that the Q1 FY18

13  Form 10-Q contained untrue statements of material fact and that the financial statements

14  and other financial information included in the Q1 FY18 Form 10-Q did not fairly present

15  in all material respects the financial condition and results of operations of Symantec for the

16  first quarter fiscal year 2018.   Moreover, Defendants failed to disclose all significant

17  deficiencies and material weaknesses in the design and operation of Symantec's internal

18  control over financial reporting likely to adversely affect Symantec's ability to record,

19  process, summarize and report financial information, as well as the financial fraud that

20  Defendants and other employees with significant roles in Symantec's internal control over

21  financial reporting were committing.

22        404.   ***Contract Duration Misstatements***: During the Company's August 2, 2017

23  earnings call, Defendant Clark promoted Symantec's "growth while substantially

24  improving profitability in our Enterprise Security business."   This statement was

25  materially misleading because Clark omitted that such "growth" was, in substantial part,

26  merely driven by longer contract terms with existing customers.

27

28

### C.      August 8, 2017 Item 5.02 On Form 8-K

405.    On August 8, 2017, Symantec filed Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers with the SEC on Form 8-K, announcing that Garfield, its Senior Vice President and CAO, resigned from his position effective August 7, 2017. The Company stated, "Mr. Garfield has agreed to continue to serve in an advisory capacity with the Company through October 2017. Mr. Garfield[']s decision to leave the Company was not due to any disagreement relating to the Company[']s management, policies, or practices. Nicholas R. Noviello, the Company[']s Executive Vice President and Chief Financial Officer, assumed the responsibilities of Principal Accounting Officer effective August 7, 2017."

406.    Symantec's statements in the Form 8-K filed on August 8, 2017, were false and misleading and omitted material facts. Defendant Garfield's decision to leave the Company was due to his disagreement relating to the Company's accounting policies and practices.  Such policies and practices directly impacted the Company's public disclosures, including commentary on historical financial results, its reporting of non-GAAP measures, including those that could impact executive compensation programs, certain forward-looking statements, stock trading plans and retaliation.

### D.      August 16, 2017 Proxy Statement

407.    On August 16, 2017, the Company filed a Schedule 14A with the SEC ("2017 Proxy Statement"), which set forth the Company's executive compensation practices and philosophy.  The 2017 Proxy Statement stated that the Company's executive compensation programs provided "direct alignment with stockholders" and that the Company uses "responsible pay policies to reinforce strong governance and enhance shareholder alignment."  The 2017 Proxy Statement discussion of executive compensation states, in relevant part:

## OUR EXECUTIVE COMPENSATION PHILOSOPHY AND PRACTICES

The overriding principle driving our compensation programs continues to be our belief that it benefits our employees, customers, partners and stockholders to have management's compensation tied to our near- and long-term performance. Our pay programs reward achievement of challenging performance goals that align with our business strategy. We measure shorter-term results, though the majority emphasis is placed on long-term equity compensation that provides direct alignment with stockholders. We use responsible pay policies to reinforce strong governance and enhance stockholder alignment.

| Base Salary | Annual Incentives | Long-Term Incentives |
|---|---|---|
| • Aligned with role, contributions, and competitive market practice<br>• Supports attraction and retention of talent | • 50% Revenue (non-GAAP)<br>• Encourages overall company growth, a key shareholder value driver | • 70% Performance Units (PRUs)*<br>• Special 1-time design that reinforces the multi-year business transformation and aligns to stockholder value generation*<br>• Measures Operating Income (non-GAAP) at the end of fiscal 2018 to assess achievement of growth and cost reduction goals |
| **Pay Policies** | 50% Operating Income (non-GAAP) | 30% time-vested restricted stock units (RSUs) |
| • Ownership guidelines<br>• No hedging/pledging<br>• Clawback policy<br>• Double-trigger equity | • Provides a strong focus on cost control, aligns with shareholder value growth | • Promotes retention and shareholder alignment |

408.   The 2017 Proxy Statement also stated, "Fiscal 2017 Performance. Our non-GAAP operating income was 105% of the targeted performance level, and our non-GAAP revenue was 100% of the targeted performance level."  The 2017 Proxy Statement further stated "Incentive Award Outcome. Our non-GAAP operating income metric funded at 125.8% of target and non-GAAP revenue funded at 100% of target.  The approved funding level was 111.5% of target, slightly below the formulaic payout."

409.   Symantec's statements regarding the Company's Executive Compensation programs, as set forth above were false and misleading and omitted material facts. Defendants inflated the Company's non-GAAP revenues and operating income through improper accounting practices and deceptive adjustments, allowing Defendants to meet their annual incentive targets.  Consequently, the Company's executive compensation program was not tied to its actual near- and long-term performance, was not aligned with

shareholder interests, and was not a responsible pay policy to reinforce strong governance and enhance stockholder alignment.  Moreover, contrary to Defendants' representations, the Company had not in fact achieved the stated non-GAAP revenue and operating income targets.

### E.    Second Quarter Fiscal Year 2018 Results

410.    On November 1, 2017, Symantec filed with the SEC its financial results for the second quarter fiscal year 2018 for the period ending September 29, 2017, and supplemental financial information and commentary by Noviello on Form 8-K.  On November 3, 2017, Symantec filed with the SEC its Quarterly Report for the second quarter fiscal year 2018 on Form 10-Q for the period ending September 29, 2017, which was signed by Defendant Clark and Noviello.  As set forth below, the Q2 FY18 Form 8-K and Q2 FY18 Form 10-Q contained materially false and misleading statements about (i) reported revenue; (ii) non-GAAP measures; and (iii) effective internal controls for financial reporting.

411.    ***Improper Recognition of GAAP Revenue:*** In the Q2 FY18 Form 8-K and Q2 FY18 Form 10-Q, Symantec reported quarterly GAAP revenue of $1.240 billion. On the Company's Condensed Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.041 billion as of September 29, 2017.

412.    In the section of the Q2 FY18 Form 10-Q titled, "Notes to Condensed Consolidated Financial Statements," Defendants affirmed that Symantec's financial statements were prepared in accordance with GAAP.  Likewise, in the section entitled "Critical Accounting Policies And Estimates," Defendants confirmed Symantec's adherence to its stated revenue recognition policies by affirming there "have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements during the six months ended September 29, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017."

413.     Symantec's statements regarding the Company's reported revenue, deferred revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above, were false and misleading and omitted material facts.   Throughout the Relevant Period, Symantec improperly recognized revenue in violation of GAAP. Section V(A)-(B). Contrary to GAAP, Symantec recognized revenue on sales at that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, where the customer was unable or unwilling to pay and/or where the Company had not satisfied its performance obligation.   Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP.   Consequently, Symantec's reported second quarter fiscal year 2018 GAAP revenue in the Company's Forms 8-K and 10-Q were overstated, the Company's reported deferred revenue for the same period was understated, the Company's Q2 FY18 Form 10-Q was not prepared in accordance with GAAP, and the Company was not complying with its stated revenue recognition policy.

414.     ***Misstatements Relating To Non-GAAP Measures:*** In the Q2 FY18 Form 8-K, the Company supplemented its reported GAAP financial results with a presentation of Symantec's non-GAAP financial measures. The Company reported non-GAAP revenue for Q2 2018 of $1.276 billion and non-GAAP operating income of $435 million.

415.     In the Company's Q2 FY18 Form 8-K and Q2 FY18 Form 10-Q, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the Company reported "Restructuring, transition and other" expenses for the second quarter of fiscal year 2018 of $97 million.   In Note 4 to the Consolidated Financial Statements in the Q2 FY18 Form 10-Q, the Company provided further information on the nature of this line item expense, including a description of the type of costs that the Company deems "Transition Costs," and represented that it had incurred a quarterly expense of $76 million in transition costs and $120 million over the past two quarters:

Note 4. Restructuring, Transition and Other Costs

Our restructuring, transition and other costs and liabilities consist primarily of severance, facilities, transition and other related costs. . ... Transition costs primarily consist of consulting charges associated with the implementation of new enterprise

resource planning systems, costs to automate business processes and costs associated with divestitures of our product lines and businesses.

. . .

[W]e expect continuing significant transition costs[.]

. . .

Restructuring, transition and other costs summary

Our restructuring, transition and other costs are presented in the table below:

| (In millions) | Three Months Ended September 29, 2017 | | Six Months Ended September 29, 2017 | |
|---|---|---|---|---|
| Severance and termination benefit costs | $ | 12 | $ | 39 |
| Other exit and disposal costs | | 1 | | 17 |
| Asset write-offs | | 8 | | 9 |
| Transition costs | | 76 | | 120 |
| Total | $ | 97 | $ | 185 |

Restructuring, transition and other

. . . During the first six months of FY18, we also incurred additional divestiture costs as a result of the divestiture of our WSS and PKI solutions, as well as costs associated with our other transition and transformation programs including the implementation of a new enterprise resource planning system and costs to automate business processes.

416.    In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," Defendants explained how Symantec's adjusted financial measures for Q2 2018 were derived, including Symantec's non-GAAP operating expenses and operating income.  As for the Company's non-GAAP operating expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for

"Restructuring, separation, transition, and other," removing operating expenses of $97 million for Q2 2018.

417.   In the "Explanation of Non-GAAP Measures and Other Items," attached as Appendix A to the Q2 FY18 Form 8-K, Defendants explained their reasoning for reporting non-GAAP measures was because "We believe that these non-GAAP financial measures also facilitate comparisons of our performance to prior periods."

418.   Notably, for the first time during the Relevant Period, Symantec's explanation for reporting non-GAAP measures no longer claimed the adjustments facilitated a comparison to "peers."

419.    Appendix A also explained the reasoning for making the "Restructuring, transition and other" adjustment, stating that the Company removed this expense because these costs, including its transition costs, were purportedly "discrete events":

> Restructuring, transition and other: . . . We have also engaged in various transition and other activities which resulted in related costs primarily consisting of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes . . . . *Each restructuring, transition, and other activity has been a discrete event based on a unique set of business objectives or circumstances, each has differed from the others in terms of its operational implementation, business impact and scope, and the amount of these charges has varied significantly from period to period*.

420.   Symantec's definition of "transition costs" as of November 1, 2017 no longer stated that Symantec did not "engage in restructuring, transition, or other activities in the ordinary course of business."

421.   Defendants reported these adjusted financial measures to investors as indicative of Symantec's financial condition.  On November 1, 2017, Defendants held a quarterly earnings call during which Noviello promoted its adjusted financials, including operating margins, operating expenses and EPS:

> Operating margin for the second quarter was 34%, at the low end of our prior guidance range of 34% to 36%. Overall spending finished the quarter on track – finished on track for the quarter despite

increased marketing cost in our Consumer Digital Safety segment and headwinds from M&A and divestiture-related costs, which totaled approximately $20 million.

. . .

Fully diluted earnings per share was $0.40, at the low end of our prior guidance range, impacted by the mix of lower in-quarter recognized revenue versus deferred revenue in our Enterprise Security segment and approximately $0.02 from the combination of increased marketing costs in our Consumer Digital Safety segment and headwinds from M&A and divestiture-related costs.

422.    Defendants' presentation and commentary regarding Symantec's reported non-GAAP financial measures, including the Company's non-GAAP net revenues and non-GAAP operating expenses, and statements regarding the Company's "Restructuring, transition and other" expenses and "transition costs" as set forth above, were false and misleading and omitted material facts.

a.    As described above, throughout the Relevant Period, Defendants improperly recognized revenue. Section V(A)-(B). Symantec recognized revenue on sales that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, where the customer was unable or unwilling to pay and/or where the Company had not satisfied its performance obligation. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy. Consequently, Symantec's reported second quarter fiscal year 2018 adjusted revenue in the Company's Form 8-K was overstated.

b.    Defendants overstated Symantec's adjusted operating income. Section V(B). Defendants recorded regular ongoing business costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Transition and Other Costs" line item. Defendants routinely characterized enterprise resource projects that would normally be put through

as operational run projects into the transformational cost bucket.  Moreover, by virtue of the Restructuring, transition and other adjustment, Defendants removed the entirety of the Company's transition costs from its adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in furtherance of Symantec's ongoing business operations. Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, transition and other" line item expenses were misstated. Moreover, Symantec reported non-GAAP operating income for Q2 2018, as well as other non-GAAP metrics dependent on this figure, such as operating margin and EPS, as set forth in the Company's 2Q2018 Form 8-K and Defendants' commentary, were also misstated.

c. Additionally, while the Company's approach to recognizing "transition costs" changed after the Blue Coat acquisition, the description of "transition costs" remained the same or did not meaningfully change so as to disclose how Symantec was recording transition costs. Defendants also failed to disclose that its employee bonuses under the AIP and EAIP were now being paid in restricted stock units immediately convertible to cash, which were excluded expenses from the Company's non-GAAP measures. Therefore, Symantec's claim that the non-GAAP measures facilitated comparison to "prior periods" was false and misleading as well.

d. The statements set forth above were also materially untrue and omitted to disclose material facts.  As Symantec belatedly admitted on September 24, 2018, in the quarter ending September 29, 2017, "the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures." It was materially untrue for Defendants to report non-GAAP measures, and explain

how those non-GAAP adjustments were derived, while failing to disclose that Defendants had retained E&Y to address wrongdoing regarding non-GAAP adjustments and Symantec was actively taking steps to enhance its policies and procedures regarding non-GAAP measures, including changing the way that it reported non-GAAP metrics in order to comply with SEC guidance.

423. *False Internal Controls And SOX Certifications:* In the section of the Q2 FY18 Form 10-Q titled, "Controls and Procedures," Defendants affirmed that they had evaluated Symantec's internal control over financial reporting, that the Company's internal control over financial reporting was effective, and that there were no changes in the Company's internal control over financial reporting during the quarter ended September 29, 2017, that materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

424. In addition, the Q2 FY18 Form 10-Q contained certifications pursuant to SOX Sections 302 and 906 signed by Defendants Clark and Noviello attesting to the accuracy of financial reporting, the disclosure of material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

425. Defendants' statements regarding the Company's internal control over financial reporting and in their SOX certifications were false and misleading. In truth, Symantec did not have effective internal controls over financial reporting, including for the recognition of revenue and review, approval and tracking of transition and transformation expenses. Indeed, by this time Defendant Garfield had already alerted the other Individual Defendants to a "significant deficiency" relating to the non-GAAP reporting. Furthermore, during 2Q 2018, Mr. Brown alerted Noviello that Symantec did not have "a review process of the actual expenses hitting GAAP-only accounts." In addition, contrary to their SOX certifications, Defendants knew that the Q2 FY18 Form 10-Q contained untrue statements of material fact and that the financial statements and other financial information included in the Q2 FY18 Form 10-Q did not fairly present in all material respects the financial

condition and results of operations of Symantec for Q2 2018. Moreover, Defendants failed to disclose all significant deficiencies and material weaknesses in the design and operation of Symantec's internal control over financial reporting likely to adversely affect Symantec ability to record, process, summarize and report financial information, as well as the financial fraud that Defendants and other employees with significant roles in Symantec's internal control over financial reporting were committing.

426.   ***Contract Duration Misstatements:*** In the Q2 FY18 Form 8-K, Defendants touted Symantec's deferred revenue growth, but failed to disclose that increased contract length drove the increase, stating Symantec had "Strong Enterprise business activity from market-leading Integrated Cyber Defense platform; double digit year-over-year deferred revenue growth."  Similarly, Defendant Clark is quoted in the Q2 FY18 Form 8-K stating the "Enterprise segment had strong business activity with substantial year-over-year deferred revenue growth."

427.   Additionally, on the November 1, 2017 conference call, rather than disclose that increased contract duration was driving the increase in deferred revenues, Clark told investors that it was being driven by an increase in cloud subscription sales.  For example, Clark stated:

> Adoption of our Integrated Cyber Defense platform is leading to an increase in the number of larger and multi-product deals, which is a strong validation that customers are designing Symantec into their future security architectures. These trends, however, are also affecting our in-period revenue recognition. ***The mix of our bookings are shifting towards more ratable revenue recognition as customers are increasingly adopting our cloud subscription and virtual clients' products in multi-product deals***.

428.   Similarly, Noviello stated that the Company's "higher mix of ratable business" acted as a "tailwind to revenue," stating:

> We look at the combination of in-quarter recognized revenue and ***deferred revenue as a strong indicator of the health of our business segments.*** To be clear, Q2 business results in our Enterprise segment were as planned, with sales capacity in place and delivering, ***but***

> *included a higher mix of ratable business. This resulted in less in-quarter recognized revenue, and more revenue deferred to the balance sheet. This has follow on impact to in quarter revenue, margins and EPS, but is a tailwind to revenue going forward.*

429.    Defendants' statements were false and misleading.  Because Symantec measured total growth by in-period revenue plus deferred revenue—the increase in deferred revenue gave the false appearance of meaningful growth, especially given Defendants' claims that it was due to increased sales of subscription products.  By failing to provide the details of Symantec's increasing contract duration, Defendants misled investors about the true reason for, and nature of, Symantec's increasing deferred revenues and, ultimately, its purported growth during the Relevant Period.

### F.    Barclays Global Technology, Media and Telecommunications Conference

430.    On December 7, 2017, Defendant Noviello spoke at the Barclays Global Technology, Media and Telecommunications Conference on behalf of Symantec which was attended by an Orbis analyst on behalf of the Plaintiffs.  During the conference, Noviello promoted the Company's deferred revenue growth, stating: "What we're building is substantial.  We're already seeing that in terms of what we've done on the margin side of the fence… We're already seeing that in terms of what *we're seeing in deferred revenue, growth on the enterprise side.* We're already seeing in terms of in-quarter recognized revenue on consumer and it all translating down to EPS."

431.    Defendant Noviello's statements were false and misleading. Because Symantec measured total growth by in-period revenue plus deferred revenue—the increase in deferred revenue gave the fake appearance of meaningful growth, especially given Defendants' claims that it was due to increased sales of subscription products.  By failing to provide the details of Symantec's increasing contract duration, Defendants misled investors about the true reason for, and nature of, Symantec's increasing deferred revenues and, ultimately, its purported growth during the Relevant Period.

### G. Third Quarter 2018 Results

432. On January 31, 2018, Symantec filed with the SEC its financial results for the third quarter fiscal year 2018 for the period ending December 29, 2017, and supplemental financial information and commentary on Form 8-K. On January 31, 2018, Symantec held an earnings call to discuss its financial results for the third quarter fiscal year 2018. On February 2, 2018, Symantec filed with the SEC its Quarterly Report on Form 10-Q for the period ending December 29, 2017, which was signed by Defendant Clark and CFO Noviello. As set forth below, the Q3 FY18 Form 8-K and Q3 FY18 Form 10-Q contained materially false and misleading statements about (i) reported revenue; (ii) adjusted revenue, operating expenses and operating income; and (iii) effective internal controls for financial reporting.

433. ***Improper Recognition of GAAP Revenue:*** In the Q3 FY18 Form 8-K and 3Q2018 Form 10-Q, Symantec reported quarterly GAAP revenue of $1.209 billion. On the Company's Condensed Consolidated Balance Sheet it reported a deferred revenue balance of $2.151 billion as of December 29, 2017.

434. In the section of the Q3 FY18 Form 10-Q titled, "Notes to Condensed Consolidated Financial Statements," Defendants affirmed that its financial statements were prepared in accordance with GAAP. Likewise, in the section entitled "Critical Accounting Policies And Estimates," Defendants confirmed Symantec's adherence to its stated revenue recognition policies by affirming, "There have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements during the nine months ended December 29, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017."

435. Defendants' statements regarding the Company's reported revenue, deferred revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above, were false and misleading and omitted material facts. Throughout the Relevant

Period, Symantec improperly recognized revenue in violation of GAAP.  Section V(A)-(B). Contrary to GAAP, Symantec recognized revenue on sales that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, where the customer was unable or unwilling to pay and/or where the Company had not satisfied its performance obligation. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP. Consequently, Symantec's reported third quarter fiscal year 2018 GAAP revenue in the Company's Forms 8-K and 10-Q were overstated, the Company's reported deferred revenue for the same period was understated, the Company's Q3 FY18 Form 10-Q was not prepared in accordance with GAAP, and the Company was not complying with its stated revenue recognition policy.

436. ***Misstatements Relating To Non-GAAP Measures:*** In the Q3 FY18 Form 8-K, the Company supplemented its reported GAAP financial results with a presentation of Symantec's non-GAAP measures. In particular, the Company reported non-GAAP revenue for Q3 2018 of $1.234 billion and non-GAAP operating income of $463 million.

437. In the Company's Q3 FY18 Form 8-K and Q3 FY18 Form 10-Q, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein it reported "Restructuring, transition and other" expenses for the third quarter of fiscal year 2018 of $93 million.

438. In Note 4 to the Consolidated Financial Statements in the Q3 FY18 Form 10-Q, the Company provided further information on the nature of this line item expense, including a description of the type of costs that the Company deems "Transition Costs," and represented that it had incurred a quarterly expense of $75 million in transition costs and $195 million over the past three quarters:

Note 4. Restructuring, Transition and Other Costs

Transition costs are incurred in connection with Board of Directors approved discrete strategic information technology transformation initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to

automate business processes. In addition, transition costs include expenses associated with divestitures of our product lines.

Restructuring, transition and other costs summary

Our restructuring, transition and other costs are presented in the table below:

| (In millions) | Three Months Ended December 29, 2017 | | Nine Months Ended December 29, 2017 | |
|---|---|---|---|---|
| Severance and termination benefit costs | $ | 11 | $ | 50 |
| Other exit and disposal costs (benefit) | | (2) | | 15 |
| Asset write-offs | | 9 | | 18 |
| Transition costs | | 75 | | 195 |
| Total | $ | 93 | $ | 278 |

439.    In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," Defendants explained how the Company's adjusted financial measures for Q3 2018 were derived, including Symantec's non-GAAP operating expenses and operating income.  As for the Company's adjusted operating expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, transition and other," removing operating expenses of $93 million for Q3 2018.

440.    In the "Explanation of Non-GAAP Measures," attached as Appendix A to the 3Q2018 Form 8-K, Defendants explained their reasoning for making the "Restructuring, transition and other" adjustment, stating that the Company removed this expense because these costs, including its transition costs, were purportedly "discrete events":

> Restructuring, transition and other costs: . . . Transition costs are associated with formal discrete strategic information technology initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes. In addition, transition costs include expenses associated with our divestitures. ***We exclude restructuring, transition and other costs from our non-GAAP results as we believe that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current***

*operating performance, and that excluding these charges facilitates a more meaningful evaluation of our current operating performance and comparisons to our past operating performance.*

441.   Defendants changed the definition of "transition costs" to include "formal discrete strategic information technology initiatives." Moreover, Defendants now claimed that the Company excluded transition costs from its non-GAAP results because it "believe[s] that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current operating performance, and that excluding these charges facilitates a more meaningful evaluation of our current operating performance and comparisons to our past operating performance."

442.   Defendants used these adjusted measures to inform investors about Symantec's financial condition. On January 31, 2018, Defendants held a quarterly earnings call.  The call commenced with a reminder that the Company would be discussing its non-GAAP metrics:  "We believe our non-GAAP financial measures also facilitate comparisons of our performance to prior periods and that investors benefit from understanding of the non-GAAP financial measures." During which Defendant Clark hyped Symantec's third quarter fiscal year 2018 adjusted operating margin, notwithstanding the Enterprise business segment's revenue shortfall:

> For Q3, even with our Enterprise revenue shortfall, we performed well against other financial metrics. Operating margin exceeded our guidance as we realized continued cost efficiencies. EPS benefited from those cost efficiencies as well as from U.S. tax reform. And we generated strong cash flow from operations, which should benefit going forward from our strong business momentum, deferred revenue and the drop-off in costs associated with our restructuring initiatives.
>
> . . .
>
> Now let me turn to our Consumer Digital Safety business which had a strong quarter. Recall that only 18 months ago, this business was in decline, with decreasing retention rates and ARPU. Today, our Consumer Digital Safety business has been transformed. Revenue in the third quarter was at the high end of our guidance range, with an

organic growth rate of 4% year-over-year in constant currency. *We experienced 53% operating margins and an increased ARPU.*

443.   On the call, Noviello further touted the Company's adjusted revenue, operating margin and EPS:

> *Our third quarter revenue was $1.234 billion*. This was comprised of Consumer Digital Safety revenue at the high end of our prior revenue guidance range and Enterprise Security revenue below the low end of our prior revenue guidance range.
>
> *Operating margin for the third quarter was 38%, above the high end of our prior guidance range of 36% to 37%.* The higher operating margin was the result of continued cost and operating efficiencies, including the completion of the net cost reduction and synergy programs we discussed last quarter across the business.
>
> *Fully diluted earnings per share was $0.49, $0.03 above the high end of our prior guidance range*.

444.   Defendants' presentation and commentary regarding Symantec's non-GAAP financial measures, including the Company's adjusted revenues and operating expenses, and statements regarding the Company's "Restructuring, transition and other" expenses and "transition costs" as set forth above, were false and misleading and omitted material facts.

a.   As described above, throughout the Relevant Period, Defendants improperly recognized revenue. Section V(A)-(B). Symantec recognized revenue on sales that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, where the customer was unable or unwilling to pay and/or where the Company had not satisfied its performance obligation. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy. Consequently, Symantec's reported third quarter fiscal year 2018 adjusted revenue in the Company's Form 8-K was overstated.

b.    Defendants overstated Symantec's non-GAAP operating income. Section V(B). Defendants recorded regular ongoing business costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Transition and Other Costs" line item. The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket. Moreover, by virtue of the Restructuring, transition and other adjustment, Defendants removed the entirety of the Company's transition costs from the Company's non-GAAP operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business. Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, transition and other" line item expenses were misstated. Moreover, Defendants' reported adjusted operating income for Q3 2018, as well as other reported adjusted metrics dependent on this figure, such as operating margin and EPS, as set forth in the Company's Q3 FY18 Form 8-K and Defendants' commentary, were also misstated.

c.    Additionally, while the Company's approach to recognizing "transition costs" changed after the Blue Coat acquisition, the description of "transition costs" remained the same or did not meaningfully change so as to disclose how Symantec was recording transition costs.  Defendants also failed to disclose that its employee bonuses under the AIP and EAIP were now being paid in restricted stock units immediately convertible to cash, which were excluded expenses from the Company's non-GAAP measures. Therefore, Symantec's claim that the non-GAAP measures facilitated comparison to "prior periods" was false and misleading as well.

d.      The statements set forth above were also materially untrue and omitted to disclose material facts. As Symantec belatedly admitted on September 24, 2018, in the quarter ending September 29, 2017, "the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures." It was materially untrue for Defendants to report non-GAAP measures, and explain how those non-GAAP adjustments were derived, while failing to disclose that Defendants had retained E&Y to address wrongdoing regarding non-GAAP adjustments and that Symantec actively taking steps to enhance its policies and procedures regarding non-GAAP measures, including changing the way that it reported non-GAAP metrics in order to comply with SEC guidance.

445.   *False Internal Controls And SOX Certification:* In the section of the 3Q2018 Form 10-Q titled, "Controls and Procedures," Defendants affirmed that they had evaluated Symantec's internal control over financial reporting, that the Company's internal control over financial reporting was effective, and that there were no changes in the Company's internal control over financial reporting during the quarter ended December 29, 2017, that materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

446.   In addition, the Q3 FY18 Form 10-Q contained certifications pursuant to SOX Sections 302 and 906 signed by Defendants Clark and Noviello attesting to the accuracy of financial reporting, the disclosure of material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

447.   Defendants' statements regarding the Company's internal control over financial reporting and in their SOX certifications were false and misleading. In truth, Symantec did not have effective internal controls over financial reporting, including for the recognition of revenue and review, approval and tracking of transition and transformation expenses. Indeed, by this time Defendant Garfield had already alerted the other Individual

1   Defendants to a "significant deficiency" relating to the non-GAAP reporting and Mr.

2   Brown had already alerted Noviello that Symantec did not have "a review process of the

3   actual expenses hitting GAAP-only accounts."   Furthermore, by this time, E&Y had

4   already informed Defendants that for Symantec's "costs, such as T&T and acquisition and

5   integration, sufficient controls do not exist to validate that those costs are of the appropriate

6   nature and type for that categorization." In addition, contrary to their SOX certifications,

7   Defendants knew that the Q3 FY18 Form 10-Q contained untrue statements of material

8   fact and that the financial statements and other financial information included in the Q3

9   FY18 Form 10-Q did not fairly present in all material respects the financial condition and

10  results of operations of Symantec for Q3 2018.   Moreover, Defendants failed to disclose

11  all significant deficiencies and material weaknesses in the design and operation of

12  Symantec's internal control over financial reporting likely to adversely affect Symantec

13  ability to record, process, summarize and report financial information, as well as the

14  financial fraud that Defendants and other employees with significant roles in Symantec's

15  internal control over financial reporting were committing.

16          448.   ***Contract Duration Misstatements:*** During the January 31, 2018 earnings

17  call, Defendant Clark stated that Symantec's "Enterprise segment … recognized less

18  revenue than we forecast," which was "due to an increasing mix shift towards our ratable

19  subscription and cloud-delivered products that reduced in-period revenue recognition."

20  Later in the call, a securities analyst asked Defendants to "talk a little about" the "mix shift"

21  because it was "surprising" to the analyst that Defendants were caught off guard by the

22  development that caused the Company to miss guidance.   In response, Defendant Noviello

23  stated: "we had an acceleration of that ratable mix and that acceleration happened in the

24  end of the quarter.   And that's the net impact we have here."   Clark made a substantially

25  similar statement in Symantec's Form 8-K filed with the SEC the same day, stating that

26  lower third quarter revenues were "due to an increased ratable mix shift in our Enterprise

27  segment.   Adoption of our cloud solutions by enterprise customers accelerated during the

28  quarter, which reduced in-period revenue recognition, but increased implied billings and

deferred revenue," adding that "Cloud adoption is positive for our customers and a long term benefit for our business." The Form 8-K also highlighted Symantec's "Double-digit year-over-year deferred revenue growth" and stated that the Company's "Enterprise segment delivered strong implied billings growth; revenue below guidance range due to accelerating mix shift to ratable business."

449. Symantec's Q3 FY18 Form 10-Q stated that the Company had been affected by a "shift in sales to products with ratable revenue recognition," which "resulted in less in-quarter recognized revenue and more revenue deferred to the balance sheet."

450. The foregoing statements were false and misleading. Because Symantec measured total growth by in-period revenue plus deferred revenue—the increase in deferred revenue gave the appearance of meaningful growth, especially given Defendants' claims that it was due to increased sales of subscription products. By failing to provide the details of Symantec's increasing contract duration, Plaintiffs were misled about the true reason for, and nature of, Symantec's increasing deferred revenues and, ultimately, its purported growth during the Relevant Period.

## H.    Fourth Quarter 2018 Results

451. On May 10, 2018, Symantec filed with the SEC its financial results for the fourth quarter fiscal year 2018 and full fiscal year 2018 for the period ending March 30, 2018, and supplemental financial information and commentary on Form 8-K. As set forth below, the 4Q 2018 Form 8-K contained materially false and misleading statements about (i) reported revenue; and (ii) adjusted revenue, operating expenses and operating income.

452. ***Improper Recognition of GAAP Revenue:*** In the 4Q2018 Form 8-K, Symantec reported quarterly GAAP revenue of $1.222 billion and GAAP revenue of $4.846 billion for the full fiscal year 2018. On the Company's Condensed Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.356 billion as of March 30, 2018. In addition, the Company reported $6 million of GAAP operating income for the quarter and $49 million of GAAP operating income for the full fiscal year.

453.    Defendants' statements regarding the Company's reported revenue, deferred revenue and operating income, set forth above, were false and misleading and omitted material facts. Throughout the Relevant Period, Symantec improperly recognized revenue in violation of GAAP. *See* Section V(A)-(B). Contrary to GAAP, Symantec recognized revenue on sales that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, where the customer was unable or unwilling to pay and/or where the Company had not satisfied its performance obligation. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP. Consequently, Symantec's reported fourth quarter fiscal year 2018 GAAP revenue in the Company's Q4 FY18 Form 8-K was overstated, the Company's reported deferred revenue for the same period was understated.  On September 24, 2018, the Audit Committee first announced that it had reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018, but $12 million of the $13 million should have been deferred.

454.    ***Misstatements Relating To Non-GAAP Measures:*** In the Q4 FY18 Form 8-K, the Company supplemented its reported GAAP financial results with a presentation of Symantec's adjusted financial measures.  The Company reported non-GAAP revenue for Q4 2018 of $1.234 billion and $4.972 billion for the full fiscal year 2018. The Company also reported non-GAAP operating income for Q4 2018 of $451 million and $1.726 billion for the full fiscal year 2018.

455.    In the Company's Q4 FY18 Form 8-K, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the Company reported "Restructuring, transition and other" expenses for the fourth quarter of fiscal year 2018 of $139 million and $417 million for the full fiscal year of 2018.

456.    In Appendix A to the 4Q FY18 Form 8-K entitled "Explanation of Non-GAAP Measures," the Company provided further information on the nature of this line

item expense, including a description of the type of costs that the Company recorded as "Transition Costs"

> *Transition costs are associated with formal discrete strategic information technology initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes. In addition, transition costs include expenses associated with our divestitures*. We exclude restructuring, transition and other costs from our non-GAAP results as we believe that *these costs are incremental to core activities that arise in the ordinary course of our business* and do not reflect our current operating performance, and that excluding these charges facilitates a more meaningful evaluation of our current operating performance and comparisons to our past operating performance.

457.   In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," the Company explained how its adjusted financial measures for Q4 2018 and the full fiscal year 2018 were derived, including Symantec's reported non-GAAP operating expenses and non-GAAP operating income. As for the Company's adjusted operating expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, transition and other," eliminating non-GAAP operating expenses of $139 million for Q4 2018 and $417 million for the full fiscal year 2018.

458.   Defendants reported these adjusted financial measures to investors as indicative of Symantec's financial performance.

459.   On May 10, 2018, Defendants held a quarterly earnings call. The call commenced with a reminder that the Company would be discussing its non-GAAP metrics: "We believe our non-GAAP financial measures also facilitate comparisons of our performance to prior periods and that investors benefit from understanding of the non-GAAP financial measures." During the call, Defendant Clark promoted Symantec's fourth quarter and full fiscal year 2018 adjusted financial results, which purportedly exceeded the Company's guidance:

> We were pleased with our performance in the fourth quarter and FY '18, delivering operating results across the business above the guidance levels we provided on our last earnings call. We're also pleased that we exceeded our full year EPS guidance based on our second half performance and good results from our cost control initiatives.
>
> In Q4, our total revenue was driven by performance in both Enterprise Security and Consumer Digital Safety. Our operating margin exceeded our guidance as a result of revenue growth and continued cost and operating efficiencies.

460.　On the earnings call, Noviello provided further color regarding the Company's fourth quarter and fiscal year adjusted 2018 financial results:

> [W]e were pleased with our performance in the fourth quarter, with both Enterprise Security and Consumer Digital Safety revenues above our prior guidance.
>
> . . .
>
> Total company operating margin for the fourth quarter was 36.5%. The year-over-year improvement in operating margin was the result of higher revenue and continued cost and operating efficiencies. Fully diluted earnings per share was $0.46, primarily driven by higher operating income.
>
> . . .
>
> Operating margin for the full fiscal year 2018 was 34.7% as compared to 28.7% in fiscal year 2017. ***This year-over-year improvement reflects our top line revenue growth as well as operating efficiencies***. Fully diluted earnings per share was $1.69, up 43% year-over-year.

461.　Defendants' presentation and commentary regarding Symantec's non-GAAP financial measures, including the Company's adjusted revenues and operating expenses, and statements regarding the Company's "Restructuring, transition and other" expenses and "transition costs" as set forth above, were false and misleading and omitted material facts.

a.　As described above, throughout the Relevant Period, Defendants improperly recognized revenue. Section V(A)-(B). Symantec recognized revenue on

sales that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, where the customer was unable or unwilling to pay and/or where the Company had not satisfied its performance obligation. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy. Consequently, Symantec's reported fourth quarter fiscal year 2018 adjusted revenue in the Company's Form 8-K was overstated.

b.  Defendants overstated Symantec's non-GAAP operating income. Section V(B). Defendants recorded regular ongoing business costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Transition and Other Costs" line item. The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket. Moreover, by virtue of the Restructuring, transition and other adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business. Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, transition and other" line item expenses were misstated. Moreover, Symantec's reported adjusted operating income for Q4 2018, as well as other reported adjusted metrics dependent on this figure, such as operating margin and EPS, as set forth in the Company's 4Q FY18 Form 8-K and Defendants' commentary, were also misstated.

c.  Additionally, while the Company's approach to recognizing "transition costs" changed after the Blue Coat acquisition, the description of "transition

costs" remained the same or did not meaningfully change so as to disclose how Symantec was recording transition costs.  Defendants also failed to disclose that employee bonuses under the AIP and EAIP were now being paid in restricted stock units immediately convertible to cash, which were excluded expenses from the Company's non-GAAP measures. Therefore, Defendants' claim that the non-GAAP measures facilitated comparison to "prior periods" was false and misleading as well.

## X.  ADDITIONAL SCIENTER ALLEGATIONS

462.  Numerous facts give rise to a strong inference that Defendants knew, or were deliberately reckless in not knowing, that: (i) Symantec improperly recognized revenue in violation of GAAP, including revenue that should have been deferred; (ii) in violation of SEC rules and regulations, Symantec improperly characterized costs that were incurred in the ordinary course of business as "transition costs," and adjusted those costs as part of the Company's non-GAAP measures; (iii) Symantec's contract duration was increasing, resulting in increased deferred revenue, creating the false appearance of meaningful growth; and (iv) Symantec's internal controls for financial reporting were not effective during the Relevant Period.  Defendants therefore knew facts or were deliberately reckless in not knowing facts making their statements as set forth above in Section IX false and misleading.

463.  Furthermore, Symantec's executive compensation program provided Defendants Clark and Noviello with strong motive to mislead investors.

### A.  The Individual Defendants Knew or Were Deliberately Reckless Regarding the T&T Manipulations

464.  Leading up to and throughout the Relevant Period, the Individual Defendants were repeatedly informed that Symantec's T&T expenses were misclassified and/or improper.

465.  In February 2017, Defendants Clark and Noviello were forwarded an email from a Senior VP in Finance, James Dildine, Enterprise CFO, that flagged the fact that

Symantec's payment of millions of dollars to outside consultants was "all being charged to T&T and integration *so not hitting non-GAAP*" even though *"much of that classification is debatable."* Among the "debatable" T&T classifications discussed in this email were "PWC … working on the ASC 606 project," which Plaintiffs specifically identify as being misclassified as T&T.[31]

466.   Defendants were similarly aware of serious problems concerning the Company's internal controls over T&T costs before the start of the Relevant Period. For example, on February 2, 2017, Defendant Noviello received a document flagging several problems with Symantec's T&T cost classification procedures. Critically, the write-up given to Noviello states that *"technical accounting assumes that as long as the total spend for an initiative/specific item is within the approved BoD [i.e., Board of Directors] amount that the detailed spend items are correctly classified."* Further, this document explained that *"[t]here isn't currently a process to audit each specific spend item on a monthly/quarterly basis to ensure the costs are correctly classified."* In sum, Noviello was informed that Symantec's accounting function was *not checking* the specific costs classified as T&T so long as they were within the Board-approved ranges, and *Symantec had no process to audit the classification of those costs.*

467.   In early March 2017, Defendant Clark received, and admitted that he reviewed, Board materials explaining that Symantec's operating margin had been improved by "corporate actions" that included shifting the bonuses from cash to equity. The same Board materials also noted that the "shift of AIP/EAIP from cash awards to equity awards" would "cut costs in order to hit the fiscal year 2018 plan" to the tune of $23 million. Defendant Noviello also admitted that he was also aware of the "shifting EAIP/AIP to RSU grants."

---

[31] According to the Lead Plaintiff's briefing in the Class Action, Defendant Clark confirmed under oath that he received this email and that he "cared about classification."

468.    Defendants failed to remedy these "debatable" T&T classifications and lack of audit processes until they got caught later by E&Y in the Relevant Period.  Even then, Defendant Clark and Noviello **continued to allow** the Company to misclassify T&T expenses in order to obtain lucrative payouts under Symantec's executive compensation plans.[32]

469.    Immediately prior to the start of the Relevant Period on May 8, 2017, Defendants Clark and Noviello were focused on the Company's reporting of non-GAAP measures, including how the "exclusion of normal, recurring cash expenses," such as the transition costs alleged herein, could be "misleading adjustments" according to SEC guidance. *See* Derivative Complaint, ¶¶99-101. Defendants Clark, Noviello, and Garfield were each present for an Audit Committee meeting on May 19, 2017 during which they discussed and reviewed "errors in financial reporting and recording," including "significant" deficiencies related to the Fiscal Year 2017 10-K.  *See* Derivative Complaint, ¶106; Unsealing Order at 4:1-3.  Specifically, Defendant Garfield disclosed a "significant deficiency" in that Symantec's non-GAAP reporting was ***overwhelmed by the volume and complexity of non-GAAP activity."*** Garfield also raised an additional "significant deficiency" regarding a restructuring charge ***"that should not have been recorded."***

470.    In July 2017, Defendants Clark and Noviello were asked by Symantec's General Counsel to "help" in getting expenses associated with Project Bedrock classified as T&T.  This was improper because the costs had been rejected **twice** and did ***not comply*** with Symantec's internal policies.

471.    Also in July 2017, Clark was informed that Defendant Garfield was leaving the Company due to the rampant accounting deficiencies and that he called for an "Accounting Re-Org" which flagged that T&T costs were "frequently submitted in error

---

[32] Also in February 2017, Defendant Clark received an email stating that the Head of Symantec's website security business could "***get there via T&T***"—*i.e.*, could meet operating income targets by excluding T&T costs—as "we always have more control over our cost base."

(as it was in Q4").  The presentation also highlighted the "recent control issues driven by complex systems" relating to non-GAAP measures.

472.  On August 7, 2017, Garfield gave an exit interview to a Symantec Board member (Anita Sands), highlighting the serious problems Symantec had with its T&T expenses and other non-GAAP measures.  The contemporaneous notes from this exit interview flag the ***"pressure to make Non-GAAP operating margin,"*** including "an effort to expand the definition of Transition costs" that is "***ridiculous***," what the Audit Committee "need[s] to worry about most" and even "***potentially illegal***."  Critically, the notes of Garfield's exit interview indicate he stated:

> What is happening is … they [are] driving the non-GAAP number up … A couple of hundred of million of extra non-GAAP dollars for Fiscal 18 drives the VCP, and they can ***triple their income***.  Even Greg [Clark] would get something like a ***3x payout***.  We've created a compensation plan that ***drives people to do something that's wrong***.

473.  According to the Lead Plaintiff's briefing in the Class Action, when asked about this language during his deposition, Defendant Garfield testified that Clark "was a participant" in the efforts of Symantec executives to "***increase their own personal income***."

474.  In September 2017, Noviello was reminded again that Symantec's non-GAAP classification procedures, which included T&T, were woefully inadequate.  On September 8, 2017, Symantec's VP of Finance (Matt Brown) emailed Noviello to provide his "unfiltered views" regarding Symantec's non-GAAP procedures.  Brown stated that Symantec's non-GAAP policy was "not firmly grounded in guidance from the SEC," had "inconsistencies," and there was a "lack of understanding of the policy by key stakeholders."  Brown also flagged two additional key deficiencies (1) Symantec did ***not*** have "any clear/current benchmarking analysis against peer companies" and (2) the Company did ***not*** have "a review process of the actual expenses hitting GAAP-only accounts" such that "nobody is reviewing what actually hits the accounts on a quarterly/monthly basis."

475.    Faced with accusations raised to the Board level that Symantec was engaging in improper T&T classifications that were "potentially illegal," Symantec retained E&Y to review its T&T classifications, including Symantec's first benchmarking of its non-GAAP measures of "NGMs" against peers.

476.    As summarized in the final November 16, 2017 Board materials that were sent to Defendants Clark and Noviello, E&Y's benchmarking analysis "showed that Symantec [wa]s an outlier in terms of the number of NGMs in comparison to [its] peers and d[id] not comply to some of the SEC guidance on usage and reconciliations to GAAP." E&Y's report also concluded that Symantec's "guidelines, processes and controls around NGMs and T&T costs [we]re not detailed and processes not fully memorialized, and as such, there [wa]s risk around completeness and accuracy of [the Company's] non-GAAP reporting."  Moreover, E&Y concluded that for T&T costs, "sufficient controls do not exist to validate that those costs are of the appropriate nature and type for that categorization." The Board also went through each major T&T project and were made aware that each presented a higher-than-average risk of "Non-compliance with SEC Guidance for Non-GAAP Presentation." Furthermore, the "Board requested that management approach its work with the assumption that we will have to address comments regarding non-GAAP measures from SEC review of the FY18 10-K" and "The Board requested that with respect to any benchmarking that identified high risk items (peer practices, SEC regulatory risk), management ensures strong documentation and process around these items."

477.    E&Y also warned Defendants that "the costs included in Transition and transformation (T&T) have the appearance of recurring operating expenses."  E&Y flagged this issue as ***"Highest risk – likely to result in SEC scrutiny or require change to historic results."***

478.    In response to E&Y's findings, Symantec made certain changes to its public disclosures and descriptions regarding its non-GAAP measures, including T&T costs.  But Defendants did not change their T&T classification practices during FY18.   Instead,

Defendants determined that Symantec's "current policy for T&T adjustments w[ould] end after Q1 2019."

479.    Significantly, Defendants waited until after FY 2018 to stop improper T&T classifications because they wanted to obtain the lucrative payouts available under Symantec's executive bonus plans for FY 2018.  Defendants Clark and Noviello needed the artificial boost to non-GAAP operating income provided by improper T&T classifications in order to hit the operating income targets necessary to achieve those big payouts.

480.    According to former employees, the "transition costs" component of Symantec's restructuring, separation, transition, and other costs line item was manipulated as result of pressure from Defendants Clark and Noviello.  In the Class Action Complaint, Symantec's former VP and CSO explained that Jordan (CIO) was under a lot of pressure and scrutiny from Defendant Clark and Noviello, that she was under tremendous scrutiny to justify her job and explain cost management in IT, and that more costs were moved in the direction of transformative or transformational costs once Blue Coat came in.  The fact that Defendants Clark and Noviello pressured employees, openly discussed, and encouraged the accounting manipulations at issue supports scienter.

481.    Furthermore, as a Board member, Defendant Clark was involved in approving T&T classifications in the form of approving the specific T&T projects and then approving a budget for T&T classifications.   Indeed, the contemporaneous documents confirm that Clark reviewed and approved T&T expenses in connection with his role as a Board member, stating for example: "T&T expense and forecasts are included in every financial review with the Board of Directors, for current quarter results and rest of year plan, as well as Board approved annual plan, Integration/Transformation programs results and plans also reviewed at every Board meeting," and "Ultimately, the T&T programs are board approved and board reviewed each quarter."  This is also confirmed by Symantec's public statement that "transition costs are incurred in connection with Board of Directors approved … transformation initiatives."

**B.    Defendants Clark and Noviello Were Motivated to Misclassify T&T Expenses to Achieve Lucrative Payouts**

482.    Defendants Clark and Noviello had a powerful motive to allow T&T costs to be misclassified to meet the payout targets available under Symantec's executive compensation plans, including the VCP.

483.    Symantec's incentive compensation plans were tied to financial performance metrics, including non-GAAP operating income.

484.    For example, under the VCP, top executives such as Clark, Noviello, and Michael Fey (COO) were eligible to receive up to 300x payouts of performance-based restricted stock units (PRUs) that were based on non-GAAP operating income targets. The actual payouts under the VCP were as follows in FY18: Clark received $54,041,606, Noviello received $13,642,826 and Fey received $33,440,301. Critically, however, if Defendants had not misclassified T&T costs in order to artificially inflate non-GAAP operating income, each of Defendants Clark, Noviello, and COO Fey would have received zero payout under the VCP. Thus, Defendants Clark and Noviello had a powerful motive – to the tune of tens of millions of dollars each – to improperly and misleadingly classify T&T costs so that they were excluded from, and would cause the inflation of, non-GAAP operating income.

485.    Indeed, as discussed above, the contemporaneous notes from the exit interview of Defendant Garfield state with direct reference to the VCP: *"We've created a compensation plan that drives people to do something that's wrong."* Garfield also testified "the plan incentivized people to increase non-GAAP operating income either through more revenue or less expenses" and that *"cutting expenses was a way to get more money for the executives."*

486.    On October 27, 2017, a Senior VP Finance (Jim Dildine) openly wrote to former COO Fey "[t]o the extent we don't hit our revenue numbers, *we will need to take out more cost or the overall company will not hit our numbers for bonus, VCP etc."* Fey testified that he discussed the email with Defendant Clark.

487.   Furthermore, the six "double digit" million-dollar deals that were double booked in 4Q17 and 4Q18 – and which Defendant Clark specifically approved – allowed Defendants Clark and Noviello to hit their bonus target, which would have been missed without the extra, improperly-recorded $63 million in revenue.

## C.   Scienter for the Revenue Recognition Violations

488.   Defendant Clark's scienter for the Oracle Transaction in which $12 million was improperly booked in 4Q FY18 is straightforward.   Defendant Clark was directly involved in the Oracle deal.   The reason $12 million of the Oracle deal was deemed to be improperly booked is because Oracle was requesting future functionality in the form of software upgrades, and Clark gave rise to an expectation of future functionality by sending a text message to Oracle stating *"we will get it done but we can't contract to it."*

489.   Indeed, Clark's scienter for the Oracle Transaction is established by the fact Symantec's VP Finance, Matt Brown, *twice* warned Clark not to provide any promise of future functionality – but he did anyway.   Clark's scienter is further demonstrated by the fact that, when he was interviewed after the Oracle Transaction, he lied and tried to cover up his side promise to Oracle.

490.   Defendant Garfield left Symantec after he closed the books for fiscal year 2017. As described above, Garfield, as the Chief Accounting Officer, oversaw all accounting-related areas at Symantec, including internal controls, accounting policies, and acquisition accounting. Garfield (a) left the Company due to revenue recognition concerns and due to the freewheeling way that Symantec was recognizing revenue under the leadership of Defendants Clark and Noviello; (b) was extremely upset with aggressive accounting practices that were being implemented under Noviello and was uncomfortable that the practices were not lining up to Symantec's controls; and (c) ultimately signed off on the books for the prior fiscal year (2017) in exchange for a pay package.  These facts unquestionably demonstrate that Defendants knew or recklessly disregarded that Symantec's internal controls were not effective and that Symantec's stated revenue

metrics, and purported compliance with GAAP and its own revenue recognition policy, were false and misleading.

491.   Further, Defendants Clark and Noviello pressured and encouraged employees to engage in the accounting manipulations that gave rise to the false statements, including improper revenue recognition.   Defendant Clark repeatedly stated in informal meetings of Symantec's ability and flexibility to shift and record revenue, and that he talked about their ability to manipulate or adjust revenue by various periods or a year. Clark specifically discussed this issue at senior leader meetings with executives which occurred approximately monthly, and Clark's views on "opportunities" to be "flexible" with respect to revenue recognition were openly discussed within the Company.   Moreover, as set for in the Class Action Complaint, Symantec's former Manager Bill and Collect-Finance explained with respect to Symantec's practice of pushing deals through that she frequently received calls from the highest executive staff, including Garfield, telling them to release those orders or to allow them to go out.   There would be a fight about it, but Garfield would indicate that the order to do so had come from someone else above him, and quote Defendant Clark or Noviello.   In addition, Symantec's former Account Manager confirmed that Defendant Clark knew and approved of deals that were booked in Q4 2017 and moved to Q1 2018, including one $13 million deal with Verizon, which involved a SOX violation.

492.   The ease with which the Company's Audit Committee and consultants determined that Symantec had weak internal controls and improperly recognized revenue supports scienter.   As described above, Defendants announced on May 10, 2018, that Symantec's Audit Committee had commenced an internal investigation due to concerns raised by a former employee, that the SEC had been contacted, and that Symantec had retained independent counsel and other advisors to assist it in its investigation and would be providing additional information to the SEC as the investigation proceeded.   By September 24, 2018, Symantec announced that the Audit Committee, independent legal counsel, and a forensic accounting firm had already concluded their internal investigation into Symantec's improper accounting.   Within a little over four months after its

announcement of the initiation of an investigation, Defendants admitted: (i) to weak and informal processes with respect to some aspects of the review, approval and tracking of transition expenses; (ii) to behaviors inconsistent with the Company's Code of Conduct; (iii) that the Company recognized $12 million as revenue in the fourth quarter of fiscal year 2018 that should have been deferred, and the Company would have to restate its Q4 2018 and Q1 2019 financial statements; and (iv) that the Company's Board of Directors had adopted substantial management changes, and "certain enhanced controls and policies related to the matters investigated." The fact that outsiders quickly and easily determined that such accounting and internal control problems existed at Symantec reinforces a strong inference of Defendants scienter.

493.    Finally, Defendants **admitted** that Symantec had recognized revenue that should have been deferred during the Relevant Period and had to restate its Q4 2018 and Q1 2019 financial statements. As described above, on September 24, 2018, the Company announced that it had inappropriately recognized $13 million in the fourth quarter of fiscal year 2018, of which $12 million should have been deferred, and that the Company would have to revise its previously disclosed financial results for both Q4 2018 and Q1 2019. Defendants' admission that Symantec recognized revenue that should have been deferred during the Relevant Period further supports a strong inference that Defendants knew or recklessly disregarded that Symantec's stated revenue and deferred revenue metrics were false and misleading, that Symantec's financial statements did not comply with GAAP, and that Symantec was not following its stated revenue recognition policy during the Relevant Period.

**D.    Scienter For Contract Duration Misstatements**

494.    There is also powerful evidence establishing Defendants' scienter for the contract duration misrepresentations.

495.    Defendants Clark and Noviello were focused on the effect of increasing contract duration prior to and throughout the Relevant Period and were informed about the Company's increasing contract duration. For example, Symantec's former VP of

Enterprise Finance testified that Clark was "as of April 26, 2017 … asking about the effect of multiyear [contracts]."  Similarly, by May 2017, Defendant Noviello was inquiring and specifically directing staff to provide him with the Company's contract duration analysis.  Moreover, it was Symantec's internal business strategy to sell more multiyear contracts.  For example, internal Symantec emails state: "Fundamentally, part of our strategy … is to try to *lock customers into [multiyear] deals,"* "we will be selling *MY [multi-year] to lock in customers,"* and "In order to meet the higher bookings number, larger deals are required which have … *longer contract terms."*

496.   In addition, internal emails between Symantec officials dating from June/July 2017 state that *"[t]erm is lengthening,* resulting in higher growth rates for TCV [total contract value] than for [annual contract value]" and the analysis *"[l]ooks pretty straightforward."*  A former Symantec executive expressly stated that he "[c]an't find any fault in the analysis" and that the analysis *"doesn't seem that complicated."*

497.   Throughout FY 2018, Symantec employees continued to voice concerns to senior executives about the trend of selling longer-term contracts.  For example, on October 24, 2017, Matt MacKenzie, Chief of Staff, emailed Clark telling him "[i]mpact of 1H[multi-year] bookings tilt vs plan is estimated to cost us 13M in revenue/qtr."

498.   Prior to the Company's second quarter 2018 conference call held on November 1, 2017, Defendant Clark was presented with a draft 2Q18 CEO script that included language concerning customers committing to longer term contracts.  Notably, however, this explicit language was later *struck* from his CEO script.

499.   Finally, Defendant Garfield's sworn testimony during his deposition in the Class Action shows that he knew the Company's statements were misleading, stating "[i]f implied billings is going up not because you … have more customer and more business being done, but *rather you're just lengthening the term of your contract, your revenue is not going to go up and it potentially could be misleading to an investor."*

**E.     Defendants Admitted that Symantec had Ineffective Internal Controls Regarding Transition Costs During the Relevant Period.**

500.     As described above, Defendants Symantec, Clark, and Noviello admitted in a September 24, 2018 press release that Symantec's Audit Committee *"noted relatively weak and informal processes with respect to some aspects of the review, approval and tracking of transition and transformation expenses."* Further, Defendants admitted that Symantec had initiated a review by an outside accounting firm, E&Y, and taken other steps to enhance, the Company's policies and procedures regarding adjusted measures, since the quarter ending September 29, 2017.  In addition, Symantec announced that in connection with the substantial structural changes to senior management, the Company would be *"adopting certain enhanced controls and policies related to the matters investigation."* These admissions support a strong inference that Defendants knew (or recklessly disregarded) that Symantec's internal controls were not effective during the Relevant Period, and that their resulting GAAP revenue and adjusted revenue and operating income metrics were false and misleading.

**F.     Further Facts Supporting a Strong Inference of Scienter**

501.     Defendants implemented significant structural management changes and then terminated thirteen executives, including Defendants Clark and Noviello. The fact that, after the end of the Relevant Period, Symantec re-structured its internal management and then terminated a multitude of senior executives, including Defendant Clark and Noviello, strongly supports scienter.

502.     As discussed above, on September 24, 2018, the Company announced that it would change the structure of its internal management, including appointing a separate Chief Accounting Officer and a separate Chief Compliance Officer reporting to the Audit Committee. Defendants' structural changes around accounting and compliance, particularly in combination with their admission that Symantec needed to enhance its internal controls, supports a strong inference that Defendants knew (or recklessly

1    disregarded) that Symantec's internal controls were not effective during the Relevant
2    Period.

3        503.   Next, the fact that numerous executives were terminated in the wake of the
4    Audit Committee investigation further establishes a strong inference of scienter. Indeed, as
5    noted above, Symantec ousted Defendants Clark and CFO Noviello and terminated the
6    employment of the following former senior officers: Michael Fey (President and Chief
7    Operating Officer); Michael Williams (Chief Marketing Officer); Bradon Rogers (Senior
8    Vice President); Marc Andrews (Head of Global Sales); Denny Young (Vice President of
9    Operations at Enterprise Security); Bryan Barney (SVP, GM of Enterprise Security); Javed
10   Hasan (SVP, Endpoint, IAAS & Datacenter products); Steve Schoenfeld (SVP, Product
11   Management); Francis C. Rosch (Executive Vice President for Consumer Digital Safety);
12   Joe McPhillips (Director of Channel Sales for Symantec's Pacific region); and Brian
13   Kenyon (Chief Strategy Officer). Analysts linked many of these suspicious executive
14   departures directly to the financial improprieties and investigations.

15       504.   <u>Defendants' Baseless Assertions that Symantec's non-GAAP measures</u>
16   <u>facilitated comparison to peers</u>.   Further supporting scienter, Defendants had absolutely
17   no factual basis to claim in their public disclosures that Symantec's non-GAAP measures
18   facilitated comparisons to peers. Remarkably, Defendants made such assertions despite the
19   fact that the Company had no clear/current benchmarking analysis against peers.  Both
20   internal documents and E&Y's report confirm that the Company had no factual support to
21   make the claim.  Indeed, Mr. Brown's September 8, 2017 email to Defendant Noviello
22   admitted "**We don't have any clear/current benchmarking analysis against peer**
23   **companies" (**emphasis in original), and E&Y's report established that any such analysis
24   would have concluded that Symantec was an ***"outlier"*** in its usage of NGMs and
25   adjustments to T&T expenses.  Telling investors that Symantec's NGMs  facilitated
26   comparisons "peers" – without any basis for such assertion – was at least deliberately or
27   severely reckless.

28

505.   The temporal proximity between Defendants' false statements and omissions and revelations of the truth supports an inference of scienter. On January 31, 2018, Symantec filed with the SEC its financial results for the third quarter of fiscal year 2018. This filing: (i) contained false and misleading statements concerning the Company's reported revenue, reported deferred revenue, compliance with GAAP, and internal revenue recognition policy; (ii) contained false and misleading adjusted measures and inflated "transition costs"; and (iii) falsely stated that the Company's internal control over financial reporting was effective.  Less than four months later, on May 10, 2018 Symantec disclosed the initiation of an internal investigation due to a whistleblower report that was so serious that it prompted the Company to contact the SEC.  The close temporal proximity between the January 31, 2018 false statements and the May 10, 2018 disclosure supports a strong inference of Defendants' scienter.

506.   The fundamental accounting principle at issue concerning Symantec's revenue recognition violations is straightforward and was known by Defendants. As explained in detail above, the fundamental accounting principle at issue in this case is straightforward: companies must recognize revenue consistently with GAAP only when certain criteria are met and in the period that revenue is realized.  This principle has been part of GAAP for decades. Additionally, the prohibition on adjusting non-GAAP performance measures such as operating expenses by eliminating or smoothing items identified as non-recurring, infrequent or unusual, when the nature of the charge is such that it is a recurring expense incurred in the ordinary course of business has been a well-accepted accounting principle for over the past fifteen years and has been the subject of SEC guidance regarding the appropriate use of or references to non-GAAP measures in public statements or disclosures.  Moreover, Defendants Clark and Noviello specifically discussed the Company's reporting of non-GAAP measures, including how the "exclusion of normal, recurring cash expenses," such as the transition costs at issue in this case, could be "misleading adjustments" according to SEC guidance.  See Derivative Complaint ¶¶99-101. Further, Defendants Clark and Noviello, and Garfield have decades of professional

1    experience in accounting and finance and would understand this concept. Moreover,

2    Symantec employed many other experts and highly qualified personnel in accounting and

3    finance whose knowledge and experience they could readily draw upon.

4        507.   Additionally, Blue Coat had previously communicated multiple times with

5    the SEC before becoming a private company on the use of adjusted measures in assessing

6    performance for the purpose of executive compensation, and the SEC had asked Blue Coat

7    for clarification and additional disclosure on how it used its adjusted measures in assessing

8    performance.  Thus, Blue Coat and its former executives were aware of the importance of

9    and SEC requirement that companies make truthful and complete disclosures to investors

10   concerning adjusted metrics and executive compensation.

11       508.   Defendants Clark, Noviello, and Garfield were highly involved in all key

12   decisions at Symantec, including integrating Symantec and Blue Coat. Defendants Clark

13   and Noviello, and Garfield, were actively involved in the Blue Coat acquisition and post-

14   close integration of the acquired entity.   Defendants Clark, Noviello and Garfield

15   controlled Symantec's financial processes and were personally involved in the preparation

16   and reporting of Symantec's financial reports, including taking steps to ensure the financial

17   statements and other financial information included in Symantec's reports fairly presented

18   in all material respects the financial condition and results of operations of the Company.

19   Defendants Clark, Noviello and Garfield were also personally responsible for establishing,

20   designing, maintaining, and evaluating Symantec's internal controls over financial

21   reporting.  In addition, Defendants Clark, Noviello and Garfield had direct involvement in

22   presenting their reported financial performance to investors, including formulating the

23   financial communication strategy, setting guidance, drafting scripts, and performing Q&A

24   with shareholders and analysts.  Defendants Clarks, Noviello and Garfield were further

25   actively involved in the development of Symantec's executive compensation plans,

26   including proposing financial performance goals tied off of Symantec's reported non-

27   GAAP measures to the Compensation Committee after taking into account factors such as

28   historical performance, internal budgets, and their expectations for Symantec's

performance.  Finally, Defendants Clark, Noviello and Garfield had special knowledge regarding the nature and scope of the Company's reported transition costs as they affirmed that such costs were those presented to and approved by the Board of Directors.

509.    Defendants Clark, Noviello and Garfield's significant personal involvement and control over these key decisions raises a strong inference that they knew, or were deliberately reckless in not knowing, about the Company's improper recognition and reporting of revenue, improper recording of continuing operating expenses incurred in the ordinary course of business as transition costs, and adjustment of these costs as part of Symantec's non-GAAP measures, as well as Symantec's materially weak and insufficient internal controls over financial reporting.

510.    <u>Defendants Clark and Noviello, and CAO Garfield held themselves out as knowledgeable about and involved in the accounting and integration at issue</u>.  Defendants held themselves out in their public statements as personally familiar with the Company's integration and with its financials.  For example, during the Relevant Period, Defendant Clark regularly spoke to investors and securities analysts regarding, among other topics, Symantec's financial and operating results, professing to know what he was speaking about.  Further, on the Symantec website, Noviello held himself out as "lead[ing] the company's integration and transformation office, and the company's cost reduction program."  During the Relevant Period, Noviello further told investors that he personally "ran the integration of Blue Coat and Symantec before being named CFO" and was "still involved heavily in all of the pieces."  Similarly, Noviello told investors that he was personally tracking "sales force attrition" in connection with tracking the process of the integration.  Noviello also regularly spoke to investors and securities analysts regarding, among other topics, Symantec's financial and operating results, professing to know what he was speaking about.  With regard to Garfield, the Chief Accounting Officer, Symantec's SEC filings stated that Garfield possessed "extensive expertise in financial reporting, accounting and finance function integrations, and Sarbanes-Oxley process management and compliance, and financial due diligence for all types of investments and acquisitions."

511.   The former Blue Coat executives, such as Defendant Clark and Noviello, were known for being *"freewheeling"* at Blue Coat and brought their *"toxic culture"* with them to Symantec.  According to an interview of Symantec's former VP and CSO quoted in the Class Action Complaint, Blue Coat systematically replaced the executives with their own people and processes, and many of the Blue Coat processes were not fit for a public company the size of Symantec.  Symantec's former VP and CSO further recounted that a number of investigations, led by Cameron Hoffman, head of investigations at Symantec, were opened about the Blue Coat leadership and unethical behavior, including the leveraging of Company expenses and resources, and how the Company was closing deals.  Indeed, ethics concerns were so great that, according to Symantec's former VP and CSO, the Company published reports that showed who was behaving ethically and who was not and there was a steering committee around this.  Further, according to Symantec's former Senior Manager, Pricing & Licensing, whose account was set forth in the Class Action Complaint, after Blue Coat came in and the Blue Coat executives assumed leadership, Symantec's management practices absolutely lacked integrity and honesty.  Moreover, the former Senior Manager, Pricing & Licensing stated that it was common knowledge that if anyone raised accounting issues and disagreed with management, their job would be at risk.

512.   Defendants provided sworn SOX certifications attesting to the adequacy of Symantec's internal controls.  Defendants Clark and Noviello affirmed Symantec's internal control over financial reporting and signed SOX certifications.  In Symantec's 2017 annual report on Form 10-K, along with each Form 10-Q filed during the Relevant Period, Defendant Clark and Noviello represented that (i) they were responsible for establishing and maintaining adequate internal control over financial reporting; (ii) they had conducted an evaluation of the effectiveness of Symantec's financial reporting; and (iii) they had concluded that Symantec's internal controls over financial reporting were effective at the reasonable assurance level throughout the Relevant Period.  Moreover, in their certifications pursuant to SOX Sections 302 and 906, submitted with the Company's 2017

annual report on Form 10-K, along with each Form 10-Q filed during the Relevant Period, Defendants Clark and Noviello represented that (i) they had reviewed the Company's respective filings; (ii) the reports did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; (iii) the financial statements "fairly present in all material respects the financial condition [and] results of operation" of Symantec; and (iv) the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."   These explicit affirmations and sworn certifications further support a strong inference of Defendants' scienter.

513.   _Defendants' undisclosed "remedial" steps show their knowledge of Symantec's fraudulent accounting practices._ As noted in Symantec's September 24, 2018 announcement of the completion of the Audit Committee investigation, unbeknownst to investors, beginning in the second quarter of fiscal year 2018 (ended September 29, 2017), the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures. As confirmed by the unsealed Derivative Complaint and numerous documents produced by Defendants in the Class Action, by October 31, 2017, Defendant Clark and Noviello were not only aware that a "significant" internal control deficiency existed (_see_ Derivative Complaint, ¶107), but that Symantec had engaged E&Y and was actively implementing "remedial measures" to address issues with respect to its "usage, policies, and controls related to [non-GAAP measures]." _See_ Derivative Complaint, ¶136. Nevertheless, Defendants continued to report the Company's financial results, certified the accuracy of the information presented therein, and affirmed the internal controls over the Company's financial reporting.   Such undisclosed steps raise an inference that Defendants knew of facts or recklessly disregarded facts making their statements false or misleading.

514.   _The accounting fraud concerned the Company's core products and key business areas_.   On August 1, 2016, Symantec acquired all of the outstanding common stock of Blue Coat for $4.67 billion.  Immediately after the acquisition was completed, the

Company identified Blue Coat's suite of network and cloud security products as core products within its Enterprise Security business segment.  Indeed, in its May 19, 2017 Annual Report, the Company disclosed that by the period ending March 31, 2017, Blue Coat's revenues constituted 11% of Symantec's total consolidated revenues.  Moreover, over the nine months ended December 29, 2017, the Company's Enterprise Security business segment increased revenue by over 15% compared to the corresponding period in the prior year, which the Company claimed was largely driven by the addition of Blue Coat.  In February 2017, Symantec acquired LifeLock for approximately $2.3 billion. Immediately after the acquisition was completed, the Company identified LifeLock's proactive identity theft protection services for consumers as core products within its Consumer Digital Safety business segment.  For the nine months ended December 29, 2017, revenue in the Company's Consumer Digital Safety segment increased 38%. Accordingly, Symantec's financial health was dependent in large part on the operations and financial performance of Blue Coat and LifeLock.  The fact that the Company's accounting fraud materially affected Symantec's core products and both of its business segments supports a strong inference of the Defendants' scienter.

515.  <u>Forced non-disclosure agreements and retaliations</u>.  Defendants concealed their misconduct by requiring employees to sign non-disclosure agreements. Moreover, while the undersigned Counsel spoke with numerous former employees that corroborated the fraud alleged in this Complaint and the Class Action complaint, Plaintiffs' Counsel also contacted dozens of witnesses who otherwise would be inclined to be interviewed who declined to provide information based on their fear that either they would be prosecuted by Symantec for violating the terms of non-disclosure agreements with the Company or they would be subject to retaliation from the Company in seeking employment, or both.

516.  Further, as described above and set forth in the Class Action Complaint, Symantec retaliated against Mr. Kearney, former Regional Vice President of Sales, after he reported accounting misconduct to the Audit Committee. Defendants' retaliation against whistleblowers supports a strong inference of scienter.

## XI.   LOSS CAUSATION

517.   Defendants' materially false and misleading statements and omissions artificially inflated the price of Symantec common stock before and during the Relevant Period and maintained inflation in the stock price.  Partial disclosures revealed the relevant truth and removed the artificial inflation from the stock price.  As detailed herein, these disclosures revealed *inter alia* that Defendants were engaged in the accounting improprieties set forth above and that Defendants had misrepresented the success of the Blue Coat integration – which Defendants had attempted to hide by improperly recognizing revenue and manipulating transition cost disclosures – and caused Symantec's stock price to drop precipitously.

518.   On May 10, 2018, after the market closed, Symantec filed a Current Report on Form 8-K with the SEC, disclosing that its Audit Committee had commenced an investigation "in connection with concerns raised by a former employee," that the Audit Committee had retained independent counsel and other advisors to assist in the investigation, and that the Company had contacted the SEC to advise the SEC of the investigation. The Company also disclosed that the Company's financial results and guidance may be subject to change based on the outcome of the investigation. The Company further disclosed that it was "unlikely that the investigation will be completed in time for the Company to file its annual report on Form 10-K for the fiscal year ended March 30, 2018 in a timely manner."  Later that same day, Symantec held an earnings call with investors to discuss the fourth quarter fiscal year 2018 results. During the call, Defendant Clark reiterated the statements made in the Company's Form 8-K, and stated "because this is an ongoing matter, we will be unable to comment further on this topic during today's call and there will be no question-and-answer session following our prepared remarks." Additionally, Defendants admitted that the Company's contract duration had increased, stating "Contract duration for our ratable business was approximately 18.5 months in Q4, up from slightly under 18 months in Q3, approximately 16.5 months in Q2 and

approximately 15.5 months in Q1," adding that "increased contract duration" was one of the "primar[y]" reasons for the Company's low revenue guidance.

519.   These partial disclosures caused Symantec's stock price to plummet.  On May 11, 2018, the share price fell $9.66 per share, or approximately **33%**.

520.   On August 2, 2018, after the market closed, Symantec filed a Current Report on Form 8-K with the SEC, disclosing that the Audit Committee's investigation was "ongoing" and applied specifically to Symantec's reported fourth quarter of fiscal year 2018 results.  The Company also disclosed resulting financial results below the Company's recent estimates for the first quarter of fiscal year 2019 and reduced guidance for revenue, operating income and earnings per share for the upcoming second quarter and the entire fiscal year of 2019.  Later that same day, Symantec held an earnings call with investors to discuss the fourth quarter fiscal year 2018 results.  Defendant Clark admitted a "slip of business in the quarter."  In response to an analyst's question as to whether "you saw any sort of negative customer reaction this quarter just around the headlines [on the audit investigation] and if that was maybe potentially impacting results," Defendant Clark stated "we cannot comment on the investigation.  I would say that Q1 had some negative press in the market during the quarter."

521.   These partial disclosures caused Symantec's stock price to decline.  On August 3, 2018, the share price fell $1.63, or approximately 8%.

## XII.   **THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

522.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles.   Moreover, none of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Symantec's current and historical

financial accounting practices, financial condition, and internal controls, among other topics.

523.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Symantec's financial accounting practices, financial condition, and internal controls, among others.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Symantec were insufficient to insulate Defendants from liability for their materially false and misleading statements.

524.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Symantec who knew that the statement was false when made.

## XIII.  PLAINTIFFS' RELIANCE

525.   At all relevant times, the market for Symantec common stock was efficient for the following reasons, among others:

    a.    Symantec's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Market, a highly efficient and automated market;

    b.    As a regulated issuer, Symantec filed periodic reports with the SEC and NASDAQ;

    c.    Symantec regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.   Symantec was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public marketplace.

526.   As a result of the foregoing, the market for Symantec's common stock reasonably promptly digested current information regarding Symantec from all publicly available sources and reflected such information in the price of Symantec's common stock.

527.   Based on these and additional facts, including a regression/event study analyses providing empirical evidence of market efficiency, the Court presiding over the Class Action concluded that the market for Symantec common stock was efficient throughout the Relevant Period, and thus investors in such securities were entitled to a presumption of reliance. *SEB Inv. Mgmt. AB v. Symantec Corp.*, 2019 WL 4859099, at *8-9 (N.D. Cal. Oct. 2, 2019).

528.   Plaintiffs purchased Symantec common stock in reliance on the market price of such securities, which reflected all of the information in the market, including Defendants' misstatements.

529.   Plaintiffs are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

530.   In addition, Plaintiffs directly relied on Defendants' false and misleading statements alleged herein when deciding whether to purchase Symantec common stock.

531.   During the Relevant Period, Plaintiffs' investments were managed by their investment advisor, Orbis Investment Management Limited, which employed an active strategy based on an analytical, research-based investment process.  Under this process, a portfolio manager, with the assistance of equity analysts, made the decisions whether to purchase, sell or hold shares for Plaintiffs.  Factors considered by the portfolio manager and analysts included, among other things, Symantec's financial performance – including,

specifically, GAAP and non-GAAP reported revenue and income – and a review of the Company's strengths, weaknesses and opportunities.

532.   Throughout the Relevant Period, both the portfolio manager and the analysts performed rigorous independent and fundamental research including reading and relying upon publicly available information concerning Symantec from the following sources: (a) Symantec's public statements, plans and press releases; (b) Symantec's corporate website and materials posted on its website; (c) analyst reports and earnings conference calls involving Symantec; (d) Symantec's periodic securities filings with the SEC and the NASDAQ; (e) other regulatory filings and reports regarding Symantec; and (f) conference transcripts involving Symantec.

533.   In particular, the portfolio manager and the analysts read and relied on the false and misleading statements in Section VIII above. The portfolio manager and the analysts used the Company's reported revenues (GAAP and non-GAAP), deferred revenues and non-GAAP operating income, among other things, as metrics to analyze Symantec's current and future operations and financial performance, and in making decisions whether to invest in Symantec or its competitors.  In so doing, the portfolio manager and analysts also read and relied on statements in Symantec's 2017 Form 10-K, 1Q2018 Form 10-Q, 2Q2018 Form 10-Q, and 3Q2018 Form 10-Q, attesting to the effectiveness of the Company's internal financial and disclosure controls and statements in Symantec's 4Q 2017 Form 8-K and 1Q 2018 Form 8-K asserting that the Company's non-GAAP financial performance facilitated comparisons of financial performance to prior periods and Symantec's peers.  Additionally, the portfolio manager and analysts attended in person Symantec analyst day presentations where Defendants made false and misleading statements about Symantec and its financial performance.

534.   On or about May 10 and 11, 2017, the portfolio manager and analysts, on behalf of Plaintiffs, read and reviewed Symantec's 2017 Form 10-K and 4Q2017 Form 8-K, and listened to and/or read the transcript of the Company's May 10, 2017 earnings call, including specifically, the false and misleading statements contained therein. On  May 11,

2017, analysts acting on behalf of Plaintiffs had a follow up call with Symantec management.  In reliance upon the false and misleading statements in the 2017 Form 10-K, 4Q2017 Form 8-K, and May 10, 2017 earnings call and follow up call on May 11, 2017, Plaintiffs purchased over 270,000 shares of Symantec common stock on four separate occasions on May 11, 2017, and were damaged thereby.

535.    On or about August 2, 4, 8, and 16, 2017, the portfolio manager and analysts, on behalf of Plaintiffs, read and reviewed Symantec's 1Q 2018 Form 8-K, 1Q 2018 Form 10-Q, August 8, 2017 Form 8-K, and August 16, 2017 Proxy Statement, and listened to and/or read the transcript of the Company's August 2, 2017 earnings call and had a follow up call with management on August 3, 2017, including specifically, the false and misleading statements contained therein.  In reliance upon the false and misleading statements in the 1Q 2018 Form 8-K, 1Q 2018 Form 10-Q, August 2, 2017 earnings call, August 3, 2017 management call, August 8, 2017 Form 8-K, and August 16, 2017 Proxy Statement, Plaintiffs purchased nearly 11 million shares of Symantec common stock on 355 separate occasions on from August 2, 2017 – November 1, 2017, and were damaged thereby.

536.    On or about November 1 and 3,  2017, the portfolio manager and analysts, on behalf of Plaintiffs, read and reviewed Symantec's 2Q 2018 Form 8-K and 2Q 2018 Form 10-Q, and listened to and/or read the transcript of the Company's November 1, 2017 earnings conference call and presentations at an investors lunch with Defendants on November 11, 2017 and  at the December 7, 2017 Barclays Global Technology, Media and Telecommunications Conference, including specifically, the false and misleading statements contained therein.  In reliance upon the false and misleading statements in the 2Q2018 Form 8-K, 2Q 2018 Form 10-Q, November 1, 2017 earnings call, November 11, 2017 investors lunch and December 7, 2017 Barclays Global Technology, Media and Telecommunications Conference, Plaintiffs purchased over 23 million shares of Symantec common stock on over 760 separate occasions from November 2, 2017 – January 30, 2018, and were damaged thereby.

537.    On or about January 31, 2018 and February 2, 2018, the portfolio manager and analysts, on behalf of Plaintiffs, read and reviewed Symantec's 3Q 2018 Form 8-K and 3Q 2018 Form 10-Q, and listened to and/or read the transcript of the Company's January 31, 2018 earnings conference call, and at a meeting with management on February 13, 2018 and the February 26, 2018 Morgan Stanley Technology, Media and Telecommunications Conference, including specifically, the false and misleading statements contained therein.  In reliance upon the false and misleading statements in the 3Q 2018 Form 8-K, 3Q 2018 Form 10-Q, and January 31, 2018 earnings call, February 13, 2018 meeting with management and February 26, 2018 Morgan Stanley Technology, Media and Telecommunications Conference, Plaintiffs purchased nearly 11 million shares of Symantec common stock on nearly 220 separate occasions from February 1, 2018 – May 9, 2018, and were damaged thereby.

538.    On or about May 10, 2018, the portfolio manager and analysts, on behalf of Plaintiffs, read and reviewed Symantec's 4Q 2018 Form 8-K and listened to and/or read the transcript of the Company's May 10, 2018 earnings conference call and the investor briefing held on May 14, 2018, including specifically, the false and misleading statements contained therein.  In reliance upon the false and misleading statements in the 4Q 2018 Form 8-K May 10, 2018 earnings call and May 14, 2018 investor briefing, Plaintiffs purchased over 230,000 shares of Symantec common stock on six separate occasions from May 11, 2018 through the end of the Relevant Period, and were damaged thereby.

# XIV.  <u>COUNTS</u>

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### (Against All Defendants)

539.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

540.    This Count is asserted on behalf of Plaintiffs against Symantec and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

541.    During the Relevant Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

542.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with its purchases of Symantec common stock during the Relevant Period.

543.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiff; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Symantec common stock, which were intended to, and did: (a) deceive the investing public, including Plaintiff, regarding, among other things, Symantec's GAAP and adjusted metrics in its financial statements, and accounting for those metrics, and the effectiveness of Symantec's internal controls; (b) artificially inflate and maintain the market price of Symantec common stock;

and (c) cause Plaintiffs to purchase Symantec common stock at artificially inflated prices and suffer losses when the true facts became known.

544.   Defendant Symantec is liable for all materially false and misleading statements made during the Relevant Period, as alleged above. The Individual Defendants, as a top executive officers of the Company during their tenure, are liable as direct participants in the wrongs complained of herein.  The Individual Defendants are liable for the false and misleading statements they personally made and/or signed, as alleged above.

545.   As described above, Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Symantec stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

546.   Plaintiffs have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Symantec common stock, which inflation was removed from the price when the true facts became known. Plaintiffs would not have purchased Symantec common stock at the prices it paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

547.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs suffered damages attributable to the material misstatements and omissions alleged herein in connection with its purchases of Symantec common stock during the Relevant Period.

548.   Taking into account, *inter alia,* tolling of the limitations period by the filing of the Class Action, Plaintiffs have brought the claims asserted in this Count within two years of discovery of the violations alleged by Plaintiffs herein.  Consequently, the claims asserted in this Count are timely.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

549.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

550.    This count is asserted on behalf of Plaintiffs against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

551.    During their tenures as officers and/or directors of Symantec, each of the Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Symantec, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  The Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by Symantec during the Relevant Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

552.    In their capacities as senior corporate officers of the Company, the Individual Defendants had direct involvement in the day-to-day operations of the Company.  The Individual Defendants signed certain of the Company's SEC filings during the Relevant Period and were directly involved in providing false information and certifying and approving the false statements disseminated by Symantec during the Relevant Period.  As a result of the foregoing, Defendants Clark, Noviello, and Garfield, as a group and individually, were controlling persons of Symantec within the meaning of Section 20(a) of the Exchange Act.

553.    As set forth above, Symantec violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

554.     By virtue of their positions as controlling persons of Symantec and as a result of their own aforementioned conduct, Defendants Clark, Noviello, and Garfield are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs with respect to purchases or acquisitions of Symantec common stock. As detailed above, during the respective times these Defendants served as officers and/or directors of Symantec, each of these Defendants was culpable for the material misstatements and omissions made by Symantec.

555.     As a direct and proximate result of these Defendants' conduct, Plaintiffs suffered damages in connection with their purchase or acquisition of Symantec common stock.

556.     Taking into account, *inter alia,* tolling of the limitations period by the filing of the Class Action, Plaintiffs have brought the claims asserted in this Count within two years of discovery of the violations alleged by Plaintiffs herein.  Consequently, the claims asserted in this Count are timely.

### COUNT III

#### For Violations of Section 20A of the Exchange Act
#### (Against Defendants Clark and Noviello)

557.     Plaintiffs repeats and realleges each and every allegation contained above as if fully set forth herein.

558.     This Count is asserted pursuant to Section 20A of the Exchange Act against Defendants Clark and Noviello, in connection with purchases of Symantec common stock contemporaneously with any sales of Symantec common stock by Defendant Noviello and Defendant Clark during the Relevant Period.

559.     As set forth in the paragraphs above, and as further set forth in the chart below, Defendant Clark and Defendant Noviello each committed underlying violations of Section 10(b) and Rule 10b-5 thereunder by selling Symantec common stock while in the possession of material, adverse, nonpublic information about, among other things, the

Company's improper accounting manipulations and ineffective internal controls. This conduct violated Section 20A of the Exchange Act.

560.   Plaintiffs purchased shares of Symantec common stock contemporaneously with sales of Symantec common stock made by Defendant Clark and Defendant Noviello while these Defendants were in possession of material, adverse, nonpublic information, as set forth in the chart below. These sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

| Defendant Noviello's and Clark's Open Market Sales | | | | Plaintiffs' Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Purchase Date | Shares Purchased | # of Purchases | Average Price |
| Noviello | 5/15/2017 | 27,741 | $32.45 | 5/11/2017 | 68,340 | 4 | $31.23 |
| | | | | 8/23/2017 | 588,700 | 3 | $29.12 |
| | | | | 8/24/2017 | 1,160,225 | 35 | $29.21 |
| | | | | 8/25/2017 | 1,102,440 | 27 | $29.47 |
| Clark | 8/28/2017 | 186,433 | $30.00 | 8/28/2017 | 433,671 | 26 | $29.55 |
| Noviello | 8/28/2017 | 14,925 | $30.00 | 8/29/2017 | 1,178,231 | 16 | $29.65 |
| | | | | 8/30/2017 | 820,600 | 24 | $29.79 |
| Clark | 8/31/2017 | 13,567 | $30.00 | 8/31/2017 | 341,312 | 16 | $29.98 |
| | | | | 9/1/2017 | 999,793 | 24 | $29.88 |
| | | | | 9/5/2017 | 276,311 | 24 | $29.76 |
| Noviello | 9/7/2017 | 7,688 | $30.00 | 9/6/2017 | 389,570 | 16 | $29.69 |
| | | | | 11/2/2017 | 1,231,544 | 46 | $29.02 |
| Noviello | 11/6/2017 | 375,000 | $29.38 | 11/7/2017 | 521,753 | 24 | $28.65 |
| | | | | 11/8/2017 | 1,041,372 | 39 | $28.75 |
| | | | | 11/9/2017 | 532,572 | 15 | $28.65 |
| | | | | 11/10/2017 | 474,151 | 23 | $28.27 |
| | | | | 11/13/2017 | 1,193,587 | 31 | $28.02 |
| | | | | 11/14/2017 | 363,946 | 23 | $27.74 |

| | 11/15/2017 | 970,796 | 28 | $27.86 |
|---|---|---|---|---|

561.    By virtue of their knowledge of material, adverse, nonpublic information, Defendant Clark and Defendant Noviello were duty bound not to benefit therefrom, a duty which they violated by selling their shares at inflated prices.

562.    Accordingly, under Section 20A of the Exchange Act, the Defendants named in this Count are each liable to Plaintiffs for all profits gained and losses avoided by them as a result of their stock sales.

563.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the Class Action, Plaintiffs have brought the claims asserted in this Count within two years of discovery of the violations alleged by Plaintiffs herein.  Consequently, the claims asserted in this Count are timely.

## COUNT IV

### For Violations of Section 18(a) of the Exchange Act
### (Against all Defendants)

564.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

565.    This claim is brought by Plaintiffs against all Defendants for violation of Section 18(a) of the Exchange Act, 15 U.S.C. § 78r.

566.    As alleged above, Defendants filed or caused to be filed with the SEC documents regarding Symantec that contained misrepresented material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

567.    Prior to purchasing Symantec common stock, Plaintiffs read and relied upon Symantec's 2017 Form 10-K, Q4 FY17 Form 8-K, Q1 FY18 Form 8-K, Q1 FY18 Form 10-Q, August 8, 2017 Form 8-K, August 16, 2017 Proxy Statement, Q2 FY18 Form 8-K, Q2 2018 Form 10-Q, Q3 FY18 Form 8-K, Q3 FY18 Form 10-Q, and Q4 FY18 Form 8-K, including the financial statements contained therein. Plaintiffs' actual "eyeball" reliance

on Symantec's 2017 Form 10-K, Q4 FY17 Form 8-K, Q1 FY18 Form 8-K, Q1 FY18 Form 10-Q, August 8, 2017 Form 8-K, August 16, 2017 Proxy Statement, Q2 FY18 Form 8-K, Q2 2018 Form 10-Q, Q3 FY18 Form 8-K, Q3 FY18 Form 10-Q, Q4 FY18 Form 8-K and the financial statements contained therein specifically includes statements concerning the Company's reported revenue (GAAP and non-GAAP), deferred revenue, revenue growth, non-GAAP operating income, and the effectiveness of the Company's internal controls.

568.   Plaintiffs' reliance was reasonable.  Plaintiffs read and relied upon these documents and financial statements not knowing they contained materially false statements and omissions.  Had Plaintiffs known the true facts, they would not have purchased Symantec common stock or would not have purchased it at the inflated price they paid.  At the time of their purchases and acquisitions of Symantec common stock, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

569.   Defendants' materially false or misleading statements artificially inflated the prices of Symantec common stock. When the truth began to emerge about the false and misleading statements and omissions, shares of Symantec common stock declined significantly and Plaintiffs were damaged.

570.   As to this Count, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made. Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

571.   By virtue of the conduct alleged herein, the Defendants named in this Count have each violated Section 18(a) of the Exchange Act, and are liable to Plaintiffs.

572.   Taking into account, *inter alia,* tolling of the limitations period by the filing of the Class Action, Plaintiffs have brought the claims asserted in this Count within two years of discovery of the violations alleged by Plaintiffs herein.  Consequently, the claims asserted in this Count are timely.

**COUNT V**

**For Violations of Section 44-1991(A) of the Arizona Securities Act**
**(Against Symantec)**

573.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

574.    This claim is brought against all Defendants for civil liability under A.R.S. §44-2003(A) for their violations of A.R.S. §44-1991(A).

575.    Defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Symantec, as specified herein. Defendants knew or recklessly ignored that disclosure of Symantec's true business condition would reduce the value of Symantec's common stock.

576.    The course of business through which Defendants fraudulently operated Symantec and disclosed information about Symantec without disclosing the misstatements alleged herein violated A.R.S. §44-1991(A).

577.    Symantec and the Individual Defendants culpably made, participated in, or induced the sales to Plaintiffs of Symantec common stock while violating A.R.S. §44-1991(A). Under A.R.S. §44-2003(A), Symantec and the Individual Defendants are jointly and severally liable for their violations of §44-1991(A).

578.    Because of the securities violations described in this claim, Plaintiffs are entitled to, and by this Complaint demand, actual damages under A.R.S. §44-2001(A).

579.    Taking into account that certain of the allegations underlying the claims asserted in this Count were not discovered by Plaintiffs and could not have been discovered by Plaintiffs until March 18, 2021, Plaintiffs have brought the claims asserted in this Count within two years of discovery of the violations alleged.  Consequently, the claims asserted in this Count are timely.

**COUNT VI**

**For Violations of the Arizona Consumer Fraud Act**
**(Against Symantec)**

580.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

581.    This claim is brought by Plaintiffs against Defendants for violation of the Arizona Consumer Fraud Act ("ACFA"), Ariz. Rev. Stat. Ann. § 44-1522.

582.    Defendants violated ACFA in that they engaged in deception, deceptive or unfair acts or practices, fraud, false pretense, false promise, misrepresentation, and/or concealment, suppression or omission of material facts with intent that others rely on such concealment, suppression or omission, in connection with the sale and/or advertisement of Symantec common stock to Plaintiffs.

583.    Defendants' violations of ACFA were wanton, reckless and/or showed spite or ill will, and/or Defendants acted with a reckless indifference to the interests of others.

584.    Plaintiffs have suffered consequence and proximate injury in that, in reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for Symantec common stock. But for Defendants' repeated material misrepresentations, Plaintiffs would not have made purchases of Symantec shares at the quantities, or at the prices, at which they in fact did.

585.    As a direct and proximate effect of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and acquisitions of Symantec common stock during the Relevant Period.

586.    An award of punitive damages is warranted because the Defendants' conduct was wanton, reckless, and/or showed spite or ill will, and/or because the Defendants acted with reckless indifference to the interests of others.

587.    Taking into account that certain of the allegations underlying the claims asserted in this Count were not discovered by Plaintiffs and could not have been discovered by Plaintiffs until March 18, 2021, Plaintiffs have brought the claims asserted in this Count

within one year of discovery of the violations alleged.  Consequently, the claims asserted in this Count are timely.

**COUNT VIII**

**Common Law Fraud**
**(Against All Defendants)**

588.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

589.   This claim is asserted against all Defendants based on common law principles of fraud.

590.   As alleged herein, each of the Defendants made material misrepresentations and omitted to disclose material facts about Symantec, its business practices, and its financial condition.

591.   The aforesaid misrepresentations and omissions by the Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs and the investing public when making investment decisions.

592.   The aforesaid misrepresentations and omissions by the Defendants constitute fraud and deceit under common law.

593.   Plaintiffs reasonably relied upon the Defendants' misrepresentations when deciding to purchase Symantec's common stock and did not know of any of the misrepresentations and omissions, as alleged with further detail herein.

594.   As a direct and proximate result of Defendants' fraud and deceit, Plaintiffs suffered damages in connection with its purchase of Symantec common stock.

595.   Defendants' fraud and deceit was intentional and/or involved conscious acts that willfully and wantonly disregarded the rights of others, including not only Plaintiffs, but the investing public. As a result, Defendants should be required to pay punitive damages to Plaintiffs.

596.   Taking into account that certain of the allegations underlying the claims asserted in this Count were not discovered by Plaintiffs and could not have been discovered

by Plaintiffs until March 18, 2021, Plaintiffs have brought the claims asserted in this Count within three years of discovery of the violations alleged (under Arizona law) . Consequently, the claims asserted in this Count are timely.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a)   Awarding compensatory damages in favor of Plaintiffs against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

b)   Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

c)   Awarding Plaintiffs punitive damages; and

d)   Awarding such equitable, injunctive or other further relief as the Court may deem just and proper.

## XVI.  JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED this 22nd day of November, 2021.

COPPERSMITH BROCKELMAN PLC

By: /s/ *Keith Beauchamp*
　　Keith Beauchamp
　　Andrew Fox

SAXENA WHITE P.A.
David Kaplan (*pro hac vice* forthcoming)
Hani Farah (*pro hac vice* forthcoming)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice* forthcoming)
Jonathan Lamet (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
msaxena@saxenawhite.com
jlamet@saxenawhite.com

**SAXENA WHITE P.A.**
Steven Singer (*pro hac vice forthcoming*)
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone: (914) 437-8551
ssinger@saxenawhite.com

*Attorneys for Plaintiffs*